## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.

**UNITED STATES OF AMERICA,**
**ex rel. TERRY LEE FOWLER AND LYSSA TOWL,**
Plaintiffs,

v.

**EVERCARE HOSPICE, INC., a Delaware Corporation; OVATIONS, INC., a Delaware Corporation; OPTUMHEALTH, LLC, a Delaware limited liability corporation; UNITED HEALTHCARE SERVICES, INC., a Minnesota corporation; UNITED HEALTH GROUP, INC., a Minnesota corporation**
Defendants.

---

### *QUI TAM* COMPLAINT AND JURY DEMAND

---

The Relators, Terry Lee Fowler and Lyssa Towl, by and through their counsel of record, acting as Relators on behalf of the Government of the United States of America (the "Relators"), state the following Complaint against the Defendants Evercare Hospice, Inc., Ovations, Inc., OptumHealth, LLC, United HealthCare Services, Inc. and United Health Group, Inc.:

### I.     INTRODUCTION

1.     This lawsuit is brought pursuant to the provisions of the False Claim Act ["FCA"], 31 U.S.C. § 3729, *et. seq.*, to recover monies which the United States overpaid the Defendants.  The Relators challenge billings the Defendants "knowingly" submitted, or caused to be submitted, in violation of 31 U.S.C. § 3729(a)(1)-(3), (7) as amended October 27, 1986 and 31 U.S.C. § 3729(1)(A)-(C),  (G) as amended May 20, 2009.

2.      This *qui tam* suit concerns billings submitted, or caused to be submitted, by the defendants to Medicare for hospice services provided by the Defendant Evercare Hospice, Inc. ("Evercare") to patients who were knowingly ineligible for Medicare hospice benefits, as well as the defendants' failure to report past payments by Medicare with respect to the provision of hospice services to ineligible patients and to reimburse Medicare for these overpayments.

3.      The principal events at issue transpired in the time period of January of 2006 to the present and are ongoing.

## II.      PARTIES

4.      Relator Terry Lee Fowler ("Fowler") is a resident of Denver, Colorado.

5.      Relator Lyssa Towl ("Towl") is a resident of Golden, Colorado.

6.      Evercare is a Delaware corporation that maintains its principal place of business at UnitedHealth Group Center, 9900 Bren Road East, Minnetonka, MN 55343. Evercare maintains an office in Colorado located at 6455 S. Yosemite Street, 6th Floor, Englewood, CO ("the Denver office"), at which local and national employees, including its senior Vice-President, Tricia Ford ("Ford"), the national Director of Quality, Terry Zelenak ("Zelenak"), and the national Quality Manager, Fowler, are located.

7.      Evercare is a Medicare licensed provider of hospice benefits.  It operates in eleven states: Alabama, Arizona, California, Colorado, Georgia, Maryland, Massachusetts, Missouri, Ohio, Texas and Virginia.

8.      Evercare does not own or manage any facilities that provide hospice care, such as a skilled nursing facility.  Rather, Evercare contracts with various skilled nursing facilities, assisted living facilities, hospitals, cancer centers, etc. to provide its hospice services.

9.      Such hospice services have also been provided, and are being provided by Evercare in a patient's home.

10.     To administer and coordinate it provision of hospice service in these eleven states, Evercare operates sixteen administrative facilities or offices ("offices") located in or near Birmingham, AL, Phoenix, AZ, Tucson, AZ, Concord, CA, Colorado Springs, CO, Denver, CO, Atlanta, GA, Macon, GA, Baltimore, MD, Boston, MA, St. Louis, MO, Cincinnati, OH, Dayton, OH, Houston, TX, Northern VA, and Reston, VA.

11.     Evercare is also in the process of opening two new offices in Santa Anna, CA and Schaumburg, Illinois.

12.     Fowler, who has been licensed as a R.N. since 1977, has been employed by Evercare at its Denver office since December of 2008 in the dual capacity of Hospice Quality Manager and as the Hospice Regional Performance Improvement Coordinator.

13.     As the Hospice Quality Manager, Fowler has administered the quality measures developed by the Senior Leadership, including the Director of Quality, Zelenak, to whom Fowler reports.  The Quality Manager collects and organizes data at the site and national level and works collaboratively with the National Medical Director and Director of Quality Assurance to design and generate useful reports.  The primary qualifications for the job are an unrestricted R.N. license in the state of residence and a four year degree with clinical experience preferred.

14.     Fowler's position as Regional Performance Improvement Coordinator ("RPIC") is identified as one of the job duties of the Hospice Quality Manager. The job description for the RPIC states that the RPIC "is a professional, registered nurse who works regionally to assist

Executive Directors, Clinical Service Directors and Quality Assurance Director in implementing the QAPI Plan and activities for the organization."

15.     Towl, who holds joint Masters degrees in Business Administration and Health Administration from the University of Colorado, had been employed by Evercare since November of 2009 in its Denver office as the Executive Director ("ED") with respect to Evercare's provision of hospice services to patients in the Denver metropolitan area and sites north of Denver, within Colorado.

16.     The Hospice Executive Director is responsible and accountable for all activities and departments in the delivery of hospice services including budgeting, accounting, data collection, record maintenance and employee practices.  In addition, the Executive Director ensures compliance with Federal and State regulations as well as other accrediting bodies.  In her capacity as ED, Towl regularly evaluated the status and eligibility of Evercare's Colorado hospice patients and also was keenly aware of the billing status of each hospice patient. Towl was improvidently terminated from her employment with Evercare on January 5, 2011.

17.     The Defendant Ovations, Inc. ("Ovations") was at all times material hereto, up to approximately December 31, 2010, the sole shareholder of Evercare.  Ovations is a Delaware corporation that maintains its principal place of business at 9701 Data Park Drive, Minnetonka, MN, 55343.  At all times material hereto, Ovations dominated and controlled Evercare.  For example, Ovations employed Jeff Maloney who was the direct supervisor of Ford and effective CEO of Evercare.  Other Ovations employees provided supervision, direction, governance and control over Evercare officers, employees and agents. Ovations also actively participated in and

directed the activities of Evercare with respect to the acts and omissions that form the basis of this action.

18.     On or about January 1, 2011 the ownership and control of Evercare was transferred from Ovations to OptumHealth, LLC ("Optum"), a Delaware limited liability corporation that maintains its principal place of business at 100 S. 5th Street, #1075, Minneapolis, MN 55402.  The transfer from Ovations to Optum represents a substantial continuity of Ovations' business operation with respect to Evercare, including the domination and control of Evercare as well as the participation and direction of the activities of Evercare with respect to the acts and omissions that form the basis of this action.  For example, Jeff Maloney, who effectively is the CEO of Evercare, was transferred from Ovations to Optum as of January 1, 2011 and other former Ovations officers, employees and agents who supervise, direct, govern and control Evercare's actions were also transferred to Optum.

19.     The Defendant United HealthCare Services, Inc. ("UHCSI") is the sole shareholder of both Ovations and Optum.  At all times material hereto, UHCSI has dominated and controlled the actions of Ovations and Optum and their subsidiaries. UHCSI is a Minnesota corporation that maintains its principal place of business at 9900 Bren Road East, Minnetonka, MN 55343

20.     The Defendant United Health Group, Inc. ("UHGI") is the sole shareholder of UHCSI and at all times material hereto has dominated and controlled the actions of UHCSI and its subsidiaries.  UHGI is a Minnesota corporation that maintains its principal place of business at 100 S. 5th Street, #1075, Minneapolis, MN 55402.

