**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 11-cv-00642-PAB-BNB
    (Consolidated with Civil Action No. 14-cv-01647-PAB)

_____

Civil Action No. 11-cv-00642-PAB-BNB

UNITED STATES OF AMERICA, *ex rel.* TERRY LEE FOWLER, and LYSSA TOWL,

    Plaintiff,

v.

EVERCARE HOSPICE, INC., a Delaware corporation,
OVATIONS, INC., a Delaware corporation,
OPTUMHEALTH, LLC, a Delaware limited liability corporation,
UNITED HEALTHCARE SERVICES, INC., a Minnesota corporation, and
UNITED HEALTH GROUP, INC., a Minnesota corporation.

    Defendants.

_____

Civil Action No. 14-cv-01647-PAB

UNITED STATES OF AMERICA *ex rel.* SHARLENE RICE,

    Plaintiff,

v.

EVERCARE HOSPICE, INC.

    Defendant.

_____

**THE UNITED STATES OF AMERICA'S
CONSOLIDATED COMPLAINT IN INTERVENTION**

_____

**TABLE OF CONTENTS**

**I.   Introduction** …………………………………..………………………………………… 3

**II.   Jurisdiction and Venue** ………………………………………………………………… 4

**III.**   **The Parties** …………………………………………………………………..... 5

**IV.**   **The False Claims Act** ………………………………………………………… 6

**V.**   **The Medicare Hospice Program** ……………………………………………….. 7

   A.   The Medicare Hospice Benefit. …………………………………………………7

   B.   Conditions of Payment for the Medicare Hospice Benefit……………………….. 10

   C.   Determining Life Expectancy Requires Knowledgeable Application of Clinical
   Research and Guidelines to Medical Facts……………………………………………… 13

   D.   How Hospice Providers Obtain Payments from Medicare…………………………. 15

**VI.**   **Evercare Knowingly Presented or Caused to be Presented False Claims for Patients**
**Who Were Not Terminally Ill.** ……………………………………………………...… 17

   A.   Evercare Knew or Should Have Known That its Policies Caused it to Obtain Patients
   Who Were Less Expensive to Care for and Who Were Less Likely to be Terminally Ill…… 18

   B.   Evercare Pressured its Staff to Admit and Retain Patients Without Care And Attention
   to Their Eligibility for Hospice………………………………………………………… 20

   C.   The Top of the Funnel:  Evercare Aggressively Admitted Patients into Hospice Without
   Ensuring and Supporting Their Eligibility……………………………………………… 22

   D.   The Bottom of the Funnel:  Evercare Failed to Ensure the Continuing Eligibility of the
   Patients it Admitted and Recertified as Terminally Ill……………………………….. 26

   E.   Internal and External Audits Demonstrate Evercare's Knowledge That it was Falsely
   Billing for Hospice………………………………………………………………………32

**VII.**   **Evercare Received Money from Medicare Based on the Presentation of False Claims.**
………………………………………………………………………………….………34

**VIII.**   **Examples of False Claims for Patients Who Were Not Terminally Ill.** ....……..… 34

   A.   Patient LH…………………………………………………………………………... 35

   B.   Patient RS……………………………………………………………………………37

   C.   Patient DH…………………………………………………………………………...40

D.    Patient VB ……………………………………………………………………..42

E.    Patient LG…………………………………………………………………... 45

F.    Patient ZF……………………………………………………………………… 48

**FIRST CAUSE OF ACTION**………………………………………………………..52

**SECOND CAUSE OF ACTION**……………………………………………………… 53

**THIRD CAUSE OF ACTION**………………………………………………………53

**PRAYER FOR RELIEF AND JURY DEMAND**………………………………………..54

## I.    INTRODUCTION

The United States brings this False Claims Act case against Evercare Hospice, Inc.

("Evercare") alleging that Evercare knowingly submitted false claims to the Medicare Program

for unnecessary hospice services for patients who were not terminally ill.[1]  Evercare consistently

and deliberately sought to increase the number of patients for whom it could bill for end of life

hospice care despite repeated warnings that a substantial portion of its patients were not, in fact,

terminally ill and in need of hospice care.  Evercare sought out categories of patients that

required fewer resources and lived for longer periods of time, thereby maximizing its profits

from Medicare, the source of approximately ninety percent of its revenue.  Evercare's business

practices created a "funnel," whereby the most patients were assured to be admitted to Evercare

hospice service (the wide end of the funnel), and Evercare created obstacles to ensure that the

fewest patients were discharged (the narrow end of the funnel).  A foreseeable result of these

---

[1]   By notice to the Court on August 25, 2014, the United States of America, by and through its undersigned counsel, partially intervened in *United States ex rel. Fowler and Towl v. Evercare Hospice, Inc. et al.*, No. 11-cv-00642 and *United States ex rel. Rice v. Evercare Hospice, Inc.*, No. 14-cv-01647, on the claims that patients were ineligible for hospice benefits because they were not terminally ill.  *See* Doc. 34.

policies and practices was that many patients were not terminally ill as is demonstrated by Evercare's medical records.  When confronted with data and audit findings that its patients were living extended periods of time; that many of its patients were being discharged from hospice alive; and that its medical records either lacked documentation to support terminal illness, or showed that patients were, in fact, not terminally ill, Evercare's business practices did not change.  Instead, Evercare continued to inappropriately bill Medicare for hospice services for patients who were not terminally ill and did not need hospice care.

Since January 1, 2007, Evercare has presented claims for Medicare hospice benefits that were false because Evercare's medical records did not support that the individuals were terminally ill and in need of hospice care.  By knowingly (as that term is defined in the False Claims Act) presenting these claims, Evercare is liable under the False Claims Act, 31 U.S.C. §§ 3729-33.

## II.    JURISDICTION AND VENUE

1.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1345, and supplemental jurisdiction to entertain common law or equitable claims pursuant to 28 U.S.C. § 1367(a).

2.    This Court has personal jurisdiction over Evercare pursuant to 31 U.S.C. § 3732(a).  Jurisdiction over Evercare is proper because it can be found in, resides in, and/or has transacted business within this Court's jurisdiction.  Moreover, acts that Evercare committed in violation of 31 U.S.C. § 3729 occurred within this district.

3.    Venue is proper in this district under 28 U.S.C. §§ 1391(b)-(c), and 31 U.S.C. § 3732(a), because Evercare resides in or transacts business in this district.

III.     **THE PARTIES**

4.      Plaintiff in this action is the United States of America, suing on behalf of the

United States Department of Health & Human Services ("HHS") and, specifically, its operating

division, the Centers for Medicare & Medicaid Services ("CMS").  At all times relevant to this

Complaint, CMS was an operating division of HHS that administered and supervised the

Medicare Program.

5.      Defendant Evercare, now known as Optum Palliative and Hospice Care, is a

Delaware corporation that maintains its principal place of business at UnitedHealth Group Center

in Minnesota.[2]

6.      At all times relevant to this Complaint in Intervention, Evercare has been owned

by United HealthCare Services, Inc., a subsidiary of UnitedHealth Group, Inc.

7.      In approximately early 2011, UnitedHealth Group, Inc., acquired Hospice Inspiris

Holdings, Inc. ("Inspiris"), which owned and operated hospices in three states.  The Inspiris

hospices were incorporated into Defendant's hospice network.

8.      As of 2011, Evercare operated for-profit hospice programs in 13 states:  Alabama,

Arizona, California, Colorado, Georgia, Illinois, Ohio, Maryland, Massachusetts, Missouri,

Pennsylvania, Texas, and Virginia.

9.      In March 2014, Evercare changed its operating name to Optum Palliative and

Hospice Care.

---

[2]   In this Complaint in Intervention, the United States names only Evercare, now known as Optum
Palliative and Hospice Care, as a Defendant.  For simplicity, the Complaint in Intervention will refer to
the Defendant as "Evercare."

10.     At all times relevant to this Complaint, Evercare was in the business of providing hospice care to individuals who were Medicare participants.

11.     Evercare finances its hospice operations largely through receipt of Medicare dollars.  Approximately ninety percent of Evercare's revenue is derived from the Medicare program and since January 1, 2007, Evercare has collected hundreds of millions of dollars from Medicare for hospice benefits.  Between 2008 and 2011 alone, Medicare has paid Evercare approximately $226 million, of which an estimated $91.5 million was for hospice patients who were on hospice for longer than one year.

12.     Since at least January 2007, Medicare billing numbers for Evercare providers were issued to Evercare Hospice, Inc., which submitted Medicare hospice claims on behalf of the Evercare providers operating across the country.

13.     Evercare's centralized billing department was located in Phoenix, Arizona.

## IV.     THE FALSE CLAIMS ACT

14.     The False Claims Act provides, in part, that any entity that knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval is liable to the United States for damages and penalties.  *See* 31 U.S.C. §§ 3729(a)(1), amended by, 31 U.S.C. § 3729(a)(1)(A).

15.     To show that an entity acted "knowingly" under the False Claims Act, the United States must prove that the entity, with respect to information:  (1) had actual knowledge of the information; (2) acted in deliberate ignorance of the truth or falsity of the information; or (3) acted in reckless disregard of the truth or falsity of the information.  The United States does not have to prove that the entity had the specific intent to defraud the United States.  31 U.S.C. § 3729(b), amended by 31 U.S.C. § 3729(b)(1).

6

V.      THE MEDICARE HOSPICE PROGRAM

A.      The Medicare Hospice Benefit.

16.     Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395-1395kkk-1, establishes

the Health Insurance for the Aged and Disabled Program, commonly referred to as the Medicare

Program (or "Medicare").

17.     The Medicare Program is comprised of four parts.  Medicare Part A is a

100 percent federally-funded health insurance program for qualified individuals aged 65 and

older, younger people with qualifying disabilities, and people with End Stage Renal Disease

(permanent kidney failure requiring dialysis or transplant).  The majority of Medicare Part A's

costs are paid by United States citizens through their payroll taxes.  The benefits covered by

Medicare Part A include hospice care, as defined in 42 U.S.C. § 1395x(dd).

18.     The Medicare hospice benefit, created by Congress in 1982, is designed to

provide terminally ill patients with palliative care (*i.e*., care intended to optimize quality of life

by preventing and relieving suffering) instead of curative care (*i.e*., care designed to cure an

illness or condition).

19.     The Medicare hospice benefit pays for medical, nursing, social, psychological,

emotional, and spiritual care intended to make terminally ill Medicare participants as physically

and emotionally comfortable as possible prior to their death, while remaining primarily in the

home environment.  *See* 79 Fed. Reg. 26538, 26541 (May 8, 2014).