21.     In addition, at all times material hereto, Evercare, Ovations, Optum and UHCSI have been the alter egos of their parent corporations.  As such, these parent corporations are fully responsible for the conduct of their subsidiaries, as well as all injuries and damages caused by their subsidiaries, and all penalties, awards and judgments entered against the subsidiaries.

22.     In addition, the parent corporations of Evercare, Ovations, Optum and UHCSI have been unjustly enriched by the acts and omissions of their subsidiaries and have maintained possession, custody or control of certain property or money which was unjustly obtained from the United States Government and should have been reimbursed to the United States Government.

### III.     JURISDICTION AND VENUE

23.     This action is brought on behalf of the United States Government under 31 U.S.C. § 3729, *et seq*., commonly known as the False Claims Act ("FCA").  The Relators bring this action under 31 U.S.C. § 3730(b) to recover for "false claims" which the defendants knowingly presented or caused to be presented to the Government and/or concealed or caused to be concealed from the Government in violation of 31 U.S.C. § 3729(a)(1)-(3), (7) as amended October 27, 1986 and 31 U.S.C. § 3729(1)(A)-(C), (G) as amended May 20, 2009. This Court has jurisdiction over such claims pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3730(b).

24.     *In personem* jurisdiction is appropriate in this District because the FCA provides for nationwide service of process. 31 U.S.C. § 3732(a).  In such circumstances, the relevant inquiry is whether a given defendant has sufficient contacts with the United States as a whole. *Appl. To Enforce Admin. Subp. of  S.E.C. v. Knowles*, 87 F.3d 413, 417-419 (10th Cir. 1996).

The Defendants have a significant commercial presence in Colorado and have abundant national contacts.

25.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because the defendants can be found or transact business in this District and/or because one or more of the acts proscribed by the False Claims Act occurred within this District.

## IV.     THE FEDERAL HEALTH CARE PROGRAMS

### A.     Medicare Part A:

26.     In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare program, to pay for the costs of certain healthcare services and items. 42 U.S.C. § 1395, *et. seq.*  The Department of Health and Human Services ("HHS") is responsible for the administration and supervision of the Medicare program. The Centers for Medicare & Medicaid Services ("CMS") is an agency of HHS and directly administers the Medicare program.  The Medicare program has several parts, including Medicare Part A ("Hospital Insurance Benefits for the Aged and Disabled").  42 U.S.C. § 1395c-1395i-4.

27.     The Medicare Part A program is a 100% federally subsidized health insurance system for eligible persons aged 65 and older and persons with qualifying disabilities who may enroll in the program to obtain benefits in return for payments of monthly premiums established by HHS.  The benefits covered by the Medicare Part A program include hospice care under 42 U.S.C. § 1395x(dd).

28.     Under Medicare Part A, institutional health care providers, such as hospitals and hospices, and including the defendant herein, Evercare, enter into an agreement with Medicare to

provide health care services to Medicare patients.  The providers are then authorized to bill Medicare for those services.

29.     The United States provides reimbursement for Medicare claims from the Medicare Trust Fund through CMS. To assist in the administration of Part A of the Medicare Program, CMS contracts with "carriers."  42 U.S.C. § 1395u.  Those carriers, also known as "fiscal intermediaries," are responsible for processing the payment of Part A claims to providers on behalf of CMS.

30.     In this particular case, Evercare provides hospice services out of sixteen offices located in eleven states: Alabama, Arizona, California, Colorado, Georgia, Maryland, Massachusetts, Missouri, Ohio, Texas and Virginia.  For example, Palmetto GBA ("Palmetto") is the CMS carrier for Alabama, Georgia, Ohio and Texas. National Government Services, Inc. ("NGSI") is the CMS carrier for Arizona and California. Cahaba Government Benefit Administrators, LLC ("Cahaba") is the CMS carrier for Colorado, Maryland, Missouri and Virginia.  NHIC Corp. ("NHIC") is the CMS carrier for Massachusetts. Each of these fiscal intermediaries was responsible for processing payment of Part A hospice services claims presented by Evercare to CMS.

31.     Under their contracts with HHS, these fiscal intermediaries review, approve, and pay Medicare bills, called "claims," received from providers.  Those Medicare claims are paid with federal funds.

32.      In order to get paid, providers fill out and submit claims for payment either by hard copy form or electronically.  These forms contain information related to the patient, the services provided, and the provider.  Medicare relies upon the accuracy and truthfulness of these

forms to determine whether and what amounts the provider is owed. After receiving and processing the claims submitted by the provider, the fiscal intermediary reimburses the provider.

33.     At all times material hereto, Evercare had an affirmative duty to report and return any Medicare based payment associated with prior billed hospice services which Evercare then knew, or later realized had been provided to an ineligible Medicare hospice patient. See, 42 U.S.C. § 1320a-7k(d).

34.     With respect to such overpayments, Evercare was subject to a statutory obligation to pay interest with respect to these funds. 42 U.S.C. § 1395ddd(f).

35.     At all times relevant herein, Evercare knowingly submitted false claims to Medicare through the respective carriers for the regions in which Evercare provided hospice services and knowingly retained Medicare based payments which it "knew," as defined by the FCA, had been provided to ineligible hospice patients.

**B.     Hospice Regulations:**

36.     Hospice is a program to provide palliative comfort care to patients instead of curative care. Patients that elect hospice agree to forego aggressive treatment of their terminal diagnosis.

37.     Pursuant to 42 C.F.R. § 418.20, "[i]n order to be eligible to elect hospice care under Medicare, an individual must be – (a) Entitled to Part A of Medicare; and (b) Certified as being terminally ill in accordance with § 418.22."

38.     According to 42 C.F.R. § 418.3, "terminally ill" means that a person "has a medical prognosis that his or her life expectancy is 6 months or less if the illness runs its normal course."

39.     An individual is eligible for an initial 90-day period of hospice care, a subsequent 90-day period and then an unlimited number of subsequent 60-day periods of care.  42 C.F.R. § 418.21.  At the beginning of each of these periods of time (90 + 90 + unlimited 60 day periods) the patient has to be properly certified as being terminally ill. 42 C.F.R. § 418.22.

40.     For the initial certification, the hospice must obtain written certification from (i) the medical director of the hospice or the physician member of the hospice interdisciplinary group, and (ii) the individual's attending physician, if the individual has one. 42 C.F.R. § 418.22(c). Thereafter, the certification may be made by either the medical director of the hospice or the physician member of the hospice interdisciplinary group. *Id.*

41.     The written certification requires: (1) a statement that the individual's medical diagnosis is that their life expectancy is 6 months or less if the terminal illness runs its normal course; (2) specific clinical findings and other documentation supporting a life expectancy of six months or less; and (3) the signature(s) of the physician(s). *Id.*; Medicare Benefit Policy Manual ("Policy Manual"), Chapter 9, § 20.1.