20.     The Medicare hospice benefit is not reasonable and necessary for a Medicare

participant unless the individual is "terminally ill."  As generally accepted by the medical

community, the term "terminal illness" refers to an incurable, advanced, progressively

deteriorating illness.  *See* 78 Fed. Reg. 48234, 48247 (Aug. 7, 2013).  Medicare defines

7

"terminally ill" to mean that an individual has a "medical prognosis that the individual's life expectancy is 6 months or less."  42 U.S.C. § 1395x(dd)(3)(A); 42 C.F.R. § 418.3.

21.     To receive the Medicare hospice benefit, eligible Medicare participants must "elect" the benefit (*i.e.*, it is *voluntary*).  42 C.F.R. § 418.24.  By doing so, they waive their right to Medicare coverage of curative treatment for their terminal illness as well as related conditions. *See* 42 C.F.R. § 418.24(d).

22.     For example, a cancer patient who has a life expectancy of six months or less and elects the Medicare hospice benefit will no longer receive Medicare-covered treatment, such as chemotherapy, intended to cure the cancer, but instead will receive palliative care designed to relieve only the pain and suffering associated with the patient's impending death.

23.     Electing the Medicare hospice benefit is often a critical decision for a Medicare participant, because, for many Medicare participants, electing the benefit is electing to cease any further curative care for their terminal illnesses.

24.     Companies can provide hospice care reimbursable by Medicare wherever the patient resides, which may be a private residence or a health care facility, such as a nursing home or assisted-living facility.  If a hospice patient lives in a health care facility, the facility will continue to provide for the patient's daily care needs.

25.     Since the inception of the Medicare hospice benefit, Medicare has paid hospices a fixed, per day, per level of care rate, which is intended to cover all hospice services needed to manage the end of life care of the terminal illness and related conditions.  *See* 79 Fed. Reg. 26538, 26543 & 26553 (May 8, 2014).  For patients receiving routine home care, the hospice is paid the same rate each day regardless of what, if any, services the hospice provides each day. *See* 79 Fed. Reg. 26538, 26553 (May 8, 2014).

26.     Originally, Medicare did not pay for hospice benefits beyond 210 days, in other words, about seven months.  Since 1990, Medicare has paid for two initial 90-day periods, and then an unlimited number of 60-day periods, but only if the individual remains "terminally ill," meaning that he or she continues to have a medical prognosis that his or her life expectancy is six months or less.  42 C.F.R. § 418.3; Medicare Benefit Policy Manual, Chapter 9, §§ 10, 20.1.

27.     Very long stays in hospice are more profitable for hospice providers than shorter stays.  Medicare Payment Advisory Commission, Report to the Congress:  Medicare Payment Policy, Chap. 11, *Hospice Services* (Mar. 2012) (hereinafter "2012 MedPac Report").  A hospice's costs of providing care typically are highest at the beginning (when the patient is initially admitted) and end of a patient's hospice stay (when the patient dies).  Medicare Payment Advisory Commission, Report to the Congress: Medicare Payment Policy, Chap. 6, *Reforming Medicare's Hospice Benefit* (Mar. 2009) (hereinafter "2009 MedPac Report").  Thus, hospices with longer average stays have lower costs per day.  Medicare Payment Advisory Commission, Report to the Congress:  Medicare Payment Policy, Chap. 12, *Hospice Services* (Mar. 2014) (hereinafter "2014 MedPac Report").

28.     Hospices that have a higher share of patients in nursing facilities and assisted-living facilities have higher profit margins than other hospices.  The average length of stay on hospice is higher among Medicare participants who reside in nursing or assisted-living facilities than at home.  In addition, having more patients in nursing facilities may reduce costs because of the overlap in responsibilities between the hospice and the facility, and treating patients in a centralized location may reduce the hospice's costs for mileage and travel time.  2014 MedPac Report.

29.      From 2000 to 2010, the number of for-profit hospices more than doubled, while the number of non-profit hospices slightly decreased.  2012 MedPac Report.

30.      The average length of stay for patients in for-profit hospices is longer than the average length of stay in non-profit hospices.  2012 MedPac Report.

31.      Medicare spending for hospice care has increased dramatically in recent years. Between 2000 and 2007, Medicare spending for hospice more than tripled, from $2.9 billion to just over $10 billion.  2009 MedPac Report.  Over $15 billion was spent annually on hospice care in 2012.  2014 MedPac Report.

32.      The increase in spending is attributable, in part, to the increased length of stay that hospice providers are billing Medicare for hospice care per patient.  Even though the Medicare hospice benefit is intended for individuals with a life expectancy of six months or less, Medicare spent nearly $8 billion in 2011 (more than half of all hospice spending that year) on hospice care for Medicare participants whose hospice stays exceeded six months.  2014 MedPac Report.

**B.      Conditions of Payment for the Medicare Hospice Benefit.**

33.      All Medicare providers must deal honestly with the Government and with patients.

34.      In addition, all healthcare providers like Evercare are obligated to comply with applicable requirements in order to be reimbursed by Medicare under Part A.  When participating in Medicare, a provider has a duty to be knowledgeable of the statutes, regulations, and guidelines for coverage of Medicare services.

35.      Evercare has a duty to have a thorough knowledge of the Medicare hospice program, and to properly train and inform its employees regarding the requirements for Medicare coverage of hospice care.

10

36.    One purpose of the Medicare hospice requirements is to ensure that limited Medicare funds are properly spent on patients whose death is predictably impending and who actually need end-of-life care.

37.    Accordingly, hospice companies like Evercare are entitled to receive Medicare dollars for hospice care only when such care is "reasonable and necessary for the palliation or management of terminal illness."  42 U.S.C. § 1395y(a)(1)(C).

38.    In order to receive payment from Medicare, a hospice company must certify that the individual is, in fact, "terminally ill."  *See* 42 U.S.C. § 1395f(a)(7).

39.    As part of the certification requirements, the hospice must ensure that the medical record that the hospice maintains for the individual contains clinical information and other documentation that support that the individual is "terminally ill."  *See* 42 U.S.C. § 1395f(a)(7); 42 C.F.R. § 418.22.

40.    A hospice company is not entitled to payment for hospice care when its medical records do not support that the individual is "terminally ill" because clinical information and other documentation in the hospice medical record that supports that the individual is "terminally ill" is a condition of Medicare payment for hospice services.  *See* 42 C.F.R. § 418.200; 42 C.F.R. § 418.22(b); 78 Fed. Reg. 48234, 48245 (Aug. 7, 2013).

41.    The requirements that hospice care be "reasonable and necessary for the palliation or management of terminal illness" and that the hospice's medical record support that the individual is "terminally ill" are in addition to a requirement that a physician certify, based on his or her clinical judgment, that the individual's prognosis is for a life expectancy of six months or less if the terminal illness runs its normal course.

42.     Put another way, before a hospice submits a claim for payment: (a) a physician must have certified based on the exercise of his or her clinical judgment that the individual's prognosis is for a life expectancy of six months or less; *and* (b) the hospice's medical record must support that the individual is "terminally ill"; *and* (c) the hospice care must be "reasonable and necessary for the palliation or management of terminal illness."  *See* 79 Fed. Reg. 26538, 26556 (May 8, 2014); *see also* 78 Fed. Reg. 48234, 48247 (Aug. 7, 2013); 70 Fed. Reg. 70532, 70534-35 (Nov. 22, 2005).

43.     For a patient's initial hospice admission, the hospice provider must obtain a certification of terminal illness for the individual from both (a) the medical director of the hospice or a physician-member of the hospice interdisciplinary group, and (b) the individual's attending physician, if the individual has an attending physician.  For subsequent periods, the hospice provider must obtain the certification of terminal illness from either the medical director of the hospice or a physician who is a member of the hospice's interdisciplinary group.  *See* 42 U.S.C. § 1395f(7)(A); 42 C.F.R. § 418.22(c).

44.     The interdisciplinary group should consist of, at a minimum, a physician, a registered nurse, a social worker, and a pastor or other counselor.  *See* 42 C.F.R. § 418.56.  The interdisciplinary group is responsible for developing and implementing an individualized plan of hospice care for each patient.  *Id.*

45.     These important Medicare requirements for coverage of hospice care are communicated to hospice providers in the Medicare statute and regulations; the Medicare Benefit Policy Manual, Chapter 9, § 20.1; the Federal Register; and other published guidance.

12

C.     **Determining Life Expectancy Requires Knowledgeable Application of Clinical Research and Guidelines to Medical Facts.**

46.    Clinical indicators of a life expectancy of six months or less are set forth in multiple public sources, including Hospice Local Coverage Determinations ("LCDs"), issued by Medicare Administrative Contractors ("MACs," also known as "Medicare claims processors").

47.    CMS has instructed hospice providers to use Local Coverage Determinations and other clinical tools to determine whether a Medicare participant, based on his or her current clinical status and the anticipated progression of his or her illness, has a prognosis of six months or less.  *See* 78 Fed. Reg. 48234, 48247 (Aug. 7, 2013); 79 Fed. Reg. 26538, 26556 (May 8, 2014).

48.    Some diagnoses, like certain cancers, have an inherent prognosis of a life expectancy of six months or less.  But other conditions do not automatically support that a patient has a life expectancy of six months or less.

49.    For example, patients with Alzheimer's disease, dementia, debility, and other diagnoses, may have a life expectancy of years before signs and symptoms of advanced disease are present.  Without the knowledgeable application of clinical research and guidelines, hospices are at risk of admitting and keeping patients who do not have a life expectancy of six months or less.

50.    For example, individuals live on average for eight to ten years after diagnosis with Alzheimer's.  Some live as long as 25 years.  Local Coverage Determinations and other clinical publications help identify which Alzheimer's patients are clinically likely to have a life expectancy of six months or less.  The sources describe end-stage Alzheimer's and medical indicators that Alzheimer's patients are nearing death.   The end stage of Alzheimer's disease is

13

characterized by the inability to communicate coherently and eventually to control movement, including swallowing.  When individuals with Alzheimer's die, they ordinarily die from infection or injuries caused by the loss of control over movement.  Aspiration pneumonia, which can occur when impaired swallowing allows food or liquids to enter the lungs, is the most common cause of death of Alzheimer's patients.  Individuals with Alzheimer's are considered to have a life expectancy of six months or less when they suffer certain medical conditions, including serious infections or inability to intake sufficient foods or fluids.  *See, e.g.*, Cahaba GBA's Local Coverage Determination for Hospice Determining Terminal Status (L13653); National Institutes on Aging, Alzheimer's disease and end of life issues, August 1, 2003 (updated December 8, 2011), available at

http://www.nia.nih.gov/print/alzheimers/features/alzheimers-disease-and-end-life-issues;  Tsai S, Arnold R., Fast Facts and Concepts #150, *Prognostication in Dementia*, February 2006 (updated April 2009), available at http://www.eperc.mcw.edu/EPERC/FastFactsIndex/ff_150.htm

51.    Similarly, Local Coverage Determinations help identify hospice-eligible patients with vascular dementia.  Vascular dementia is caused by a stroke or vascular disease in the brain.  Many patients with vascular dementia are not hospice-eligible.  Whether a patient with vascular dementia has a life expectancy of six months or less depends on other medical indicators, such as severe nutritional impairment, or significant disability that severely limits the individual's ability to move and take care of himself or herself.  *See, e.g.*, Palmetto GBA's Local Coverage Determinations for Hospice Stroke and Coma (L316) and Neurological Conditions (L30708).