42.     In addition, clinical information and other documentation that support the medical prognosis must accompany the certification and must be filed in the medical record with the written certification and the physician must include a brief narrative that explains the clinical findings that support a life expectancy of 6 months or less. 42 C.F.R. § 418.22.

43.     Federal statutes which apply to the provision of hospice services and the submission of billing for said services include 42 U.S.C. § 1395l(e) "Payment of Benefits" which provides that a hospice provider like Evercare must submit with its billing "such information as may be necessary in order to determine the amounts due …"

44.     Hospice patients must both be eligible to elect Medicare hospice benefits and their eligibility must be supported by documentation.  An individual may elect hospice benefits if he or she has a life expectancy of six months or less if a disease runs its normal course as certified by a physician.  See generally 42 U.S.C. § 1395x(dd)(1).

45.     It is a condition of participation that hospice service providers must maintain a clinical record for each hospice patient that contains "correct clinical information." All entries in the clinical record must be "legible, clear, complete, and appropriately authenticated and dated. …" 42 C.F.R. § 418.104.

46.     42 U.S.C. § 1395f(a)(7) states the statutory basis for hospice care eligibility, including written certification, a written plan of care and care that is provided pursuant to such plan of care.  The statute also notes that a certification must be "accompanied by such medical and other evidence as may be required by regulations." Subsection (i)(1)(A) states the requirement that any billed hospice services must be reasonable and related to the cost of providing hospice care.

47.     In order to provide more detail to this process, carriers like Cahaba create local coverage determinations ("LCDs") for the geographic area over which they have been provided authority that set forth certain general and disease specific clinical variables.  *See*, 42 U.S.C. § 1395y(j)(4) –(5).  For example, Cahaba has issued a LCD titled "Hospice Determining Terminal Status." This LCD covers a multi-state region including Colorado, Maryland, Missouri and Virginia.  Similar LCDs have been created for other geographic areas.  For example, NHIC Corp has issued the LCD for determining terminal status for the region that includes Massachusetts and it is substantially similar to the Cahaba LCD.   The bottom line of these LCDs is the

reasonable and appropriate documentation of a patient's decline towards a certain death.  On the other hand, if a patient stabilizes and does not reasonably appear to be within 6 months of death, that individual should be "live discharged."

48.     These LCDs advise that if a patient improves or stabilizes over time while in a hospice such that he/she no longer has a prognosis of six months or less from the most recent recertification evaluation or definitive interim evaluation, that the patient should be considered for discharge from the Medicare hospice benefit.

49.     On November 22, 2005, CMS released a Final Rule, effective January 23, 2006, revising 42 C.F.R. § 418, to require hospices to put in place a "discharge planning process that takes into account the prospect that a patient's condition might stabilize or otherwise change such that the patient cannot continue to be certified as terminally ill." 42 C.F.R. § 418.26(d).

50.     Hospices are paid a per diem rate based on the number of days and level of care provided during the election period.  Policy Manual, Chapter 9, § 40; 42 C.F.R. § 418.302.  To be covered, hospice services must be:

> Reasonable and necessary for the palliation and management of the terminal illness as well as related conditions.  The individual must elect hospice care in accordance with § 418.24.  A plan of care must be established and periodically reviewed by the attending physician, the medical director, and the interdisciplinary group of the hospice program as set forth in § 418.56.  That plan of care must be established before hospice care is provided.  The services provided must be consistent with the plan of care.  A certification that the individual is terminally ill must be completed as set forth in § 418.22.

51.     The statute and regulations exclude from payment any services that are not reasonable and necessary for palliation and management of terminal illness.  42 U.S.C. § 1395y(a)(1)(C).

52.     Hospices submit claims on a monthly basis to their carriers by a hard copy form called a UB-04, or by using an electronic file transfer called an electronic data exchange.  Those submissions contain information such as the patient's name and Medicare beneficiary identifier, principal diagnosis, dates of services, level of service, condition codes, and discharge status. Medicare relies on the accuracy and truthfulness of those claims in determining the proper amount of reimbursement for hospices.

## V.      THE IMPROPER CONDUCT OF THE DEFENDANTS

53.     From 2006 to the present and ongoing, the defendants defrauded the United States through the submission, or causing the submission of false or fraudulent claims to Medicare for ineligible hospice patients and/or by their failure to report past overpayments for ineligible patients and to reimburse Medicare for these overpayments.

54.     As a result of the defendants' submission of, or causing the submission of claims that were knowingly false, or with reckless disregard or deliberate ignorance of their falsity, and/or their "knowing" concealment or avoidance of their obligation to the Government, the United States was damaged by reimbursing defendants for providing hospice care to patients that were not eligible for hospice benefit and by the omission of reimbursements from the defendants.

55.     In addition to billing Medicare for patients with knowledge of their ineligibility, defendants knew or recklessly disregarded the fact that their business practices would cause the enrollment and provision of hospice services to ineligible patients, and thus the submission of false claims for the provision of hospice services to ineligible patients.

56.     For example, defendants created an incentive for staff to admit and retain ineligible patients by providing monetary bonuses and other non-monetary incentives based upon

meeting census targets set by the defendants.  These included bonuses for staff members with responsibility for obtaining, admitting, certifying, recertifying and discharging patients.

57.     Defendants threatened staff with reductions in hours or terminations if census fell below targets and/or demoted or fired staff who discharged ineligible patients.

58.     Defendants employed inexperienced staff and failed to provide adequate hospice eligibility training to its staff to ensure that only hospice eligible patients were admitted and retained.

59.     Defendants developed mandatory live discharge procedures that prevented, chilled, made difficult and/or delayed the live discharge of ineligible patients.

60.     Defendants engaged in intentional disregard, reckless disregard or deliberate ignorance of the statements of staff and outside consultants as well as their own records regarding the presence within Evercare's hospice census of ineligible patients.

61.     Defendants pressured or caused salaried and contracted physicians to improperly certify and recertify ineligible patients and/or to fail to live discharge ineligible patients.

62.     Defendants targeted for admission ineligible elderly patients with conditions like debility, dementia, Alzheimer's and cardiac or pulmonary irregularities that while serious were not likely to lead to the death of the patient within six months, thus allowing the defendants to keep these types of patients on their hospice census for more than six months, if not several years.

63.     Defendants failed to immediately discharge patients as to whom the defendants had decided not to appeal a carrier's denial of hospice benefits for a given month because the

patient was ineligible, then billed the patient's hospice care in subsequent months even though the patient's eligibility had not materially changed.

64.     Defendants intentionally sequenced the submission of hospice claims to the carriers to attempt to hide or avoid audit and denial with respect to ineligible patients.

65.     These practices, independently and in conjunction with one another, resulted in the "knowing" admission and retention of patients who were ineligible for Medicare benefits and the submission of false claims to Medicare with respect to patients that were ineligible for the hospice benefit.

66.     As a result, Medicare paid the defendants millions of dollars that should not have been paid and the defendants retained millions of dollars that the defendants should have reimbursed to Medicare.

**A.     Defendants provided financial incentives to staff based on census:**

67.     The defendants set aggressive census targets for each of the Evercare offices to achieve.

68.     The defendants provided staff members with monetary bonuses if the individual Evercare office met its census goal.