52.    Clinical guidelines are also available to assist in identifying patients who have a life expectancy of six months or less due to debility.  The hospice diagnosis of debility is characterized by progression of disease as documented by worsening clinical status, symptoms,

signs, and laboratory results, which in combination cause an irreversible decline in the patient's

health such that the patient is not expected to live more than six months.  The diagnosis of

debility has been used as a terminal diagnosis when a patient experiences such decline related to

multiple medical conditions, none of which are deemed terminal by themselves.  Whether a

patient with debility has a life expectancy of six months or less depends on various medical

indicators, such as recurrent or intractable infections, irreversible weakness from lack of

nourishment, and deteriorating ability to move and perform activities of daily living (eating,

bathing, dressing, and toileting) without assistance.  *See, e.g.*, Decline in Clinical Status

Guidelines in Cahaba GBA's Local Coverage Determination for Hospice Determining Terminal

Status (L13653).  Such indicators would routinely be noted in the patient's medical records.  In

2013, CMS issued guidance that debility and adult failure to thrive should no longer be used as

principal hospice diagnoses because these diagnoses "are incongruous to the comprehensive

nature of the hospice assessment, the specific, individualized hospice plan of care, and the

hospice services provided."  78 Fed. Reg. 27823, 27832 (May 10, 2013).

   53. CMS also has instructed hospice providers that an individual should be

considered for discharge from the Medicare hospice benefit if he or she improves or stabilizes

sufficiently over time while on hospice, such that he or she no longer has a life expectancy of six

months or less.  *See* 75 Fed. Reg. 70372, 70448 (Nov. 17, 2010).

   **D.** **How Hospice Providers Obtain Payments from Medicare.**

   54. The United States, through CMS, reimburses Medicare providers with payments

from the Medicare Trust Fund, which is supported by American taxpayers.  CMS, in turn,

contracts with Medicare claims processors to review, approve, and pay Medicare bills, called

15

"claims," received from health care providers like Evercare.  In this capacity, the Medicare claims processors act on behalf of CMS.

55.     Payments typically are made by Medicare directly to the health care provider rather than to the Medicare participant, who usually assigns his or her right to Medicare payment to the provider.

56.     Since January 1, 2007, multiple Medicare claims processors have processed Medicare hospice claims submitted by Evercare.

57.     Hospice providers like Evercare are reimbursed based upon their submission of an electronic or hard-copy claim form called a "CMS-1450 form."

58.     When a hospice provider submits a Medicare hospice claim, it represents that it is entitled to payment for the claim.

59.     On the CMS-1450 form, the hospice provider must state, among other things, the patient's name, the diagnosis supporting the patient's admission to hospice, and the beginning and ending dates of the period covered by the bill.  *See* Medicare Claims Processing Manual, Chap. 11, Processing Hospice Claims.

60.     On the claim form, the provider certifies that the billing information on the claim is "true, accurate, and complete"; that "[p]hysician's certifications and re-certifications, if required by contract or Federal regulations, are on file"; and that "[r]ecords adequately describing services will be maintained and necessary information will be furnished to such governmental agencies as required by applicable law."

61.     Because it is not feasible for the Medicare program, or its contractors, to review every patient's medical records for the millions of claims for payments it receives from hospice

providers, the Medicare program relies upon the hospice providers to comply with the Medicare

requirements, and trusts the providers to submit truthful and accurate claims.

62.     Once the provider submits its CMS-1450 form to the Medicare claims processor,

in most cases, the claim is paid directly to the provider without any review of the patient's

medical record.

63.     The physician certifications and clinical information in the medical record are

submitted to the Medicare claims processor only if the claim is selected for medical review,

which does not happen routinely.  *See generally* Medicare Claims Processing Manual, Chap. 11,

Processing Hospice Claims, and Medicare Program Integrity Manual, Chap. 3, Verifying

Potential Errors and Taking Corrective Actions.

64.     If a hospice claim is selected for medical review, the hospice provider (such as

Evercare) is required to submit to Medicare the physician certifications and clinical information

in the medical record supporting the claim.

65.     The Medicare claims processor may not pay the claim if the clinical information

that the hospice submits for medical review does not support that the patient is actually

terminally ill and in need of hospice care.

66.     Federal law requires providers like Evercare, which receive funds under the

Medicare program, to report and return any overpayments within specified time periods.  42

U.S.C. § 1320a-7k(d).

## VI.     EVERCARE KNOWINGLY PRESENTED OR CAUSED TO BE PRESENTED FALSE CLAIMS FOR PATIENTS WHO WERE NOT TERMINALLY ILL.

67.     Evercare knowingly asked the Medicare program to pay amounts to which

Evercare was not entitled by presenting or causing to be presented false claims for hospice care

17

for individuals for whom Evercare's medical records did not support terminal illness and a need for end-of-life care.

A.   **Evercare Knew or Should Have Known That its Policies Caused it to Obtain Patients Who Were Less Expensive to Care for and Who Were Less Likely to be Terminally Ill.**

68.   During the relevant time period, Evercare knew that its average length of stay was higher than the national average for hospices.  Evercare tracked its average length of stay by patient, by location, and for the entire company.  Evercare compared these numbers to hospices nationwide.

69.   Evercare was aware that many of its patients had very long lengths of stay.  In February 2011, of the fifteen locations Evercare tracked, Evercare knew that all fifteen had over thirty percent of their patients on service for longer than 180 days (six months), and, on average, over forty percent of Evercare's patients nationwide were on service longer than 180 days.  At that time, 547 of 1,289 patients had been on hospice service for 180 days or longer; 258 of 1,289 patients had been on service for longer than one year; 154 of 1,289 patients had been on service 500 days or longer; 66 of 1,289 patients had been on service 700 days or longer; 24 of 1,289 patients had been on service 900 days or longer; and 5 of 1,289 patients had been on service 1100 days or longer, with one patient on service over 1400 days (or nearly four years).

70.   As a further example, Evercare collected Medicare hospice payments for over 1200 days (over 18 months) for patient VB in Reston, Virginia, discussed in Section VIII below.[3]

---

[3]   To protect patient privacy, the United States has not identified by name any individual patients used as examples in this Complaint.  The United States will provide Evercare with a list identifying each patient by name and patient identification number.

71.     During the relevant time period, Evercare also knew that its proportion of patients with Alzheimer's, dementia, or debility was higher than the national average for hospices.  In an August 2009 email, Randy Drager, Evercare's Director of Finance, explained:  "In Phoenix, over 63% of the patient[s] served have a diagnosis of debility, dementia, or Alzheimer's vs. the national average for all hospices of less than 30%.  Only 9% have a cancer diagnosis, compared to 41% nationally. The percentages for Denver are similar."  In approximately 2009, Evercare's overall percentage of debility and dementia patients was 49%, compared to 21% nationwide in 2007, while Evercare's overall percentage of cancer patients was 24%, compared to 41% nationwide.  The following table demonstrates Evercare's patient mix as compared to hospices nationwide, as tracked by Evercare.



72.     Evercare was aware that its methods for obtaining patients were responsible for the skewed patient mix.  It knew that the reason it had large numbers of patients with Alzheimer's, dementia, and debility was Evercare's heavy reliance on referrals from nursing homes (which serve these patients) and from Evercare's sister segment, a Medicare Advantage plan that also serves these patients.  As Mr. Drager explained in an August 2009 email, "[t]his

19

[patient] mix is being driven in part by the historical over-reliance on Evercare Institutional members to drive census.  By definition these patients are in the nursing home and tend to skew toward the debility/dementia/Alzheimer's diagnosis when they are ready for hospice care."

> **B.  Evercare Pressured its Staff to Admit and Retain Patients Without Care And Attention to Their Eligibility for Hospice.**

73.     Evercare pressured all employees, including its physician Medical Directors and nurses, to meet the company's expectations for the number of patient admissions and for the total number of patients, or "census," at a site, without care and attention to whether the patients were eligible for Medicare hospice benefits.

74.     The final target census numbers for each Evercare site were established not by the leadership of each site, but by Evercare corporate leadership.

75.     Evercare conveyed these admissions and census expectations in monthly operations reports, employee town hall meetings, and weekly or monthly calls between corporate leadership and local Executive Directors.

76.     The target census numbers were unrealistic, and many Evercare sites did not reach the census numbers established for them.

77.     Evercare tracked each sites' admission numbers regularly and knew that many Evercare sites were not meeting the census numbers established for them.  For example, in October 2010, ten of fifteen sites were not meeting their yearly admission targets, and fourteen of fifteen sites were not meeting their quarterly admission targets.

78.     Evercare knew the target census numbers were unrealistic.  For example, in August 2009, Mr. Drager believed that even with "fairly aggressive growth," Evercare would "still fall short of the 'Realistic Goal'" that was the basis for the previous forecast.  And in a

November 2010 email, when Evercare was "so far off" the budget projections, Beth Imlay, a Regional Director, wondered if they just had "pie in the eye."

79.    Nevertheless, Evercare leadership, including Tricia Ford (the former Chief Operating Officer), Ms. Imlay, and Mr. Drager, pressured Evercare site leaders to meet their unrealistic census expectations.  For example, during weekly and monthly calls, the leadership was hostile, aggressive, and intimidating in pressuring sites to meet census goals.

80.    In addition to creating pressure to meet these unrealistic census goals, Evercare employees were incentivized to admit patients.

81.    Evercare sales employees – called "Community Outreach Representatives," or "CORs" – were paid bonuses per admission.  In addition to the regular bonus structure, the CORs were often offered additional incentives to obtain admissions.  For example, in August 2009, Evercare announced that all admissions were worth $50, and in December 2009, the bonus on admissions was doubled.

82.    Clinical staff were also offered additional compensation if their sites met the company's admissions and census expectations.  For example, in July 2009, as part of an extra bonus program, two sites that met the targeted census goals were told they would receive four $500 awards for clinical staff members.

83.    Evercare not only paid bonuses based on admissions and census, it threatened layoffs and disciplined and terminated staff to increase pressure to meet the company's admissions and census expectations.

84.    CORs who did not meet admission goals were placed on corrective action plans and terminated.

85.     Moreover, Evercare's staffing model was based on census numbers, therefore, when census expectations were not met, clinical staff members were laid off, and local managers and sales employees were disciplined and terminated.  For example, when the Phoenix location fell below 180 patients in November 2009, Ms. Imlay stated that "we are going to have to look at lay offs now."