69.     The defendants employed a monthly "Scorecard" for each Evercare office that was heavily weighted towards a given office meeting its census goal.  For example, a given Evercare office would receive positive "points" if its Average Daily Census ("ADC") met the census goal.  Sub-categories within the ADC section of the scorecard included whether that month's admissions were greater than 30% of the ADC, whether the office had converted at least

85% of its referrals into admissions and whether the office had received at least 10% of its referrals from palliative care.

70.     On the negative side, the Scorecard would penalize a given office if its live discharges of ineligible patients exceeded 10% of the ADC.

71.     The Evercare staff was eligible for bonuses approaching 20% of their annual salaries if their office received a good score on the Scorecard.

72.     In addition, the defendants employed a sales force called the Community Outreach ("COR"), whose duty was to troll nursing homes, hospitals and other care facilities to obtain new Evercare hospice patients. The COR sales people were paid on a salary and monthly commission basis, and thus these sales people received financial bonuses on the basis of the number of new admissions achieved through their sales efforts.

73.     Periodically Evercare ran special promotions that gave COR sales people additional incentives to cause the admission of new hospice patients.

74.     Furthermore, the Interdisciplinary Team ("IDT"), which was responsible for making decisions regarding the admission, certification, re-certification, retention and provision of care to hospice patients was largely composed of individuals who had a financial incentive to admit and retain hospice patients.

75.     The provision of bonuses and other financial incentives to staff based on admissions and census created an incentive to admit and retain patients that were ineligible for the Medicare hospice benefit.

**B.     Defendants pressured, threatened and retaliated against staff to meet census goals:**

76.     At the same time that defendants provided financial incentives to staff to meet census goals, the defendants pressured, threatened and retaliated against staff to meet census goals and threatened adverse consequences and acted upon those threats if census fell below those targets.

77.     Staff received regular communications from superiors informing them of each office's census goals, current census and the need to increase census.

78.     Staff was periodically advised that the failure to increase census would result in the need to cut hours or personnel.

79.     On a national basis, the Executive Directors ("ED") for each Evercare office would receive a monthly berating from his or her superiors if the census goals were not met.

80.     By way of example, in January, February and March of 2010, Towl, Ursula Peterson ("Peterson"), the Clinical Services Director, and staff physician Dr. Rooney ("Rooney") live discharged approximately fifteen (15) patients from the Denver office who were deemed not to have been hospice eligible.  These were patients that typically had been on Evercare hospice service for more than a year, with a few having been on service for several years.  These patients did not meet the eligibility criteria for hospice care as they were not "terminally ill."

81.     Shortly after the live discharges of these ineligible patients, in approximately March of 2010, Towl, Peterson and Rooney were called on the carpet by the Vice-President, Ford, and the Executive Regional Director, Beth Imlay ("Imlay"), for discharging these ineligible patients.  Rooney was subsequently never promoted.  Ursula Peterson was demoted and later quit.  Towl remained on the job, but was repeatedly advised by Ford and Imlay that

Towl needed to be more responsible for the growth of her office's hospice census and that live discharges negatively impacted that growth.

82.     On January 5, 2011 following the live discharges of additional, ineligible patients Towl was fired by the defendants.  Towl was specifically advised that the reason for her termination was the failure to maintain and improve census.

83.     Similarly, Fowler recommended that the Boston office discharge many ineligible patients.  In the time period of August through December of 2010, Boston live discharged 31 ineligible patients. Like the Denver patients described above, most of these Boston patients had been on hospice service for greater than 180 days and did not meet the LCD eligibility criteria. One patient had been on service for over 900 days. Shortly after the Boston office live discharged a number of these ineligible patients, Fowler was placed on a corrective action plan by his superiors.

**C.     Defendants employed inexperienced staff and failed to provide adequate hospice eligibility training:**

84.     Defendants did not require hospice eligibility experience as a pre-requisite for the hiring of its staff, including its doctors and nurses, and failed to provide adequate training to staff to ensure that only hospice eligible patients were admitted and retained.

85.     Staff requests for training were often ignored and the staff was advised at times that Evercare was a "self-help" organization.

86.     The COR sales force was largely comprised of individuals who did not possess hospice training and could certainly not discern an eligible patient from an ineligible one.

87.     As one example of employing inexperienced staff, in approximately November or December of 2009 Evercare in Denver changed Dr. Rob Howe's ("Howe") status from working

as a contract physician to an Evercare salaried employee.  Howe was hired to act as an associate medical director.  This change in Howe's status was made over Towl's objection.  Howe was by training and experience an emergency room doctor with little or no end of life care experience, or training or experience with the hospice eligibility regulations or LCDs.  However, at the point in time when Howe was hired as a salaried employee he had displayed a liberal knack for admitting and certifying hospice patients.

88.     Similarly, when in the spring of 2010 Evercare decided to establish a compliance program it hired from another United HealthCare company Bev Duffy, R.N. who also had no hospice experience and no expertise with interpreting hospice regulations, auditing hospice charts, or training hospice staff.

89.     In particular, at all times material hereto, Evercare did not establish a concrete policy or procedure, and train its staff with respect to said policy and procedure, to ensure that ineligible patients were not admitted or retained.

90.     Defendants also provided no compliance training regarding hospice eligibility, no quality training and as a general statement most of the staff did not know what the LCDs or regulations mandated regarding hospice eligibility.

91.     Defendants actively discouraged staff attempts to better understand the LCDs or regulations.

92.     In fact, Evercare staff was advised by Ford and Zelenak that the carriers' LCDs regarding eligibility were not mandatory but were simply guidelines that need not be followed.

**D.      Defendants developed mandatory live discharge procedures that prevented, chilled, made difficult or delayed the live discharge of ineligible patients:**

93.      In approximately late 2008, early 2009, Evercare imposed a mandatory policy that any requests by physicians, nurses or other staff to live discharge an Evercare hospice patient had to be reviewed and approved by either Zelenak, who is an R.N., or Imlay, who is an L.P.N.  By way of background, an L.P.N. does not possess the education, training or experience to make judgment calls regarding the hospice eligibility of a given patient.

94.      Defendants' process to live discharge a patient required multiple layers of review to maximize the opportunities to object to discharge and to delay the process.

95.      The discharge decision was not left solely to the discretion of the medical director, the associate medical director, the executive director or the Interdisciplinary Team.

96.      The end result was that recommendations by R.N.s and physicians to discharge ineligible patients or bill such patients at zero were challenged or ignored, thus, at a minimum, causing a significant delay in the live discharge of these ineligible patients.

97.      This live discharge policy, in addition to the negative ramifications associated with reducing census discussed above, caused a chilling effect on R.N.s or physicians ordering the discharge of ineligible patients.

**E.      Defendants engaged in intentional disregard, reckless disregard or deliberate ignorance of the statements of staff, outside consultants and their own records regarding the presence of ineligible patients:**

98.      On one or more occasion, defendants were advised by physicians or staff that ineligible patients were on Evercare's hospice census, yet defendants intentionally, with reckless disregard or deliberate ignorance failed to take adequate and appropriate measures to discharge

20

these ineligible patients, to report said patient's past ineligibility and to reimburse Medicare for the overpayments the defendants had received with respect to these ineligible patients.