86.     Evercare received multiple complaints through its internal employee complaint mechanisms that management pressured and instructed employees to admit and retain inappropriate patients.

87.     Consistent with this pressure, Evercare's philosophy was to bring lots of patients into hospice without care and attention to their eligibility for hospice care, and then make it hard for them to leave, even when its own staff caring for the patients thought the patients should be discharged.  As Ms. Imlay explained in a July 2009 email, Evercare hospice should be a "funnel":  "easy to access end-of-life care (wide at the top) and hard to get out of (narrow end of funnel at the bottom)."

**C.     The Top of the Funnel:  Evercare Aggressively Admitted Patients into Hospice Without Ensuring and Supporting Their Eligibility.**

88.     During the relevant time period, Evercare used the following general procedure when initially enrolling a patient for the Medicare hospice benefit:

a.      Once a patient was referred to Evercare hospice, Evercare sent a nurse to evaluate the patient;

b.      The nurse evaluated the patient to determine whether to admit the patient;

c.      The nurse orally communicated the findings to the Medical Director on duty, who issued a verbal order to admit the patient; and

22

d.      The Certification of Terminal Illness was signed shortly thereafter by the same or

a different Medical Director.

89.      Several specific facts relating to this general procedure demonstrate that Evercare

knowingly submitted false claims to Medicare for patients who were not terminally ill.

90.      Evercare's nurses were key players in the admission and retention process for

patients because they were responsible for seeing the patients, assessing whether the patients

should be admitted, documenting the patients' conditions in the medical records, and orally

communicating to the doctors the patient information on which the doctors relied to certify and

recertify the patients as terminally ill.

91.      Rather than hiring nurses and other clinical staff experienced in assessing the life

expectancy of patients with Alzheimer's disease, dementia, and debility, Evercare often hired

nurses with little or no prior hospice experience.

92.      Evercare also failed to adequately train its staff to identify terminally ill patients.

It did not provide its staff comprehensive training on the identification of hospice-eligible

patients with Alzheimer's disease, dementia, and debility, and the clinical progression of these

illnesses.

93.      Prior to approximately 2010, Evercare did not even have a corporate clinical

department that supervised the clinical teams at each site.

94.      Prior to 2010, Evercare did not have a full-time Chief Medical Officer or Chief

Nursing Officer.

95.      Sharon Kuhn-Ernst, Evercare's corporate Director of Training and Development,

personally believed that Evercare's staff lacked understanding of the Local Coverage

Determinations in determining eligibility for hospice care.  But prior to 2012, providing that type of training was not her responsibility.

96.     The training that Ms. Kuhn-Ernst did provide to clinical staff focused on the process of entering information into the electronic medical record rather than the substance of the information and whether it supported that patients were terminally ill.

97.     Prior to approximately 2012, training of nurses at each site about disease progression and identifying terminally ill patients was primarily the responsibility of the site Clinical Services Managers or Clinical Services Directors (or nursing managers, known as "CSMs" or "CSDs").  But these local nursing managers received minimal, if any, formal training from Evercare on Local Coverage Determinations and differentiating terminally ill from chronically ill patients.

98.     Evercare's training of nurses on identifying terminally ill patients often consisted of little beyond providing to nurses, without further formal instruction, a reference book on clinical criteria called "Quickflips."

99.     Physician Medical Directors, who relied on nurses to provide thorough and complete assessments of prospective hospice patients, likewise observed that nurses were not adequately trained to assess eligibility.

100.    A former medical director in Massachusetts found that when she started with Evercare, the majority of patients seen by the nurse who was responsible for training other new nurses were not hospice eligible.

101.    Another Medical Director in Ohio from 2010 to 2013 observed that nurses sometimes did not understand what information was needed to determine eligibility for hospice.

24

102.    While decisions to admit a patient to Evercare hospice were seldom, if ever, questioned, decisions that a patient was not terminally ill (and therefore not admitted to Evercare) were subject to intense scrutiny.

103.    Most, if not all, Evercare locations had a policy that employees could not deny a referred patient admission into hospice without "involvement and approval" of the site manager, or "Executive Director."

104.    As a result, when the initial nurse examined the patient and informed his or her supervisor that the nurse believed the patient was not eligible for admission, Evercare management frequently sent a second nurse to admit the patient.

105.    The visit of the second nurse would take place before the Medical Director was called for his or her opinion about the eligibility of the patient.

106.    An intake coordinator in Ohio from 2007 to 2013 recalled that this practice occurred more often when the patient census was low.

107.    There was no similar policy requiring the involvement and approval of management to admit patients who were determined to be appropriate for hospice.  Likewise, Evercare management did not have a regular practice of sending a second nurse to evaluate patients who were determined to be eligible for hospice.

108.    The Evercare Medical Director providing the verbal order to admit the patient often did not physically examine the patient prior to issuing the verbal order to admit.

109.    The Evercare Medical Director providing the verbal order to admit the patient may not have any medical records for the patient and thus relied on the oral report of the nurse (or second nurse) who evaluated the patient.  As described above, this nurse often had no hospice experience and little training and was pressured to admit and keep more patients.  Evercare's

25

pressure on and deficient training of nurses thus affected physician certifications of terminal illness.

110.    The Evercare Medical Director signing the Certification of Terminal Illness was not always the same Medical Director who provided the verbal order to admit.

111.    The Evercare Medical Director signing the Certification of Terminal Illness frequently signed the certification without seeing the patients.

112.    Not only were Evercare's admissions policies likely to lead to inappropriate *admissions* to hospice, but also Evercare's recertification process predictably led to the *retention* of non-terminally ill patients in hospice.

**D.     The Bottom of the Funnel:  Evercare Failed to Ensure the Continuing Eligibility of the Patients it Admitted and Recertified as Terminally Ill.**

113.    During the relevant time period, Evercare used the following general procedure when recertifying a patient for the Medicare hospice benefit:

a.    When a patient was up for recertification (*i.e.*, at the end of a benefit period), that patient would be discussed at the interdisciplinary group meeting; and

b.    The Evercare Medical Director who attended the interdisciplinary group meeting would sign the Certification of Terminal Illness.

114.    Several specific facts relating to this general procedure demonstrate that Evercare knowingly submitted false claims to Medicare for patients who were not terminally ill.

115.    The Evercare Medical Director who signed the Certification of Terminal Illness for recertification frequently did not physically examine the patient.  Thus, that Medical Director necessarily relied on the oral reports of the nurses during the interdisciplinary group meeting and

26

the medical records for the patient.  The nurses the Medical Director is relying on are the same under-trained and pressured nurses discussed in the prior allegations.

116.   Evercare's medical records were inaccurate and often lacking in the information and detail necessary to support a hospice determination.

117.   Rather than providing detailed, individualized visit information, there was duplication ("copying and pasting") within a patient's medical record of clinical notes describing the patient's condition.  For example, the same description of patient DH's condition, described in Section VIII below, is duplicated in case conference notes over a four month period.  These conference notes became inconsistent with other contemporaneous clinical notes.

118.   Moreover, there was untimely entry of clinical notes into the medical record.

119.   Evercare's Director of Quality (Terry Zelenak), Director of Training and Development (S. Kuhn Ernst), and others were aware of the copying and pasting and untimely entry of clinical notes in the medical records.

120.   In an August 2010, email, Ms. Imlay explained to Ms. Zelenak, Jennie Roberts (the Chief Nursing Officer hired in 2010), Ms. Ford, and Mr. Drager that "nurses cut & paste majority of their notes," and that the delay in nursing documentation "can exceed two weeks."

121.   Evercare's internal audits also demonstrate that nursing notes were frequently not completed in the electronic medical record on the same day as the clinical visit.  For example, internal audits show that in Vienna, Virginia, in 2009, only 38% of notes were completed on the same day; in Houston, Texas, in 2010, 0% of notes were completed on the same day; and, in Boston, Massachusetts, in 2010, only 20% of notes were completed on the same day.

122.   Evercare did not adequately address this problem.

123.    Evercare failed to ensure that its nurses documented accurate and complete information about the patients' medical conditions in the medical records.

124.    Evercare failed to ensure that its nurses communicated accurate and complete information about the patients' medical conditions to Evercare's physician Medical Directors.

125.    Former employees identified a pattern in which nurses, in response to pressure to increase census: (a) emphasized information supporting hospice eligibility for their admissions assessments and in the medical records and (b) downplayed or omitted information indicating the patient had a life expectancy greater than six months.

126.    For example, a nurse who worked for Evercare in Phoenix from 2008 to 2010 stated that due to pressure to meet admissions or census goals, nurses learned how to show hospice eligibility by documenting *only* what a patient was not able to do, not what a patient was able to do.

127.    A Medical Director in Illinois in 2012 observed that patients appeared to be in worse condition according to the written medical records than described by the nurses when he questioned them about the patients' condition.

128.    Evercare knew as early as approximately 2009 that "[c]linical documentation in the medical record" and hospice "[e]ligibility determinations" were "Potential Risk Areas" for the company.

129.    According to Ms. Zelenak, whether there was sufficient support for a terminal prognosis in the medical records has "always been considered a risk area."

130.    Evercare knew that a substantial number of its patients that it admitted as "terminally ill" ended up being later discharged as not terminally ill.  Evercare knew that its rate for "live discharges" – patients it had admitted into hospice and later discharged while alive –

28

was higher than the national average.  Between 2009 and 2011, Evercare live discharged 23% of its patients nationwide, compared to 18% nationwide.   Some locations were higher:  between 2009 and 2011, Evercare's live discharge rate was 36% in the Phoenix site, 36% in the Birmingham site, and 40% in the Macon site.

131.    In December 2010 alone, Mr. Drager wrote that "live discharges continue to trend high with 9 sites over the industry national average"; Ms. Ford wrote that she was "highly concerned … to have 6 sites over 25% for the quarter"; and Dr. James Mittleberger (the Chief Medical Officer hired in 2010), wrote that he was "very concerned about the live discharge rate."

132.    Evercare knew that its high live discharge rate was linked to having patients on hospice who were not terminally ill.  In July 2009, an Executive Director expressed to Ms. Imlay that he was "aggravated that we have inherited a census that included three patients that truly were not hospice appropriate and were put on just to get numbers."  In August 2010, a Medical Director wrote to Ms. Imlay:  "Most of our patients have never been seen by a M.D.  I anticipate that many will not and likely have never met criteria.  I anticipate additional live discharges." And in September 2011, a Medical Director similarly wrote to Dr. Mittleberger that "there were quite a few patients that we took off service after I started that I would doubt ever had a prognosis of 6 months."

133.    Evercare also received multiple staff complaints that it was admitting and recertifying patients who were not terminally ill.