99.     For example, during the meeting in approximately March of 2010 between Towl, Peterson, Rooney, Ford and Imlay, Rooney stated to Ford and Imlay that at least half of Denver's hospice patients were ineligible.  The defendants chose to take no action to fully explore Rooney's statement and instead took the opposite approach, retaliating against Rooney, Towl and Peterson and pressuring them not to live discharge patients.

100.     Similarly, on a periodic basis Fowler conducted chart audits and reported his findings to the defendants' governing bodies. Significant red flags were identified in these periodic chart audits; it was not unusual for these audits to indicate that 10-45% of the audited patients were not hospice eligible.  The defendants took no affirmative action after receipt of these periodic chart audits to clean their hospice census of the ineligible patients or to ensure proper reimbursements were made to the Government.

101.     Defendants also periodically received a census summary titled "Hospice Exec Summary" which detailed the ADC on a quarterly basis for each of the Evercare offices and these offices as a whole, the average length of service ("ALOS") for discharged patients and the percentage of patients whose length of service ("LOS") was greater than 180 days.  The statistics from these summaries would have alarmed an organization that was intent on abiding by the regulations.  For example, between the first quarter of 2008 and November of 2010, the national ALOS increased from 75.8 to 125.6 days.  And, on a national basis the percent of patients whose LOS was greater than 180 days rose from 28% to 44% meaning that potentially 44% of Evercare's hospice patients were ineligible.

102.     Perhaps more alarming was the available statistics regarding the number and percentage of patients who had been on service for greater than 300 days, many of whom were ultimately discharged in good or fair condition.  For example, the defendants maintained a record known as an Admission Discharge Report which at any given time detailed the information regarding the patients being provided hospice services from a given Evercare office.   These Evercare records evidence that at times the percentage of patients from offices like Cincinnati, Colorado Springs, Phoenix, Denver and Boston who were on service for more than 300 days was approximately 10% or more of the patient population and most of these 300+ day patients were diagnosed with conditions like debility, dementia and Alzheimer's that normally do not cause immediate death.

103.     In addition, the defendants employed an outside consultant, on information and belief to be the Corridor Group ("Corridor"), to analyze the defendants' hospice operation, including their quality control and the eligibility of the hospice patients.  Corridor issued a report that was deemed to be negative to the operation and was subsequently locked away by the defendants' legal department. Even Zelenak, the Director of Quality, was not allowed to see the Corridor report.

104.     The defendants did not implement a compliance program until the Spring of 2010 and then the compliance program was placed in the hands of an individual who had no hospice experience.  As a result, at all times material hereto, the defendants did not adequately review potential and existing patients for hospice eligibility and failed to control the conduct of branch offices that were known to admit and retain large percentages of ineligible patients.

**F.     Defendants pressured or caused salaried and contracted physicians to improperly certify and recertify ineligible patients and/or fail to live discharge ineligible patients:**

105.     Defendants utilized physicians that were either salaried employees of defendants or on a long term contract with defendants to certify and recertify hospice patients.

106.     The salaried physicians were subject to criticism, withholding of bonuses, demotion or termination if the hospice census and financial goals were not met.  Defendants thus pressured or caused these salaried physicians to certify and recertify patients that were ineligible for hospice benefits and/or pressured or caused these salaried physicians not to immediately live discharge ineligible patients.

107.     Similarly, defendants entered into long term contracts with other physicians to assist with the certification and recertification of defendants' hospice patients. The nature of these contracts both provided incentives to the contract physicians to certify and recertify ineligible patients and subjected these contract physicians to the same type of criticism, pressure and threat of contract termination if they failed to assist in maintaining and building hospice census.

108.      Defendants challenged these salaried and contract physicians' recommendations for live discharges to ensure, among other things, that these physicians understood that reducing census was not favored.

109.     Defendants were aware of and did not discourage the practice of these physicians to certify and recertify patients these doctors had never examined or had not seen in many months, if not years. Large and inappropriate numbers of certifications and recertifications were completed without the physician actually seeing the patient or having a working familiarity with

the patient's condition or status.  For example, it was not uncommon for a physician to certify or recertify a patient based upon the representations of one of defendants' employees or agents, versus a careful review of the patient's chart and a physical examination of the patient.

110.     The end result was that a large number of defendants' hospice patients were improperly certified or recertified by these salaried and contract physicians.

**G.     Defendants targeted for admission ineligible patients with conditions like debility, dementia, Alzheimer's and cardiac or pulmonary irregularities that while serious were not likely to lead to the patient's death within six months:**

111.     To provide clarity, this action does not target 100% of defendants' hospice patients during the time period of January 1, 2006 to the present and ongoing.  At this stage, it appears that approximately 75-85% of defendants' hospice patients, on a nationwide basis during this time period, were eligible hospice patients:  individuals who suffered a terminal illness, who elected hospice service versus aggressive treatment and who passed away within six months.

112.     On the other hand, defendants appreciated that one hospice patient who remains on service for a year or even three years is a more valuable patient that one who dies within thirty to forty-five days.

113.     At all times material hereto, approximately 15-25% of defendants' hospice patients were individuals with conditions like debility, dementia, Alzheimer's and cardiac or pulmonary irregularities that while serious were not probably going to cause the patient's death within six months.  These patients were, or are, ineligible for one or more months for which defendants billed Medicare for the provision of hospice services.

114.     Defendants, including their sales force, targeted these types of patients knowing that once certified as "terminally ill" defendants would be able to keep these types of patients on census for lengthy periods of time.

115.     For example, as of November, 2011, offices like Cincinnati, Colorado Springs, Denver, Boston and Phoenix had approximately 10% or more of their patients, over the time period at issue in this action that had been on service for greater than 300 days with some patients being on service for greater than 900 days.  In addition, at that time 44% of defendants' hospice patients had been on service for greater than 180 days.

116.     Many of these types of patients were ultimately live discharged, albeit too late, in good or fair condition after having been on service for more than 300 days, yet defendants took no measures to report these ineligible patients and provide reimbursement to Medicare.

**H.     Defendants failed to immediately discharge patients as to whom Defendants had decided not to appeal a carrier's denial of hospice benefits for a given month because the patient was ineligible, then billed the patient's hospice care in subsequent months even though the patient's eligibility had not materially changed:**

117.     The carriers responsible for policing offices like Boston, Denver and Phoenix, began over time to target defendants' patients who had non-immediately terminal illnesses and the carriers began to deny hospice benefits for many of these patients.

118.     When a carrier denies a patient's claim, the first step is notification by the carrier of the denial and an invitation to defendants to submit additional documentation, which is commonly known as an "additional development request" or ADR. At this point Defendants have significant appellate rights, including taking the matter to federal district court.

119.     On many occasions defendants received denials and ADRs with respect to its Boston, Colorado Springs, Denver and Phoenix offices on the basis that the patient was not

25

eligible for hospice benefits because the patient was not "terminally ill," and defendants elected not to appeal the carrier's denial of benefits on the basis that the patient was not eligible.