134.    Evercare had a policy that required all Medical Directors' plans to discharge patients to be reviewed by Ms. Imlay and Ms. Zelenak.

135.    There was no similar policy that required management review of patients that were recertified for Evercare hospice.

29

136.    Many Evercare employees perceived this policy to require the approval of Ms. Imlay and/or Ms. Zelenak prior to discharging a patient from hospice.  For example, in December 2009, in an email to Ms. Imlay, a Medical Director described a patient as one that "we were going to [discharge] at the end of last cert period as he was one of those 'admit and see how he does' who didn't have a whole lot of decline," and now the Medical Director sought Ms. Imlay's "blessing" to discharge; in December 2009, an employee asked Ms. Zelenak and Ms. Imlay to "confirm [their] decision" on a discharge; in June 2010, an employee stated that "we need your permission to proceed with discharge"; in August 2010, an employee described the process as "presentation of our final findings to corporate for final approval"; and, in May 2011, in an email to Ms. Imlay, an employee "ask[ed] for [her] approval in discharge."

137.    In at least some cases, management succeeded in persuading the Medical Directors to recertify the patients and keep them on hospice.

138.    Ms. Zelenak acknowledged that she was contacted to review proposed live discharges *after* the clinical team at the site already decided that the patients should be live discharged, and some patients stayed on hospice after she communicated back to the clinical team that she thought the discharge decision should be reconsidered.

139.    At least one Medical Director who did not follow the discharge review policy was penalized.  Ms. Ford accused a Medical Director in Denver in 2010 of ruining the budget for discharging of a number of ineligible patients without management pre-approval.

140.    In a February 2010 email, Ms. Ford wrote that she was "furious about the [live discharge] in Denver" and that the Medical Director responsible for the discharges should be "minimize[d]."

141.     Another email from Ms. Ford discussed placing Denver's nursing manager on a corrective action plan but notes the "delicacy of this and how it appears for CMS."

142.     Following this incident, the Denver staff members were informed that management had "zero tolerance on a go forward basis not to be informed of [proposed live discharges] 2-3 weeks in advance."  And in June 2010, staff members in Tucson were informed that the "process needs to be followed.  Discussing the patient with a doctor is not the same as providing [Ms. Imlay] with a summary of the hospice physician's physician visit within the past week."

143.     After staff in Tucson had failed to follow the process for one patient in June 2010, Ms. Imlay explained that "I have to explain this to people I report up to and … [a]ppears the decision has already been made and I'm simply be [sic] notified."

144.     Evercare also knowingly challenged or disregarded Medical Directors' decisions that patients were not terminally ill and should be discharged.

145.     A nursing manager in Illinois challenged a Medical Director's decisions regarding eligibility by attempting to have the head Medical Director certify the patient.

146.     An Executive Director and clinical manager in Ohio likewise tried to make a Medical Director in Ohio from 2007 to 2011 change her mind and certify patients whom the Medical Director found ineligible for hospice benefits.

147.     When this former Medical Director in Ohio refused to recertify three patients, Hugh Henderson, the Regional Director, told the Executive Director in a December 2010 email that "I think you are going to have to tell her she is not in line with our company philosophy and we may have to part ways."

148.    Similarly, Evercare encouraged a Massachusetts Medical Director to leave Evercare after she discharged so many ineligible patients that a corporate team began reviewing her proposed discharges.

**E.     Internal and External Audits Demonstrate Evercare's Knowledge That it was Falsely Billing for Hospice.**

149.    Evercare knew from internal and external medical record reviews that its medical records did not support that its patients were terminally ill and needed hospice care.

150.    Ms. Zelenak (Director of Quality) acknowledged that Evercare's internal medical record reviews performed after 2008 "always" revealed a pattern of the clinical documentation in the medical record not supporting a terminal prognosis.

151.    For example, Evercare's internal audits of several Evercare sites revealed that in *most* charts it reviewed, the documentation did not support the initial certification or a finding of terminal illness:

a.      2009, Vienna, Virginia:  Documentation did not support terminal prognosis and initial certification in 4 out of 8 charts (50%);

b.      2010, Houston, Texas:  Documentation did not support terminal prognosis and initial certification in 3 out of 5 charts (60%);

c.      2010, Boston, Massachusetts:  Documentation did not support terminal prognosis and initial certification in 9 out of 10 charts (90%);

d.      2012, Dayton, Ohio:  Documentation did not support recertification in 4 out of 9 charts (44%).

152.    In addition, Evercare's internal audits for the Denver site revealed a similar pattern:

32

a.    First Quarter, 2010:  Documentation did not support terminal prognosis and initial certification in 4 of 10 charts (40%);

b.    Third Quarter, 2010:  Documentation did not support terminal prognosis and initial certification in any of 5 charts (0%);

c.    First Quarter, 2011:  Documentation did not support certification/recertification in 4 out of 14 charts (29%).

153.    Ms. Kuhn-Ernst (Director of Training and Development) heard in meetings before 2012 attended by company leadership that Evercare's internal medical record reviews found medical records did not support that patients were terminally ill and eligible for hospice care.

154.    According to Ms. Zelenak, who was responsible for Evercare's internal medical record reviews, Evercare never considered refunding Medicare payments that it received for individuals whose medical records did not support a terminal prognosis.

155.    Evercare's medical records were also reviewed by Medicare claims processors.

156.    The absence of support for a terminal prognosis was a common reason that Medicare claims processors denied payment of Evercare's claims that were medically reviewed by the claims processors in the period from 2008 through 2012.

157.    For example, according to an attachment to a November 2008 email from Eugene Glancy, a Senior Analyst, to Evercare's internal quality team and others, approximately 44% of claims selected for medical review at that time had been denied by Medicare claims processors.

158.    Evercare frequently decided not to appeal denials of payment because Evercare knew its medical records did not support payment.

159.    For example, according to an attachment to a November 2010, email from Mr. Glancy to Evercare's internal quality team and others, Evercare decided not to appeal 20% of claims denied by Medicare contractors.

160.    And according to an attachment to a May 2011, email from Mr. Glancy to Evercare's internal quality team and others, Evercare decided not to appeal 22% of claims denied by Medicare contractors.

161.    Ms. Ford (Chief Operating Officer) also knew that medical record reviews performed internally and by Medicare claims processors found that medical records did not support payment of the claims or eligibility of the patients for hospice care.

## VII.   EVERCARE RECEIVED MONEY FROM MEDICARE BASED ON THE PRESENTATION OF FALSE CLAIMS.

162.    From at least January 1, 2007, Evercare has collected hundreds of millions of dollars from Medicare for hospice benefits.  For example, between 2008 and 2011 alone, Medicare paid Evercare approximately $226 million.  Much of that revenue was derived from hospice patients with stays exceeding six months.  In fact, approximately $91.5 million dollars was for hospice patients who were on hospice for longer than one year.

## VIII.  EXAMPLES OF FALSE CLAIMS FOR PATIENTS WHO WERE NOT TERMINALLY ILL.

163.    Evercare's medical records reflect the company's failure to provide its clinical staff adequate training to identify terminally ill patients and pressure on all its employees, including its clinical staff, to admit and retain patients to meet the company's patient admissions and census expectation.

164.    Evercare's medical records show, for example, that recorded scores on clinical scales – such as the Functional Assessment Staging ("FAST") scale, which is used to assess the

progression of Alzheimer's disease – often underrate patients' functional ability, making the patients appear worse than reflected in visit notes.   Evercare's medical records also reflect the ongoing problem of copying and pasting in, and delayed entry of, visit notes.

165.    The specific examples, described below, of patients admitted by Evercare providers across the United States, illustrate how Evercare's company-wide conduct led to the submission of false claims for patients who were not terminally ill or in need of hospice care.

**A.    Patient LH**

166.    Evercare knowingly submitted false claims for hospice care for patient LH in Colorado Springs, Colorado for nearly ten months from January 21, 2009, to November 16, 2009.  These claims were false because Evercare's own medical records showed that patient LH was not terminally ill and did not need hospice care during that time.

167.    When Evercare admitted LH, she was 87 years old and living in a nursing facility.

168.    Evercare admitted LH with a diagnosis of "debility."  *See supra* Section V.C. ¶52.

169.    On a January 29, 2009, visit, Evercare's physician reported that LH was admitted to hospice for "physical decline" that was "primarily marked by strength decrease in the recent months."  This physician noted that if LH "remains stable under our care, we will reconsider her eligibility with input from the entire IDT [Interdisciplinary Team]."

170.    On a March 31, 2009, visit, over two months after Evercare admitted LH to hospice, Evercare's social worker recorded in the medical record that LH may be discharged from hospice due to "extended prognosis."  Despite this medical record entry, Evercare kept LH on hospice.

171.    On a April 7, 2009, visit, Evercare's nurse recorded in the medical record that although LH complained of weakness, pain in her legs and shoulders, and dizziness when turning

her head to the left, LH remained able to walk with a walker and "needs minimal assistance" with activities of daily living.

172.   On a May 19, 2009, visit, Evercare's nurse recorded that LH complained of pain and tingling in her right arm and was looking forward to her visit with the rheumatologist; LH's appetite was good; and the nurse encouraged LH to take a planned trip to Kansas.

173.   On June 9 and 16, 2009, visits, Evercare's nurse recorded that LH's dizziness was managed; LH started a medication prescribed by the rheumatologist; and LH reported that her trip to Kansas went fairly well, although she had stubbed her toes while walking to the bathroom without her walker.

174.   On a June 22, 2009, visit, Evercare's Chaplain recorded that LH showed him pictures of her trip to Kansas, including "pictures of her fish she caught."

175.   On August 11, 2009, visit, Evercare's nurse recorded that LH was "independent or assisted during the day," her "appetite [was] good," and although she had periodic pain in her upper left extremity, she did not wish to change her pain medication.

176.   On August 17, 2009, Evercare's nurse recorded that LH "uses a walker for stability" and can "do [her] own cares with occasional assist."

177.   LH was not terminally ill, based on the facts in Evercare's medical records, from January 21, 2009, to at least November 16, 2009.