120.     When the decision was made not to appeal the carrier's denial, the requested hospice benefit was forfeited, or in the circumstance where the carrier had already authorized payment and payment had been made, the defendants were required to effectively reimburse that payment, which they did by either a reimbursement payment or an accounting transaction in which an overpayment was designated by the carrier and recouped with respect to later claims.

121.     The decision not to appeal was only made after a concerted review of the patient's chart and conference involving more than one of the defendants' employees or agents.

122.     For example, as of December 28, 2010, 19% of the ADRs the Boston office had received were written off as "no appeal."  The percentages of "no appeals" for other offices were: Cincinnati – 4%, Phoenix- 25%, Tucson- 3%, Denver- 67% and Colorado Springs- 38%.

123.     This means that with respect to the carrier's draw of files to audit and review, using Denver as an example, 67% of those claims audited and reviewed were deemed to be invalid, and defendants agreed by virtue of their decision not to appeal the carrier's denial that the claims had been false.

124.     However, on many occasions with respect to these "no appeal" patients defendants neither:  immediately discharged the patient, reported the patient's prior ineligibility and reimbursed Medicare, nor thoroughly examined the patient, obtained in-depth evaluations of the patient or otherwise obtained a legitimate justification for not discharging the patient and maintaining the patient on census.

125.    In fact, with respect to many of these "no appeal" patients who were maintained on census, a review of the patient's medical or nursing chart evidences the patient was not eligible in the time period before the carrier's denial of hospice benefits and remained ineligible in the subsequent months.

126.    Nevertheless, the defendants kept these "no appeal" patients on hospice service, failed to report these patients' ineligibility, failed to provide the Government any voluntary reimbursement, and, instead, continued to bill the Government and make best efforts to conceal these ineligible claims from being detected by the carrier.

127.    The defendants' billing office, located near Phoenix, AZ, would label these types of patients "bill the next claim – no appeal- continue to bill."  Defendants' Phoenix billing office is headed by Defendants' CFO, Randy Drager, managed by Ed Glancey and most of the billing is performed by individuals who have been provided a region for which the individual is responsible.  For example at certain times material hereto, the individual billers have included Patti Reilly, Jennifer Jagars, Londi Johnson and Natalie Hilverda.

128.    Members of the defendants' billing office intentionally billed patients that should have been billed at zero because often times these invalid claims were paid.  Ed Glancey has stated on at least one occasion that efforts to internally audit the patient files to discharge and/or bill at zero ineligible patients was a waste of time because the billing office would still bill the claims.

129.    In addition, Mr. Glancey stated that the billing office would make its best effort to determine the order in which the carriers were pulling claims for audit and review and would intentionally sequence the suspect claims in a fashion to avoid detection.  For example, if the

carrier was pulling every fifth claim, the billing department would slot clearly valid claims, like a cancer patient who had died within 45 days, into the fifth slot and place the suspect claims in different slots.

### I.    Examples of ineligible patients who were admitted and retained on defendants' hospice census:

130.    The foregoing practices contributed to the improper admission and retention of ineligible patients.

131.    The following patients are examples of the defendants knowingly admitting, retaining, billing and failing to reimburse with respect to patients that were ineligible for hospice.

132.    Patient 1was admitted to Evercare hospice care through the Denver office in October of 2008 and was live discharged to self care on approximately November 21, 2010 in good or fair condition.  Patient 1 had been admitted with a dementia diagnosis.  At the time of Patient 1's live discharge, it was determined that for the approximate 780 days that Patient 1 had been on hospice service that Patient 1 had probably not been eligible.  Defendants continuously billed Medicare for the ineligible hospice care of Patient 1 from admission to discharge and did not report any overpayments or make any reimbursements to the carrier, CMS or Medicare.

133.    Patient 2 was admitted to Evercare hospice care through the Phoenix office on July 8, 2009 with a diagnosis of Parkinson's disease.  The carrier flagged and denied the initial claim from July 8, 2009 on the basis that Patient 2 was not hospice eligible.  Defendants made a decision not to appeal the carrier's denial of this claim, yet kept Patient 2 on service until December 17, 2009 at which time Patient 2 was live discharged in fair condition.  Defendants continuously billed Medicare for the ineligible hospice care of Patient 2 from admission to

discharge and did not report any overpayments or make any reimbursements to the carrier, CMS or Medicare.

134.    Patient 3 was admitted to Evercare hospice care through the Boston office on November 20, 2008 with a diagnosis of a malignant neoplasm.  The carrier flagged and denied the claims from March 1, 2009, January 1, 2010, February 1, 2010 and April 1, 2010 on the basis that Patient 3 was not hospice eligible.  Defendants made a decision not to appeal the carrier's denial of these claims, yet have kept Patient 3 on service as of last report.  Defendants continuously billed Medicare for the ineligible hospice care of Patient 3 from admission to October 6, 2010 and did not report any overpayments or make any reimbursements to the carrier, CMS or Medicare.

135.    Patient 4 was admitted to Evercare hospice care through the Phoenix office on July 10, 2006.  Patient 4 has been on service with a few brief interludes since that time with a diagnosis of dementia and depression.  The carrier flagged and denied the claims from November 1, 2009 and December 1, 2009 on the basis that Patient 4 was not hospice eligible. Defendants made a decision not to appeal both the carrier's denials, yet kept Patient 4 on service and Patient 4 remains on service.  Defendants continuously billed Medicare for the ineligible hospice care of Patient 4 from admission to the present and did not report any overpayments or make any reimbursements to the carrier, CMS or Medicare.

136.    Patient 5 was admitted to Evercare hospice care through the Denver office on July 9, 2010 and remained on service at last report.  Patient 5 was admitted with a diagnosis of debility.  As of January 5, 2010 it was known that Patient 5 probably was not and never had been hospice eligible.  Defendants had taken no action to live discharge Patient 5.  Defendants

continuously billed Medicare for the ineligible hospice care of Patient 5 from admission to date and did not, and have not reported any overpayments or make any reimbursements to the carrier, CMS or Medicare.

137.    Patient 6 was admitted to Evercare hospice care through the Phoenix office in February of 2007 with a diagnosis of heart failure.  Patient 6 has been on hospice service with a few short breaks since that time.  Patient 6's most recent service episode began on October 10, 2008. The carrier flagged and denied the claims from October 1, 2007, December 1, 2007, October 10, 2008, February 1, 2009, July 1, 2009 and September 1, 2009 on the basis that Patient 6 was not hospice eligible.  Defendants made a decision not to appeal the carrier's denial of these claims, yet kept Patient 6 on service until October 6, 2010, with one brief interlude in treatment between April 6, 2010 and May 25, 2010, when Patient 6 was discharged to self care in good condition.  Defendants continuously billed Medicare for the ineligible hospice care of Patient 6 from admission to October 6, 2010 and did not report any overpayments or make any reimbursements to the carrier, CMS or Medicare.

138.    Patient 7 was admitted to Evercare hospice care through the Boston office on July 16, 2008 with a dementia diagnosis.  The carrier flagged and denied the initial claim from July 16, 2008 on the basis that Patient 7 was not hospice eligible.  Defendants made a decision not to appeal the carrier's denial of this claim, yet kept Patient 7 on service until April 23, 2009 at which time Patient 7 was live discharged in fair condition.  Defendants continuously billed Medicare for the ineligible hospice care of Patient 7 from admission to discharge and did not report any overpayments or make any reimbursements to the carrier, CMS or Medicare.