178.   Evercare was not entitled to receive the following Medicare payments that it received for hospice claims submitted for LH when its medical records showed that LH was not terminally ill and did not need hospice care:

| Claim Number | Date claim was received | Beginning date of service on the claim | End date of service on the claim | Paid date of the claim | Payment amount ($) |
|---|---|---|---|---|---|
| 20917092325708COR | 20-Jun-09 | 21-Jan-09 | 31-Jan-09 | 22-Jun-09 | 1578.07 |
| 20917092325608COR | 20-Jun-09 | 1-Feb-09 | 28-Feb-09 | 22-Jun-09 | 4016.91 |
| 20910400873302COR | 16-Apr-09 | 1-Mar-09 | 31-Mar-09 | 28-Apr-09 | 4447.29 |
| 20913300868102COR | 15-May-09 | 1-Apr-09 | 30-Apr-09 | 27-May-09 | 4303.83 |
| 20916101277702COR | 12-Jun-09 | 1-May-09 | 31-May-09 | 24-Jun-09 | 4447.29 |
| 20919400852602COR | 15-Jul-09 | 1-Jun-09 | 30-Jun-09 | 27-Jul-09 | 4382.23 |
| 20922300149202COR | 12-Aug-09 | 1-Jul-09 | 31-Jul-09 | 25-Aug-09 | 4447.29 |
| 20925300455602COR | 11-Sep-09 | 1-Aug-09 | 31-Aug-09 | 24-Sep-09 | 4447.29 |
| 20928100283202COR | 10-Oct-09 | 1-Sep-09 | 30-Sep-09 | 22-Oct-09 | 4303.83 |
| 20931400045102COR | 13-Nov-09 | 1-Oct-09 | 31-Oct-09 | 24-Nov-09 | 4592.14 |

179.    LH was on Evercare hospice service for at least 360 days.  LH died 600 days (or over one year and seven months) after she was admitted to hospice by Evercare.

180.    From January to November 2009 (the period during which she was not eligible for hospice, or nearly ten months), LH received approximately 62 visits from an Evercare Registered Nurse ("RN").

**B.    Patient RS**

181.    Evercare knowingly submitted false claims for hospice care for patient RS in Cincinnati, Ohio for approximately fourteen months, from January 16, 2010, to September 12, 2010, and from March 12, 2011, to September 28, 2011.   These claims were false because Evercare's own medical records showed that RS was not terminally ill and did not need hospice care during that time.

37

182.     When Evercare admitted RS, he was 86 years old and living in an assisted living facility.

183.     Evercare admitted RS with a primary diagnosis of vascular dementia.  *See supra* Section V.C. ¶ 51.

184.     Evercare's own medical records show that RS had a good appetite, a normal body mass index (BMI), no significant difficulty swallowing, clear speech (albeit confused in content), capacity for wound healing, ongoing ability to walk, and no serious infections.

185.     For example, on January 17, 2010, Evercare's nurse recorded that RS "ate 100% of meal," "per facility staff [RS] eats between 75-100% of most meals," "ambulates with a walker," "is continent most times," and "denies pain."

186.     Similarly, on February 4, 2010, Evercare's nurse recorded that RS "is on a regular diet eating 100% of meals at this time," and "up walking around in facility common area."

187.     On March 22, 2010, Evercare's nurse recorded that RS was "walking in hall with his neighbor's walker."

188.     On August 24, 2010, Evercare's nurse recorded that RS was having increased difficulty walking but remained able to walk with a walker.   His recorded BMI of 23 was normal.

189.     In September 2010, RS suffered a fall that resulted in a laceration to his head and fractured rib.

190.     But by at least March 12, 2011, RS had recovered from his injuries, had maintained a stable weight for four months, and had no infections or other complications that would support a life expectancy of six months or less.

191.     Over the next six months, from March 12, 2011, until September 29, 2011 (when RS exhibited symptoms of a stroke), RS maintained a stable weight, good intake of food and liquids, and the ability to walk with a walker.

192.     For example, Evercare's nurses recorded the following weights for RS in the months of January through July 2011:

    a.   January 2011 – 164 lbs.

    b.   February 2011 – 164 lbs.

    c.   March 2011 – 166 lbs.

    d.   April 2011 – 164 lbs.

    e.   May 2011 – 165 lbs.

    f.   June 2011 – 165 lbs.

    g.   July 2011 – 165 lbs.

193.     RS was not terminally ill, based on the facts in Evercare's medical records, from January 16, 2010, to at least September 12, 2010, and from at least March 12, 2011, to September 28, 2011.

194.     Evercare was not entitled to receive the following Medicare payments that it received for hospice claims submitted for RS when its medical records showed that RS was not terminally ill and did not need hospice care:

| Claim Number | Date claim was received | Beginning date of service on the claim | End date of service on the claim | Paid date of the claim | Payment amount ($) |
|---|---|---|---|---|---|
| 21120103594408OHRU | 21-Jul-11 | 16-Jan-10 | 31-Jan-10 | 25-Jul-11 | 2322.07 |
| 21120103594508OHRU | 21-Jul-11 | 1-Feb-10 | 28-Feb-10 | 25-Jul-11 | 4063.61 |
| 21120103594608OHRU | 21-Jul-11 | 1-Mar-10 | 31-Mar-10 | 25-Jul-11 | 4499.00 |

| Claim Number | Date claim was received | Beginning date of service on the claim | End date of service on the claim | Paid date of the claim | Payment amount ($) |
|---|---|---|---|---|---|
| 21120103594708OHRU | 21-Jul-11 | 1-Apr-10 | 30-Apr-10 | 25-Jul-11 | 4353.87 |
| 21016603534805OHR | 17-Jun-10 | 1-May-10 | 31-May-10 | 28-Jun-10 | 4499.00 |
| 21019603691505OHR | 19-Jul-10 | 1-Jun-10 | 30-Jun-10 | 28-Jul-10 | 4353.87 |
| 21022804618405OHR | 18-Aug-10 | 1-Jul-10 | 31-Jul-10 | 27-Aug-10 | 4499.00 |
| 21025102808405OHR | 10-Sep-10 | 1-Aug-10 | 31-Aug-10 | 22-Sep-10 | 4499.00 |
| 21113001284805OHR | 12-May-11 | 1-Apr-11 | 30-Apr-11 | 24-May-11 | 4372.91 |
| 21116403816805OHR | 15-Jun-11 | 1-May-11 | 31-May-11 | 24-Jun-11 | 4518.67 |
| 21119404359905OHR | 15-Jul-11 | 1-Jun-11 | 30-Jun-11 | 26-Jul-11 | 4372.91 |
| 21122705463605OHR | 17-Aug-11 | 1-Jul-11 | 31-Jul-11 | 26-Aug-11 | 4518.67 |
| 21125904388305OHR | 20-Sep-11 | 1-Aug-11 | 31-Aug-11 | 29-Sep-11 | 4518.67 |
| 21128703474205OHR | 18-Oct-11 | 1-Sep-11 | 30-Sep-11 | 27-Oct-11 | 4372.91 |

195.    RS died 665 days (or over one year and nine months) after he was admitted to hospice by Evercare.

196.    From January to September 2010, and from March to September 2011 (the periods in which he was not eligible for hospice, or approximately fourteen months), RS received approximately 88 visits from an Evercare RN.  Only two of these visits lasted longer than thirty minutes, and approximately 55 of these visits was ten minutes or less.

**C.    Patient DH**

197.    Evercare knowingly submitted false claims for hospice care for patient DH in Columbia, Maryland for over six months from April 8, 2009, to October 21, 2009.  These claims

40

were false because Evercare's own medical records showed that DH was not terminally ill and did not need hospice care during that time.

198.    When Evercare admitted DH, she was 81 years old and living in a nursing facility.

199.    Evercare admitted DH with a primary diagnosis of debility.  *See supra* Section V.C. ¶ 52.

200.    Weight loss was the only change in DH's condition.  There were no changes in DH's condition following her admission to support a life expectancy of six months or less.

201.    The same description of DH's condition is duplicated in case conference notes for May 12, 2009; May 26, 2009; June 9, 2009; June 23, 2009; July 7, 2009; August 4, 2009; and August 18, 2009.

202.    On a September 24, 2009 visit, Evercare's nurse recorded that DH "has not had a decline since admission to hospice."

203.    Similarly, a September 29, 2009, case conference note records that DH "is stable and has not shown any signs [of] decline in the last 3 recert periods."

204.    DH was not terminally ill, based on the facts in Evercare's medical records, from at least April 8, 2009, to October 21, 2009, when Evercare discharged DH.

205.    Evercare was not entitled to receive the following Medicare payments that it received for hospice claims submitted for DH when its medical records showed that DH was not terminally ill and did not need hospice care:

| Claim Number | Date claim was received | Beginning date of service on the claim | End date of service on the claim | Paid date of the claim | Payment amount ($) |
|---|---|---|---|---|---|
| 20916300992602MDR | 17-Jun-09 | 1-May-09 | 31-May-09 | 26-Jun-09 | 4698.91 |
| 20919500937502MDR | 16-Jul-09 | 1-Jun-09 | 30-Jun-09 | 28-Jul-09 | 4547.33 |

| Claim Number | Date claim was received | Beginning date of service on the claim | End date of service on the claim | Paid date of the claim | Payment amount ($) |
|---|---|---|---|---|---|
| 20923600232804MDR | 25-Aug-09 | 1-Jul-09 | 31-Jul-09 | 8-Sep-09 | 4698.91 |
| 20929400311204MDR | 22-Oct-09 | 1-Aug-09 | 31-Aug-09 | 4-Nov-09 | 4698.91 |
| 20929200007702MDR | 27-Oct-09 | 1-Sep-09 | 30-Sep-09 | 4-Nov-09 | 4547.33 |
| 20931400070802MDR | 13-Nov-09 | 1-Oct-09 | 21-Oct-09 | 24-Nov-09 | 3234.94 |

206.    DH was on Evercare hospice service for 617 days.  She died over a year after she was discharged from hospice (over two and a half years after she was first admitted to Evercare).

207.    From April to October 2009 (the period in which she was not eligible for hospice, or over six months), DH received approximately eighteen visits from an Evercare RN.  Only three of these visits lasted longer than fifteen minutes.

**D.    Patient VB**

208.    Evercare knowingly submitted false claims for hospice care for patient VB in Reston, Virginia for over twenty three months from August 9, 2007, to at least July 21, 2009.  These claims were false because Evercare's medical records showed that patient VB was not terminally ill and did not need hospice care during that time.

209.    When Evercare admitted VB, she was 85 years old and living in an assisted living facility.

210.    Evercare admitted VB with a diagnosis of Alzheimer's disease.  *See supra* Section V.C. ¶ 50.

42

211.    During the period from August 9, 2007, to July 21, 2009, VB suffered no significant infections.  After early skin issues were resolved, visit notes recorded that her skin was mostly intact.  For example:

a.    On an August 23, 2007, visit, Evercare's nurse reported "skin intact."

b.    On an April 4, 2008, visit, Evercare's nurse reported "skin intact."

c.    On a December 24, 2008, visit, Evercare's nurse reported "skin intact."