139.    Patient 8 was admitted to Evercare hospice care through the Phoenix office on November 15, 2006 with a dementia diagnosis.  Patient 8 remained on Evercare hospice service until live discharged on July 16, 2010 in fair condition, with one break of six months after December of 2008.  Patient 8 was readmitted to Evercare hospice care on September 23, 2010 with a dementia diagnosis and remains on service as of last report.   The carrier flagged and denied the claims from December 1, 2007, January 1, 2008, February 1, 2008, March 1, 2008, April 1, 2008 and May 1, 2008 on the basis that Patient 8 was not hospice eligible.  Defendants made a decision not to appeal the carrier's denial of these claims, yet kept Patient 8 on service as described above.  Defendants continuously billed Medicare for the ineligible hospice care of Patient 8 while Patient 8 was on service and did not report any overpayments or make any reimbursements to the carrier, CMS or Medicare.

140.    Patient 9 was admitted to Evercare hospice care through the Denver office on July 30, 2004 with a diagnosis of multiple sclerosis.  Patient 9 remained on Evercare hospice service until she died on July 30, 2010, with one break in Evercare hospice service between July and October of 2008.  The carrier flagged and denied the claims from January 1, 2008, February 1, 2008, March 1, 2008, April 1, 2008 and May 1, 2008 on the basis that Patient 9 was not hospice eligible.  Defendants made a decision not to appeal the carrier's denial of these claims, yet kept Patient 9 on service as described above.  Defendants continuously billed Medicare for the ineligible hospice care of Patient 9 while Patient 9 was on service and did not report any overpayments or make any reimbursements to the carrier, CMS or Medicare.

141.    Patient 10 was admitted to Evercare hospice care through the Phoenix office on November 1, 2006 with a diagnosis of dementia.  Patient 10 remained on Evercare hospice

service until she was discharged to self care in fair condition on February 10, 2010.  The carrier

flagged and denied the claims from December 1, 2007, January 1, 2008, February 1, 2008 and

March 1, 2008 on the basis that Patient 10 was not hospice eligible.  Defendants made a decision

not to appeal the carrier's denial of these claims, yet kept Patient 10 on service as described

above.  Defendants continuously billed Medicare for the ineligible hospice care of Patient 10

while Patient 10 was on service and did not report any overpayments or make any

reimbursements to the carrier, CMS or Medicare.

142.    Patient 11 was admitted to Evercare hospice care through the Boston office on

December 12, 2007 with a diagnosis of adult failure to thrive.  Patient 11 remained on Evercare

hospice service for 540 days until she was discharged to self care in fair condition on June 3,

2009.  The carrier flagged and denied the claim from July 1, 2008 on the basis that Patient 11

was not hospice eligible.  Defendants made a decision not to appeal the carrier's denial of these

claims, yet kept Patient 11 on service as described above.  Defendants continuously billed

Medicare for the ineligible hospice care of Patient 11 while Patient 11 was on service and did not

report any overpayments or make any reimbursements to the carrier, CMS or Medicare.

143.    Patient 12 was admitted to Evercare hospice care through the Denver office on

September 25, 2008 and remained on service at last report.  Patient 12 was admitted with a

diagnosis of late effects of a CVA.  As of January 5, 2010 it was known that Patient 12 probably

was not and never had been hospice eligible.  Defendants had taken no action to live discharge

Patient 12.  Defendants continuously billed Medicare for the ineligible hospice care of Patient 12

from admission to date, at least 890 days, and did not, and have not reported any overpayments

or make any reimbursements to the carrier, CMS or Medicare.

144.    Patient 13 was admitted to Evercare hospice care through the Boston office on March 28, 2007 with a dementia diagnosis.  Patient 13 remained on Evercare hospice service for 659 days until she was discharged to self care in fair condition on January 14, 2009.  The carrier flagged and denied the claim from June 1, 2008 on the basis that Patient 13 was not hospice eligible.  Defendants made a decision not to appeal the carrier's denial of these claims, yet kept Patient 13 on service as described above.  Defendants continuously billed Medicare for the ineligible hospice care of Patient 13 while Patient 13 was on service and did not report any overpayments or make any reimbursements to the carrier, CMS or Medicare.

145.    Patient 14 was admitted to Evercare hospice care through the Denver office in August of 2008 and remained on service at last report.  Patient 14 was admitted with a diagnosis of dementia.  As of January 5, 2010 it was known that Patient 14 probably was not and never had been hospice eligible.  Defendants had taken no action to live discharge Patient 14.  Defendants continuously billed Medicare for the ineligible hospice care of Patient 14 from admission to date, approximately 920 days, and did not, and have not reported any overpayments or make any reimbursements to the carrier, CMS or Medicare.

146.    Patient 15 was admitted to Evercare hospice care through the Boston office on May 1, 2008 with a dementia diagnosis.  Patient 15 remained on Evercare hospice service for 540 days until she was discharged to self care in fair condition on October 22, 2009.  The carrier flagged and denied the claim from July 1, 2009 on the basis that Patient 15 was not hospice eligible.  Defendants made a decision not to appeal the carrier's denial of these claims, yet kept Patient 15 on service as described above.  Defendants continuously billed Medicare for the

ineligible hospice care of Patient 15 while Patient 15 was on service and did not report any

overpayments or make any reimbursements to the carrier, CMS or Medicare.

147.    Patient 16 was admitted to Evercare hospice care through the Denver office in

June of 2008 and remained on service at last report.  Patient 16 was admitted with a diagnosis of

Alzheimer's.  As of January 5, 2010 it was known that Patient 16 probably was not and never

had been hospice eligible.  Defendants had taken no action to live discharge Patient 16.

Defendants continuously billed Medicare for the ineligible hospice care of Patient 16 from

admission to date, approximately 980 days, and did not, and have not reported any overpayments

or make any reimbursements to the carrier, CMS or Medicare.

148.    Patient 17 was admitted to Evercare hospice care through the Boston office on

September 12, 2008 with a dementia diagnosis.  The carrier flagged and denied the claim from

October 1, 2009 on the basis that Patient 17 was not hospice eligible.  Defendants made a

decision not to appeal the carrier's denial of this claim, yet kept Patient 17 on service until

February 10, 2010 at which time Patient 17 was live discharged in fair condition.  Defendants

continuously billed Medicare for the ineligible hospice care of Patient 17 from admission to

discharge and did not report any overpayments or make any reimbursements to the carrier, CMS

or Medicare.

149.    Patient 18 was admitted to Evercare hospice care through the Denver office on

February 15, 2007 and was live discharged to self care on approximately November 25, 2010 in

good or fair condition.  Patient 18 had been admitted with a diagnosis of Alzheimer's.  At the

time of Patient 18's live discharge, it was determined that for the approximate 1,380 days Patient

18 had been on hospice service that Patient 18 probably had not been eligible.  Defendants

34

continuously billed Medicare for the ineligible hospice care of Patient 18 from admission to discharge and did not report any overpayments or make any reimbursements to the carrier, CMS or Medicare.