212.    In most visit notes in the period from August 9, 2007, to July 21, 2009, VB was described as eating well (75% to 100% of her meals).  When recorded, her weights and mid-arm circumference were stable, or even increasing.  For example:

a.    On an August 31, 2007, visit, Evercare's nurse reported that VB's "[a]ppetite [is] good.  Needs to be fed.  No problem with swallowing."

b.    On an April 4, 2008 visit, Evercare's nurse noted "muscle wasting" but recorded that VB's "[a]ppetite is good, fed by staff, eats very slowly but 100% … no new issues."

c.    On June 6, 2008, Evercare's social worker reported that the staff at the assisted living facility where VB resided "reports no changes/concerns in behavior or health issues—wt [weight] has been stabilizing … resident eating heartily as being fed."

d.    On November 28, 2008, Evercare's social worker reported that VB "continues to eat well but now needs to be fed by staff and weight is stable if not slight gain."

e.    On a December 24, 2008, visit, Evercare's nurse reported that VB was "[f]ed by staff[;] appetite is good … No prob swallowing."

43

213.    VB was not terminally ill, based on the facts in Evercare's medical records, for over 23 months, from August 9, 2007, to at least July 21, 2009.

214.    Evercare was not entitled to receive the following Medicare payments that it received for hospice claims submitted for VB when its medical records showed that VB was not terminally ill and did not need hospice care:

| Claim Number | Date claim was received | Beginning date of service on the claim | End date of service on the claim | Paid date of the claim | Payment amount ($) |
|---|---|---|---|---|---|
| 20803901017502 | 12-Feb-08 | 1-Jan-08 | 31-Jan-08 | 22-Feb-08 | 4703.94 |
| 20807100741602 | 13-Mar-08 | 1-Feb-08 | 29-Feb-08 | 25-Mar-08 | 4400.46 |
| 20810100338602 | 14-Apr-08 | 1-Mar-08 | 31-Mar-08 | 24-Apr-08 | 4703.81 |
| 20813400973402 | 15-May-08 | 1-Apr-08 | 30-Apr-08 | 27-May-08 | 4552.07 |
| 20817500444602 | 25-Jun-08 | 1-May-08 | 31-May-08 | 7-Jul-08 | 4703.81 |
| 20819700605502 | 17-Jul-08 | 1-Jun-08 | 30-Jun-08 | 29-Jul-08 | 4552.08 |
| 20828300827202 | 13-Oct-08 | 1-Jul-08 | 31-Jul-08 | 23-Oct-08 | 4703.81 |
| 20827300759802 | 16-Oct-08 | 1-Aug-08 | 31-Aug-08 | 24-Oct-08 | 4703.81 |
| 20828700907302 | 21-Oct-08 | 1-Sep-08 | 30-Sep-08 | 27-Oct-08 | 4552.08 |
| 20916990502108VAR | 19-Jun-09 | 1-Oct-08 | 31-Oct-08 | 22-Jun-09 | 4808.32 |
| 20916990502208VAR | 19-Jun-09 | 1-Nov-08 | 30-Nov-08 | 22-Jun-09 | 4653.21 |
| 20916990502308VAR | 19-Jun-09 | 1-Dec-08 | 31-Dec-08 | 22-Jun-09 | 4808.32 |
| 20916990502408VAR | 19-Jun-09 | 1-Jan-09 | 31-Jan-09 | 22-Jun-09 | 4808.32 |
| 20916990502508VAR | 19-Jun-09 | 1-Feb-09 | 28-Feb-09 | 22-Jun-09 | 4343.00 |
| 20913400831602VAR | 19-May-09 | 1-Mar-09 | 31-Mar-09 | 28-May-09 | 4808.32 |
| 20913400832602VAR | 22-May-09 | 1-Apr-09 | 30-Apr-09 | 28-May-09 | 4653.21 |
| 20916300997302VAR | 16-Jun-09 | 1-May-09 | 31-May-09 | 26-Jun-09 | 4808.32 |

| Claim Number | Date claim was received | Beginning date of service on the claim | End date of service on the claim | Paid date of the claim | Payment amount ($) |
|---|---|---|---|---|---|
| 20919500925302VAR | 16-Jul-09 | 1-Jun-09 | 30-Jun-09 | 28-Jul-09 | 4653.21 |

215.     VB was on Evercare hospice service for approximately 1260 days.  She died over three years and five months after she was admitted to hospice by Evercare.

216.     From August 2007 to at least July 2009 (the period during which she was not eligible for hospice, or over twenty three months), VB had approximately forty four visits from an Evercare RN, or approximately one every two weeks.  VB did not receive a single visit from an Evercare RN in April, June, July, August, October, November, or December 2008, or in January or February 2009.

### E.      Patient LG

217.     Evercare knowingly submitted false claims for hospice care for patient LG in Phoenix, Arizona for nearly fifteen months, from April 27, 2008, to July 22, 2009.  These claims were false because Evercare's medical records showed that patient LG was not terminally ill and did not need hospice care during that time.

218.     When Evercare admitted LG, he was 68 years old and living in a nursing home.

219.     Evercare admitted LG with a diagnosis of Alzheimer's disease.  *See supra* Section V.C. ¶ 50.

220.     Although initially LG suffered a wound on his foot and slow weight loss, at least by April 27, 2008, his wound had healed, his weight and mid-arm circumference had stabilized, his intake of food and fluid was good, and he had no complications that would support a life expectancy of six months or less.

221. For example, on September 3, 2008, Evercare's nurse recorded that LG's "appetite [was] good," "nurse on duty [at the nursing facility where LG resided] reports [LG] [was] eating 100% of meals," and although he need[ed] help eating, "no coughing or choking [was] reported." In addition, "skin [was] checked for breakdown … none noted."

222. On March 1, 2009, Evercare's nurse recorded that LG's wife reported LG "appears to be having a delayed swallowing time, and maybe holding food in his mouth," Evercare's nurse "explained hazards of pushing food and fluids when a patient is having a 'bad' day swallowing."

223. Although LG fell on April 20, 2009, resulting in skin abrasions, and slid out of his chair on June 13, 2009, resulting in a small forehead laceration and skin tear on his hand, these events did not indicate progression in weakness or change in function and did not cause injury or infection that affected his life expectancy.

224. LG's recorded weight did not change from April 2009 to June 2009. On June 9, 2009, Evercare's nurse recorded that LG's weight was 197.5 lb., "which is the same as May." Evercare' nurse also noted that LG had lost less than 1 lb. since January.

225. In addition, during his hospice stay, LG's wife repeatedly expressed concern that LG did not need hospice care.

a. In a January 18, 2008, phone call, Evercare's social worker recorded that LG's wife "said when she signed [LG] on hospice 6/07, she was told he only had a couple of weeks to live" and now over six months later, his wife "feels that he does not need hospice at this time and would like to revoke." But, according to the medical record, Evercare management directed "we are not to revoke this patient because 'our census is too low.'"

      b.      Nearly seven months later, in a phone call on August 14, 2008, Evercare's nurse

recorded that LG's wife again expressed concern that LG did not qualify for

hospice as his condition was not changing.

226.     LG was not terminally ill, based on the facts in Evercare's medical record, from at

least April 27, 2008, until he suffered a seizure on July 23, 2009.

227.     Evercare was not entitled to receive the following Medicare payments that it

received for hospice claims submitted for LG when its medical records showed that LG was not

terminally ill and did not need hospice care:

| Claim Number | Date claim was received | Beginning date of service on the claim | End date of service on the claim | Paid date of the claim | Payment amount ($) |
|---|---|---|---|---|---|
| 20815803778202 | 7-Jun-08 | 1-May-08 | 31-May-08 | 19-Jun-08 | 4468.43 |
| 20819203355702 | 11-Jul-08 | 1-Jun-08 | 30-Jun-08 | 22-Jul-08 | 4324.28 |
| 20822601096702 | 14-Aug-08 | 1-Jul-08 | 31-Jul-08 | 26-Aug-08 | 4468.42 |
| 20831500348902 | 12-Nov-08 | 1-Aug-08 | 31-Aug-08 | 24-Nov-08 | 4468.42 |
| 20831500354302 | 14-Nov-08 | 1-Sep-08 | 30-Sep-08 | 24-Nov-08 | 4324.28 |
| 20910428435008AZR | 16-Apr-09 | 1-Oct-08 | 31-Oct-08 | 17-Apr-09 | 4620.50 |
| 20910428435108AZR | 15-Apr-09 | 1-Nov-08 | 30-Nov-08 | 16-Apr-09 | 4471.46 |
| 20910428435208AZR | 15-Apr-09 | 1-Dec-08 | 31-Dec-08 | 16-Apr-09 | 4620.50 |
| 20910428435308AZR | 15-Apr-09 | 1-Jan-09 | 31-Jan-09 | 16-Apr-09 | 4620.51 |
| 20910428435408AZR | 15-Apr-09 | 1-Feb-09 | 28-Feb-09 | 16-Apr-09 | 4173.36 |
| 20910300347602AZR | 15-Apr-09 | 1-Mar-09 | 31-Mar-09 | 27-Apr-09 | 4620.50 |
| 20913300337202AZR | 14-May-09 | 1-Apr-09 | 30-Apr-09 | 26-May-09 | 4471.45 |
| 20916100171502AZR | 11-Jun-09 | 1-May-09 | 31-May-09 | 22-Jun-09 | 4620.50 |

| Claim Number | Date claim was received | Beginning date of service on the claim | End date of service on the claim | Paid date of the claim | Payment amount ($) |
|---|---|---|---|---|---|
| 20926500265002AZR | 23-Sep-09 | 1-Jun-09 | 30-Jun-09 | 5-Oct-09 | 4471.45 |

228.     LG was on Evercare hospice service for 868 days before he was discharged.  He was later readmitted and died.  LG died over two years and seven months after his first admission to hospice by Evercare.

229.     From April 2008 to July 2009 (the period during which he was not eligible for hospice, or nearly fifteen months), LG had forty seven visits from an Evercare RN.  None of these visits was longer than twenty minutes, and fourteen of the visits were less than ten minutes.

**F.     Patient ZF**

230.     Evercare knowingly submitted false claims for hospice care for patient ZF in Denver, Colorado for over twenty one months from November 13, 2008, to August 30, 2010.  These claims were false because Evercare's medical records showed that patient ZF was not terminally ill and did not need hospice care during that time.

231.     When Evercare admitted ZF, she was 79 years old and living in a nursing facility.

232.     Evercare admitted ZF with a diagnosis of Alzheimer's disease.  *See supra* Section V.C. ¶ 50.

233.     Although ZF had some weight loss prior to admission, Evercare's own medical records show her Body Mass Index on admission was 24, nearly overweight.  Moreover, ZF was completely independent with ambulation (walking), and was able to answer simple questions.

234.     Evercare's medical records demonstrate duplication of clinical notes describing ZF's condition, which result in notes that were consistent with hospice eligibility but were unsupported and inaccurate when compared to contemporaneous visit notes.