150.    Patient 19 was admitted to Evercare hospice care through the Colorado Springs office on August 15, 2006 with a diagnosis of congestive heart failure.  Patient 19 was initially on Evercare hospice service from August 15, 2006 to November 17, 2008, or 824 days, then readmitted on August 10, 2009 and remains on service, for an additional 582 days. The carrier flagged and denied Patient 19's claims from February 1, 2008, March 1, 2008 and April 1, 2008 on the basis that Patient 19 was not hospice eligible.  Defendants made a decision not to appeal the carrier's denial of these claims, yet kept Patient 19 on service as described above.  Patient 19's chart evidences that Patient 19 was never eligible for hospice care. Defendants continuously billed Medicare for the ineligible hospice care of Patient 19 while Patient 19 was on service and did not report any overpayments or make any reimbursements to the carrier, CMS or Medicare.

151.    Patient 20 was admitted to Evercare hospice care through the Denver office in February of 2008 and was live discharged to self care in October of 2010 in good or fair condition.  Patient 20 had been admitted with a debility diagnosis.  At the time of Patient 20's live discharge, it was determined that for the approximate 975 days Patient 20 had been on hospice service that Patient 20 probably had not been eligible.  The carrier in the second quarter of 2010 denied a claim for Patient 20 on the basis she was not hospice eligible.  At that time she received her first physician visit from Evercare.  The defendants made a decision not to contest or appeal this denial of benefits, but kept Patient 20 on hospice service for at least an additional 120 days. Defendants continuously billed Medicare for the ineligible hospice care of Patient 20

35

from admission to discharge and did not report any overpayments or make any reimbursements to the carrier, CMS or Medicare.

152.    Patient 21 was admitted to Evercare hospice care through the Cincinnati office on December 20, 2007 with a diagnosis of failure to thrive and was live discharged to self care on December 8, 2010 after the determination was made that Patient 21 was not eligible for hospice care.  Patient 21's chart evidenced that Patient 21 had never been eligible for hospice care. Defendants continuously billed Medicare for the ineligible hospice care of Patient 21 from admission to discharge, a total of 1,082 days, and did not report any overpayments or make any reimbursements to the carrier, CMS or Medicare.

153.    Additional examples of defendants billing and/or failing to reimburse Medicare for hospice services provided to ineligible patients will be demonstrated through discovery and at trial.

## VI.    FIRST CLAIM FOR RELIEF – FCA LIABILITY

154.    The Relators incorporate by reference the prior allegations of this Complaint, as though more fully set forth herein.

155.    On or about January 1, 2006 and continuing into the future, defendants "knowingly" presented or "knowingly" caused to be presented to an officer or employee of the United States Government false or fraudulent claims for payment or approval, in violation of 31 U.S.C. § 3729(a)(1), as amended October 27, 1986, and 31 U.S.C. § 3729(a)(1)(A), as amended May 20, 2009, with respect to bills submitted to Medicare for hospice services rendered at defendants' sites nationwide.

156.     On or about January 1, 2006 and continuing into the future, defendants "knowingly" made, used or "knowingly" caused to be made or used false records or statements to get false or fraudulent claims paid or approved by the Government, in violation of 31 U.S.C. § 3729(a)(2), as amended October 27, 1986, and 31 U.S.C. § 3729(a)(1)(B), as amended May 20, 2009, with respect to bills submitted to Medicare for hospice services rendered at defendants' sites nationwide.

157.     On or about January 1, 2006 and continuing into the future, defendants conspired to commit the violations described above, in violation of 31 U.S.C. § 3729(a)(3), as amended October 27, 1986, and 31 U.S.C. § 3729(a)(1)(C), as amended May 20, 2009, with respect to bills submitted to Medicare for hospice services rendered at defendants' sites nationwide.

158.     On or about January 1, 2006 and continuing into the future, defendants knowingly made, used, or caused to be made or used a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoid or decrease an obligation to pay or transmit money or property to the Government, in violation of 31 U.S.C. § 3729(a)(7), as amended October 27, 1986, and 31 U.S.C. § 3729(a)(1)(G), as amended May 20, 2009.

159.     The defendants' acts and omissions were material.

160.     At all times material hereto, defendants acted by and through its officers, directors, employees and/or agents and is, therefore, vicariously responsible for the actions of said officers, directors, employees and/or agents.

161.    As a direct and proximate result of the defendants' actions, the United States

Government paid, approved or allowed false or fraudulent claims and did not received

reimbursement.

162.    Accordingly, the United States is entitled to judgment against the defendants for

the full amount of the damages it has sustained because of the acts and omissions of the

defendants, plus treble damages and penalties.

## XII.   PRAYER FOR RELIEF

WHEREFORE, the Relators, Terry Fowler and Lyssa Towl, on behalf of the United

States, request (a) that the United States Government recover from the Defendants Evercare

Hospice, Inc., Ovations, Inc., OptumHealth, LLC, United HealthCare Services, Inc. and/or

United Health Group, Inc., jointly and severally, all sums which it improvidently paid to the

defendants as a result of their actions, including interest thereon; (b) that the United States

Government recover from the Defendants Evercare Hospice, Inc., Ovations, Inc., OptumHealth,

LLC, United HealthCare Services, Inc. and/or United Health Group, Inc., jointly and severally,

all sums which the defendants failed to reimburse to the United States Government, including

interest thereon; (c) that the damages described in (a) and (b) be trebled as provided in 31 U.S.C.

§ 3729(a); (d) that a civil penalty of no less than $5,500 and no more than $11,000 be assessed

against defendants, jointly and severally, for each false claim, record or statement submitted

directly or indirectly to the Government; (e) that the Court award the Relators all amounts as are

permitted under 31 U.S.C. § 3730(d), including an appropriate share of any sums recovered and

benefits, obtained in this action, now or in the future, along with the Relators' reasonable

expenses, attorney fees, and costs incurred herein; and (f) that the Court grant any additional

appropriate relief with respect to this *qui tam* claim.

**THE RELATORS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE**

Respectfully submitted this Tuesday, March 15, 2011.

THE LAW FIRM OF MICHAEL S. PORTER

By:     /s/ Michael S. Porter_____
Michael S. Porter, Esq.
4465 Kipling Street
Wheat Ridge, CO  80033
Telephone:  (303) 940-8370
Fax:    (303) 421-4309
E-mail: porterlaw@comcast.net

Richard C. LaFond, Esq.
Richard C. LaFond,  P.C.
1756 Gilpin St.
Denver, CO  80202
Telephone:  (303) 388-4551
Fax:  (303) 388-8324
E-mail:  richardlafondpc@gmail.com

Lester Nieves, Esq.
Lester Nieves, P.C.
955 Bannock Street, Suite 200
Denver, CO 80204
Telephone:    (720) 941-600
Fax:    (303) 620-4987
E-mail: lnlaw@msn.com

**ATTORNEYS FOR THE PLAINTIFFS/RELATORS
TERRY FOWLER AND LYSSA TOWL**

Relator Terry Fowler's address:
2615 S. Columbine Street
Denver, CO 80201

Relator Lyssa Towl's address:
56 S. Russell Court
Golden, CO 80401