235.     For example, case conference notes for six months in a row (January 14, 2010; February 11, 2010; March 11, 2010; April 22, 2010; May 6, 2010; and June 17, 2010), record the following statement:  "progressive weight decline in past 2 months of 5% (Jan = 125.8 LBS, May = 125.2 LBS, Jun = 125.8 LBS, Jul = 121.4 LBS, Aug = 121.2 LBS, Sep = 120.2, Oct = 120.0 ), BMI = 22.7)."  Notably, the "two month" difference between ZF's August and October weights is less than 5%.  Furthermore, this "two month" difference did not occur repetitively through 2010 despite being documented in those notes.

236.     Evercare's medical records also recorded FAST scores for ZF that appeared to support eligibility, but were inconsistent and inaccurate compared to other information in the record:

a.      On admission, ZF was scored as a FAST 7A.

b.      On December 23, 2008, in response to Evercare's chaplain playing Christmas music in the dining area of the nursing facility, Evercare's chaplain recorded that ZF stated that she loved the music and "you are darling."

c.      On January 30, 2009, Evercare's social worker recorded that ZF talked briefly to the social worker, and then asked him to leave.

d.      Despite these demonstrated abilities, on February 3, 2009, ZF's verbal communication was described as limited to "short phrases or single words" and she was scored a FAST 7E.

49

e.  Six days later, on February 9, 2009, Evercare's nurse recorded that ZF was able to answer the nurse's questions.

f.  On February 24, 2009, ZF was again scored as a FAST 7A.

g.  But then again on April 27, 2009, ZF was scored as a FAST 7E, despite the fact that on the same day, she reacted to her name and smiled and said many more words.

h.  Six case conference notes in a row (January 14, 2010; February 11, 2010; March 11, 2010; April 22, 2010; May 6, 2010; and June 17, 2010) then record that ZF's "FAST = 7D changed from the 7A last recert."

237.  In a physician visit prior to her discharge in August 2010, the physician recorded that ZF was able to "ambulate on her own," that her "weight has remained stable," that she was a FAST 7A, with "no significant infections or fever," and that she had "no [symptoms] that are difficult to manage."

238.  ZF was not terminally ill, based on the facts in Evercare's medical records, from November 13, 2008, to August 30, 2010.

239.  Evercare was not entitled to receive the following Medicare payments that it received for hospice claims submitted for ZF when its medical records showed that ZF was not terminally ill and did not need hospice care:

| Claim Number | Date claim was received | Beginning date of service on the claim | End date of service on the claim | Paid date of the claim | Payment amount ($) |
|---|---|---|---|---|---|
| 20916993886108COR | 19-Jun-09 | 1-Dec-08 | 31-Dec-08 | 22-Jun-09 | 4764.80 |
| 20916993886208COR | 19-Jun-09 | 1-Jan-09 | 31-Jan-09 | 22-Jun-09 | 4764.80 |
| 20916993886308COR | 19-Jun-09 | 1-Feb-09 | 28-Feb-09 | 22-Jun-09 | 4303.69 |

50

| Claim Number | Date claim was received | Beginning date of service on the claim | End date of service on the claim | Paid date of the claim | Payment amount ($) |
|---|---|---|---|---|---|
| 20910000810002COR | 14-Apr-09 | 1-Mar-09 | 31-Mar-09 | 24-Apr-09 | 4764.80 |
| 20913300850402COR | 15-May-09 | 1-Apr-09 | 30-Apr-09 | 27-May-09 | 4611.09 |
| 20916101258902COR | 12-Jun-09 | 1-May-09 | 31-May-09 | 24-Jun-09 | 4764.80 |
| 20919400862502COR | 15-Jul-09 | 1-Jun-09 | 30-Jun-09 | 27-Jul-09 | 4611.09 |
| 20922300117002COR | 13-Aug-09 | 1-Jul-09 | 31-Jul-09 | 25-Aug-09 | 4764.80 |
| 20925300479102COR | 14-Sep-09 | 1-Aug-09 | 31-Aug-09 | 24-Sep-09 | 4764.80 |
| 20928200146802COR | 14-Oct-09 | 1-Sep-09 | 30-Sep-09 | 23-Oct-09 | 4611.09 |
| 20931300177802COR | 11-Nov-09 | 1-Oct-09 | 31-Oct-09 | 23-Nov-09 | 4862.14 |
| 20934900151002COR | 17-Dec-09 | 1-Nov-09 | 30-Nov-09 | 29-Dec-09 | 4705.29 |
| 21001500965502COR | 20-Jan-10 | 1-Dec-09 | 31-Dec-09 | 29-Jan-10 | 4862.14 |
| 21004100371102COR | 12-Feb-10 | 1-Jan-10 | 31-Jan-10 | 24-Feb-10 | 4862.14 |
| 21006800542202COR | 11-Mar-10 | 1-Feb-10 | 28-Feb-10 | 23-Mar-10 | 4391.61 |
| 21010201062102COR | 14-Apr-10 | 1-Mar-10 | 31-Mar-10 | 26-Apr-10 | 4862.14 |
| 21013400745802COR | 18-May-10 | 1-Apr-10 | 30-Apr-10 | 28-May-10 | 4705.29 |
| 21016500948102COR | 16-Jun-10 | 1-May-10 | 31-May-10 | 28-Jun-10 | 4862.14 |
| 21019300315602COR | 14-Jul-10 | 1-Jun-10 | 30-Jun-10 | 26-Jul-10 | 4705.29 |
| 21022800918902COR | 18-Aug-10 | 1-Jul-10 | 31-Jul-10 | 30-Aug-10 | 4862.14 |
| 21118600246504COR | 13-Jul-11 | 1-Aug-10 | 30-Aug-10 | 14-Jul-11 | 4705.29 |

240.    ZF was on Evercare hospice service for 656 days (nearly 2 years) before she was discharged.  She was later readmitted and died.  ZF died nearly three years after her first admission to hospice by Evercare.

51

241.     From November 2008 and August 2010 (the period during which she was ineligible for hospice, over twenty one months), ZF received approximately seventy seven visits from an Evercare RN (less than one per week).  Of these seventy seven visits, approximately forty five were only ten minutes long or shorter.  Approximately another twenty one visits were twenty minutes long or shorter.

**FIRST CAUSE OF ACTION**
**(False or Fraudulent Claims)**
**(False Claims Act, 31 U.S.C. § 3729(a)(1)(A),**
**formerly 31 U.S.C. § 3729(a)(1)).**

242.     The United States re-alleges and incorporates by reference the allegations of paragraphs 1 through 241.

243.     By virtue of the acts described above, Evercare knowingly presented or caused to be presented to an officer or employee of the United States false or fraudulent Medicare claims for payment or approval, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1), amended by 31 U.S.C. § 3729(a)(1)(A); that is, Evercare knowingly made or presented, or caused to be made or presented, to the United States claims for payment for hospice services for Medicare participants who were not terminally ill and for whom hospice services were not reasonable and necessary.

244.     By reason of the foregoing, the United States suffered actual damages in an amount to be determined at trial, and therefore is entitled to treble damages under the False Claims Act, plus civil penalties of not less than $5,500 and not more than $11,000 per false claim.  Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 (notes), and 64 Fed. Reg.

47099, 47103 (1999), civil penalties were adjusted to $5,500 to $11,000 for violations occurring on or after September 29, 1999.

## SECOND CAUSE OF ACTION
### (Payment by Mistake)

245.    The United States re-alleges and incorporates by reference the allegations of paragraphs 1 through 244.

246.    This is a claim by the United States for the recovery of monies paid to Evercare by mistake for Medicare participants who were not terminally ill and for whom hospice services were not reasonable and necessary.

247.    As a consequence of the conduct and the acts set forth above, Evercare was paid by mistake by the United States in an amount to be determined which, under the circumstances, in equity and good conscience, should be returned to the United States.

## THIRD CAUSE OF ACTION
### (Unjust Enrichment)

248.    The United States re-alleges and incorporates by reference the allegations of paragraphs 1 through 247.

249.    This is a claim by the United States for recovery of monies by which Evercare has been unjustly enriched.

250.    By virtue of the conduct and the acts described above, Evercare was unjustly enriched at the expense of the United States in an amount to be determined, which, under the circumstances, in equity and good conscience, should be returned to the United States.

## PRAYER FOR RELIEF AND JURY DEMAND

WHEREFORE, the United States respectfully prays for judgment in its favor as follows:

1.  As to the First Cause of Action (False Claims Act), against Evercare for: (i) statutory damages in an amount to be established at trial, trebled as required by law, and such penalties as are required by law; (ii) the costs of this action, plus interest, as provided by law; and (iii) any other relief that this Court deems appropriate, to be determined at a trial by jury.

2.  As to the Second Cause of Action (Payment Under Mistake of Fact), for:  (i) an amount equal to the money paid by the United States through the Medicare Program to Evercare, and illegally retained by Evercare, plus interest; (ii) the costs of this action, plus interest, as provided by law; and (iii) any other relief that this Court deems appropriate, to be determined at a trial by jury.

3.  As to the Third Cause of Action (Unjust Enrichment), for:  (i) an amount equal to the money paid by the United States through the Medicare Program to Evercare, or the amount by which Evercare were unjustly enriched, plus interest; (ii) the costs of this action, plus interest, as provided by law; and (iii) any other relief that this Court deems appropriate, to be determined at a trial by jury.

4.  All other and further relief as the Court may deem just and proper.

    The United States hereby demands a jury trial on all claims alleged herein.

Respectfully submitted this 10th day of November 2014.

JOYCE R. BRANDA
Acting Assistant Attorney General

JOHN F. WALSH
United States Attorney

s/ Marcy E. Cook
Marcy E. Cook
Edwin G. Winstead
Assistant United States Attorneys
1225 Seventeenth Street, Suite 700
Denver, Colorado  80202
Telephone:  (303) 454-0171/0102
Fax: (303) 454-0404
E-mail: marcy.cook@usdoj.gov
            edwin.winstead@usdoj.gov

MICHAEL D. GRANSTON
RENÉE BROOKER
HOLLY H. SNOW
BRIAN E. BOWCUT
Attorneys, Civil Division
United States Department of Justice
601 D Street, NW
Washington, DC 20004
Tel.: (202) 616-2879
Counsel for the United States

**CERTIFICATE OF SERVICE**

I hereby certify that on November 10, 2014, I electronically filed the foregoing using the CM/ECF system, which will cause a copy of the foregoing to be e-mailed to the following:

Michael Porter
porterlaw@comcast.net
Counsel for Relators in 11-cv-00642

James F. Barger, Jr.
jim@frohsinbarger.com
Counsel for Relator in 14-cv-01647

I also hereby certify that on November 10, 2014, I caused the foregoing to be e-mailed to the following:

Representative for HHS-OCIG.

s/ Marcy E. Cook
Marcy E. Cook