**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 11-cv-00642-PAB-NYW

**UNITED STATES OF AMERICA,
<u>ex</u> <u>rel.</u> TERRY LEE FOWLER AND LYSSA TOWL,**
Plaintiffs,

v.

**EVERCARE HOSPICE, INC., n/k/a OPTUM PALLIATIVE AND HOSPICE CARE a
Delaware Corporation;
OVATIONS, INC., a Delaware Corporation; and
OPTUMHEALTH HOLDINGS, LLC, a Delaware limited liability corporation.**
Defendants.

---

**SECOND AMENDED *QUI TAM* COMPLAINT AND JURY DEMAND**

---

The Relators, Terry Lee Fowler and Lyssa Towl, by and through their counsel of record,

acting as Relators on behalf of the Government of the United States of America (the "Relators"),

state the following Second Amended Complaint against the Defendants Evercare Hospice, Inc.,

Ovations, Inc. and OptumHealth Holdings, LLC:

## I.      INTRODUCTION

1.      This lawsuit is brought pursuant to the provisions of the False Claims Act

["FCA"], 31 U.S.C. § 3729, *et seq.*, to recover monies which the United States overpaid the

Defendants.  The Relators challenge billings the Defendants "knowingly" submitted, or caused to

be submitted, in violation of 31 U.S.C. § 3729(a)(1), as amended October 27, 1986, and 31

U.S.C. § 3729(a)(1)(A), as amended May 20, 2009.

**EXHIBIT A**

2.      This *qui tam* suit concerns billings submitted, or caused to be submitted, by the Defendants to Medicare for hospice services provided by the Defendant Evercare Hospice, Inc. n/k/a Optum Palliative and Hospice Care ("Evercare") to patients who were knowingly ineligible for Medicare hospice benefits.

3.      The principal events at issue transpired in the time period of January of 2006 to the present and are ongoing.

4.      These Relators acknowledge The United States of America's Consolidated Complaint in Intervention ("U.S. Consolidated Complaint") [ECF No. 46] is the operative complaint, and supersedes these Relator's March 15, 2011 *Qui Tam* Complaint and Jury Demand [ECF No. 1] with respect to the claim asserted by the United States: the alleged violation of 31 U.S.C. § 3729(a)(1), as amended October 27, 1986, and 31 U.S.C. § 3729(a)(1)(A), as amended May 20, 2009, as against Evercare, only.  *See* U.S. Consolidated Complaint at ¶¶ 5, 242-244.

5.      This acknowledgement that the U.S. Consolidated Complaint is the operative complaint with respect to the FCA violations alleged in the U.S. Consolidated Complaint is without prejudice to these Relators' rights to participate as parties with respect to that claim, to participate in a share of any recovery as to that claim, as well as their right to recover their reasonable attorneys' fees, costs and expenses.  31 U.S.C. § 3730(c)(1), (d)(1).  *United States ex rel. Bilotta v. Novartis Pharmaceuticals Corporation*, -- F.Supp.3d --, No. 11 Civ. 0071(PGG), 2014 WL 4922291 (S.D.N.Y. Sept. 30, 2014).

6.      This Second Amended *Qui Tam* Complaint and Jury Demand asserts the claim as to which the government did not intervene: (1) the claim of violation of 31 U.S.C. § 3729(a)(1),

**EXHIBIT A**

as amended October 27, 1986, and 31 U.S.C. § 3729(a)(1)(A,) as amended May 20, 2009, as to the other Defendants: Ovations, Inc. and OptumHealth Holdings, LLC.

## II.    PARTIES

7.     Relator Terry Lee Fowler ("Fowler") is a resident of Denver, Colorado.

8.     Relator Lyssa Towl ("Towl") is a resident of Golden, Colorado.

9.     Evercare is a Delaware corporation that maintains its principal place of business at UnitedHealth Group Center, 9900 Bren Road East, Minnetonka, MN 55343.

10.     At times material hereto, Evercare maintained an office in Colorado located at 6455 S. Yosemite Street, 6th Floor, Englewood, CO ("the Denver office"), at which local and national employees, including its senior Vice-President, Tricia Ford ("Ford"), the national Director of Quality, Terry Zelenak ("Zelenak"), and the national Quality Manager, Fowler, are or were located.

11.     At times material hereto, Evercare has been a Medicare licensed provider of hospice benefits and has operated in thirteen states: Alabama, Arizona, California, Colorado, Georgia, Illinois, Maryland, Massachusetts, Missouri, Ohio, Pennsylvania, Texas and Virginia.

12.     At all times relevant to this Complaint, Evercare was in the business of providing hospice care to individuals who were Medicare participants.

13.      Evercare finances its hospice operations largely through receipt of Medicare dollars. Approximately ninety percent of Evercare's revenue has been derived from the Medicare program and since January 1, 2007, Evercare has collected hundreds of millions of dollars from Medicare for hospice benefits. Between 2008 and 2011 alone, Medicare has paid Evercare

**EXHIBIT A**

approximately $226 million, of which an estimated $91.5 million was for hospice patients who were on hospice for longer than one year.

14.     Since at least January 2007, Medicare billing numbers for Evercare providers were issued to Evercare Hospice, Inc., which submitted Medicare hospice claims on behalf of the Evercare providers operating across the country.

15.     Evercare's centralized billing department was located in Phoenix, Arizona.

16.     To administer and coordinate its provision of hospice service, Evercare has operated administrative facilities or offices ("offices") located in or near Birmingham, AL, Phoenix, AZ, Tucson, AZ, Concord, CA, Santa Anna, CA, Colorado Springs, CO, Denver, CO, Atlanta, GA, Macon, GA, Baltimore, MD, Columbia, MD, Boston, MA, St. Louis, MO, Schaumburg, IL, Cincinnati, OH, Dayton, OH, Philadelphia, PA, Houston, TX, San Antonio, TX, Haymarket VA, and Reston, VA.

17.     Fowler, who has been licensed as a R.N. since 1977, was employed by Defendants at the Denver Evercare office since December of 2008 in the dual capacity of Hospice Quality Manager and as the Hospice Regional Performance Improvement Coordinator. In April of 2011 Fowler voluntarily terminated his employment relationship with the Defendants.

18.     As the Hospice Quality Manager, Fowler administered the quality measures developed by the Senior Leadership, including the Director of Quality, Zelenak, to whom Fowler reported.  The Quality Manager collected and organized data at the site and national level and worked collaboratively with the National Medical Director and Director of Quality Assurance to design and generate useful reports.  The primary qualifications for the job were an unrestricted R.N. license in the state of residence and a four year degree with clinical experience preferred.

**EXHIBIT A**

19.     Fowler's position as Regional Performance Improvement Coordinator ("RPIC") was identified as one of the job duties of the Hospice Quality Manager. The job description for the RPIC stated that the RPIC "is a professional, registered nurse who works regionally to assist Executive Directors, Clinical Service Directors and the Quality Assurance Director in implementing the QAPI Plan and activities for the organization."

20.     Towl, who holds joint Masters degrees in Business Administration and Health Administration from the University of Colorado, had been employed by Defendants since November of 2009 in the Denver Evercare office as the Executive Director ("ED") with respect to Defendants' provision of hospice services to patients in the Denver metropolitan area and sites north of Denver, within Colorado.

21.     At the time of Towl's employment with the Defendants, the Hospice Executive Director was responsible and accountable for all activities and departments in the delivery of hospice services including budgeting, accounting, data collection, record maintenance and employee practices.  In addition, the Executive Director ensured compliance with Federal and State regulations as well as other accrediting bodies.  In her capacity as ED, Towl regularly evaluated the status and eligibility of Defendants' Colorado hospice patients and also was keenly aware of the billing status of each hospice patient. Towl was improvidently terminated from her employment with Defendants on January 5, 2011.

22.     The Defendant Ovations was at all times material hereto, up to approximately December 31, 2010, the sole shareholder of Evercare.  Ovations is a Delaware corporation that maintains its principal place of business at 9701 Data Park Drive, Minnetonka, MN, 55343.

5

**EXHIBIT A**

23.     The Defendant OptumHealth Holdings was at all times material hereto, from about January 1, 2011 to the present the sole shareholder of Evercare. Optum is a Delaware limited liability corporation that maintains its principal place of business at 6300 Olson Memorial Hwy, Golden Valley, MN 55427.

### III.    JURISDICTION AND VENUE

24.     This action is brought on behalf of the United States Government under 31 U.S.C. § 3729, *et seq*., commonly known as the False Claims Act ("FCA").  The Relators bring this action under 31 U.S.C. § 3730(b) to recover for "false claims" which the Defendants knowingly presented or caused to be presented to the Government in violation of 31 U.S.C. § 3729(a)(1), as amended October 27, 1986, and 31 U.S.C. § 3729(1)(A) and (G), as amended May 20, 2009. This Court has jurisdiction over such claims pursuant to 28 U.S.C. § 1331, 1345 and 31 U.S.C. § 3730(b).

25.     *In personem* jurisdiction is appropriate in this District because the FCA provides for nationwide service of process. 31 U.S.C. § 3732(a).  In such circumstances, the relevant inquiry is whether a given defendant has sufficient contacts with the United States as a whole. *Appl. To Enforce Admin. Subp. of  S.E.C. v. Knowles*, 87 F.3d 413, 417-419 (10th Cir. 1996). The Defendants have a significant commercial presence in Colorado and have abundant national contacts.

26.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because the Defendants can be found or transact business in this District and/or because one or more of the acts proscribed by the False Claims Act occurred within this District.

6

**EXHIBIT A**

## IV.     THE FALSE CLAIMS ACT

27.     The False Claims Act provides, in part, that any entity that knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval is liable to the United States for damages and penalties. *See* 31 U.S.C. §§ 3729(a)(1), amended by, 31 U.S.C. § 3729(a)(1)(A).

28.     To show that an entity acted "knowingly" under the False Claims Act, the United States must prove that the entity, with respect to information: (1) had actual knowledge of the information; (2) acted in deliberate ignorance of the truth or falsity of the information; or (3) acted in reckless disregard of the truth or falsity of the information. The United States does not have to prove that the entity had the specific intent to defraud the United States. 31 U.S.C. § 3729(b), amended by 31 U.S.C. § 3729(b)(1).

## V.     THE MEDICARE HOSPICE PROGRAM

**A.     The Medicare Hospice Benefit.**

29.     Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395-1395kkk-1, establishes the Health Insurance for the Aged and Disabled Program, commonly referred to as the Medicare Program (or "Medicare").

30.      The Medicare Program is comprised of four parts. Medicare Part A is a 100 percent federally-funded health insurance program for qualified individuals aged 65 and older, younger people with qualifying disabilities, and people with End Stage Renal Disease (permanent kidney failure requiring dialysis or transplant). The majority of Medicare Part A's costs are paid by United States citizens through their payroll taxes. The benefits covered by Medicare Part A include hospice care, as defined in 42 U.S.C. § 1395x(dd).

**EXHIBIT A**

31.     The Medicare hospice benefit, created by Congress in 1982, is designed to provide terminally ill patients with palliative care (*i.e*., care intended to optimize quality of life by preventing and relieving suffering) instead of curative care (*i.e*., care designed to cure an illness or condition).

32.     The Medicare hospice benefit pays for medical, nursing, social, psychological, emotional, and spiritual care intended to make terminally ill Medicare participants as physically and emotionally comfortable as possible prior to their death, while remaining primarily in the home environment. *See* 79 Fed. Reg. 26538, 26541 (May 8, 2014).

33.     The Medicare hospice benefit is not reasonable and necessary for a Medicare participant unless the individual is "terminally ill." As generally accepted by the medical community, the term "terminal illness" refers to an incurable, advanced, progressively deteriorating illness. *See* 78 Fed. Reg. 48234, 48247 (Aug. 7, 2013). Medicare defines "terminally ill" to mean that an individual has a "medical prognosis that the individual's life expectancy is 6 months or less." 42 U.S.C. § 1395x(dd)(3)(A); 42 C.F.R. § 418.3.

34.     To receive the Medicare hospice benefit, eligible Medicare participants must "elect" the benefit (*i.e.*, it is voluntary). 42 C.F.R. § 418.24. By doing so, they waive their right to Medicare coverage for curative treatment for their terminal illness as well as related conditions. *See* 42 C.F.R. § 418.24(d).

35.      For example, a cancer patient who has a life expectancy of six months or less and elects the Medicare hospice benefit will no longer receive Medicare-covered treatment, such as chemotherapy, intended to cure the cancer, but instead will receive palliative care designed to relieve only the pain and suffering associated with the patient's impending death.

8

**EXHIBIT A**

36.     Electing the Medicare hospice benefit is often a critical decision for a Medicare participant, because, for many Medicare participants, electing the benefit is electing to cease any further curative care for their terminal illnesses.

37.      Companies can provide hospice care reimbursable by Medicare wherever the patient resides, which may be a private residence or a health care facility, such as a nursing home or assisted-living facility. If a hospice patient lives in a health care facility, the facility will continue to provide for the patient's daily care needs.

38.     Since the inception of the Medicare hospice benefit, Medicare has paid hospices a fixed, per day, per level of care rate, which is intended to cover all hospice services needed to manage the end of life care of the terminal illness and related conditions. *See* 79 Fed. Reg. 26538, 26543 & 26553 (May 8, 2014). For patients receiving routine home care, the hospice is paid the same rate each day regardless of what, if any, services the hospice provides each day. *See* 79 Fed. Reg. 26538, 26553 (May 8, 2014).

39.     Originally, Medicare did not pay for hospice benefits beyond 210 days, in other words, about seven months. Since 1990, Medicare has paid for two initial 90-day periods, and then an unlimited number of 60-day periods, but only if the individual remains "terminally ill," meaning that he or she continues to have a medical prognosis that his or her life expectancy is six months or less. 42 C.F.R. § 418.3; Medicare Benefit Policy Manual, Chapter 9, §§ 10, 20.1.

**B.     Conditions of Payment for the Medicare Hospice Benefit.**

40.     All Medicare providers must deal honestly with the Government and with patients.

**EXHIBIT A**

41.     In addition, all healthcare providers like Evercare are obligated to comply with applicable requirements in order to be reimbursed by Medicare under Part A. When participating in Medicare, a provider has a duty to be knowledgeable of the statutes, regulations, and guidelines for coverage of Medicare services.

42.     At all times material hereto, the Defendants had a duty to have a thorough knowledge of the Medicare hospice program, and to properly train and inform their agents and employees regarding the requirements for Medicare coverage of hospice care.

43.     One purpose of the Medicare hospice requirements is to ensure that limited Medicare funds are properly spent on patients whose death is predictably impending and who actually need end-of-life care.

44.     Accordingly, hospice companies like Evercare are entitled to receive Medicare dollars for hospice care only when such care is "reasonable and necessary for the palliation or management of terminal illness." 42 U.S.C. § 1395y(a)(1)(C).

45.     In order to receive payment from Medicare, a hospice company must certify that the individual is, in fact, "terminally ill." *See* 42 U.S.C. § 1395f(a)(7).

46.     As part of the certification requirements, the hospice must ensure that the medical record that the hospice maintains for the individual contains clinical information and other documentation that support that the individual is "terminally ill." *See* 42 U.S.C. § 1395f(a)(7); 42 C.F.R. § 418.22.

47.     A hospice company is not entitled to payment for hospice care when its medical records do not support that the individual is "terminally ill" because clinical information and other documentation in the hospice medical record that supports that the individual is "terminally

10

**EXHIBIT A**

ill" is a condition of Medicare payment for hospice services. *See* 42 C.F.R. § 418.200; 42 C.F.R. § 418.22(b); 78 Fed. Reg. 48234, 48245 (Aug. 7, 2013).

48.     It is a condition of participation that hospice service providers must maintain a clinical record for each hospice patient that contains "correct clinical information." All entries in the clinical record must be "legible, clear, complete, and appropriately authenticated and dated. …" 42 C.F.R. § 418.104.

49.      The requirements that hospice care be "reasonable and necessary for the palliation or management of terminal illness" and that the hospice's medical record support that the individual is "terminally ill" are in addition to a requirement that a physician certify, based on his or her clinical judgment, that the individual's prognosis is for a life expectancy of six months or less if the terminal illness runs its normal course.

50.     Put another way, before a hospice submits a claim for payment: (a) a physician must have certified based on the exercise of his or her clinical judgment that the individual's prognosis is for a life expectancy of six months or less; and (b) the hospice's medical record must support that the individual is "terminally ill"; and (c) the hospice care must be "reasonable and necessary for the palliation or management of terminal illness." *See* 79 Fed. Reg. 26538, 26556 (May 8, 2014); *see also* 78 Fed. Reg. 48234, 48247 (Aug. 7, 2013); 70 Fed. Reg. 70532, 70534-35 (Nov. 22, 2005).

51.     For a patient's initial hospice admission, the hospice provider must obtain a certification of terminal illness for the individual from both (a) the medical director of the hospice or a physician-member of the hospice interdisciplinary group, and (b) the individual's attending physician, if the individual has an attending physician. For subsequent periods, the

**EXHIBIT A**

hospice provider must obtain the certification of terminal illness from either the medical director

of the hospice or a physician who is a member of the hospice's interdisciplinary group. *See* 42

U.S.C. § 1395f(7)(A); 42 C.F.R. § 418.22(c).

52.     The interdisciplinary group should consist of, at a minimum, a physician, a

registered nurse, a social worker, and a pastor or other counselor. *See* 42 C.F.R. § 418.56. The

interdisciplinary group is responsible for developing and implementing an individualized plan of

hospice care for each patient. *Id.*

53.     These important Medicare requirements for coverage of hospice care are

communicated to hospice providers in the Medicare statutes and regulations; the Medicare

Benefit Policy Manual, Chapter 9, § 20.1; the Federal Register; and other published guidance.

**C.      Determining Life Expectancy Requires Knowledgeable Application of Clinical
Research and Guidelines to Medical Facts.**

54.     Clinical indicators of a life expectancy of six months or less are set forth in

multiple public sources, including Hospice Local Coverage Determinations ("LCDs"), issued by

Medicare Administrative Contractors ("MACs," also known as "Medicare claims processors").

55.     Fiscal intermediaries, or carriers, like Cahaba create these LCDs for the

geographic area over which they have been provided authority that set forth certain general and

disease specific clinical variables. *See* 42 U.S.C. § 1395y(j)(4)–(5).  For example, Cahaba has

issued a LCD titled "Hospice Determining Terminal Status." This LCD covers a multi-state

region including Colorado, Maryland, Missouri and Virginia.  Similar LCDs have been created

for other geographic areas.  For example, NHIC Corp has issued the LCD for determining

terminal status for the region that includes Massachusetts and it is substantially similar to the

Cahaba LCD.

**EXHIBIT A**

56.     The bottom line of these LCDs is the reasonable and appropriate documentation of a patient's decline towards a certain death.  On the other hand, if a patient stabilizes and does not reasonably appear to be within 6 months of death, that individual should be "live discharged."

57.      CMS has instructed hospice providers to use LCDs and other clinical tools to determine whether a Medicare participant, based on his or her current clinical status and the anticipated progression of his or her illness, has a prognosis of six months or less. *See* 78 Fed. Reg. 48234, 48247 (Aug. 7, 2013); 79 Fed. Reg. 26538, 26556 (May 8, 2014).

58.     Some diagnoses, like certain cancers, have an inherent prognosis of a life expectancy of six months or less. But other conditions do not automatically support that a patient has a life expectancy of six months or less.

59.     For example, patients with Alzheimer's disease, dementia, debility, and other diagnoses, may have a life expectancy of years before signs and symptoms of advanced disease are present. Without the knowledgeable application of clinical research and guidelines, hospices are at risk of admitting and keeping patients who do not have a life expectancy of six months or less.

60.     For example, individuals live on average for eight to ten years after diagnosis with Alzheimer's. Some live as long as 25 years. Local Coverage Determinations ("LCDs") and other clinical publications help identify which Alzheimer's patients are clinically likely to have a life expectancy of six months or less. The sources describe end-stage Alzheimer's and medical indicators that Alzheimer's patients are nearing death. The end stage of Alzheimer's disease is characterized by the inability to communicate coherently and eventually to control movement,

13

**EXHIBIT A**

including swallowing. When individuals with Alzheimer's die, they ordinarily die from infection or injuries caused by the loss of control over movement. Aspiration pneumonia, which can occur when impaired swallowing allows food or liquids to enter the lungs, is the most common cause of death of Alzheimer's patients. Individuals with Alzheimer's are considered to have a life expectancy of six months or less when they suffer certain medical conditions, including serious infections or inability to intake sufficient foods or fluids. *See, e.g.*, Cahaba GBA's Local Coverage Determination for Hospice Determining Terminal Status (L13653); National Institutes on Aging, Alzheimer's disease and end of life issues, August 1, 2003 (updated December 8, 2011), available at http://www.nia.nih.gov/print/alzheimers/features/alzheimers-disease-and-end-life-issues; Tsai S, Arnold R., Fast Facts and Concepts #150, *Prognostication in Dementia*, February 2006 (updated April 2009), available

at http://www.eperc.mcw.edu/EPERC/FastFactsIndex/ff_150.htm

61.     Similarly, Local Coverage Determinations help identify hospice-eligible patients with vascular dementia. Vascular dementia is caused by a stroke or vascular disease in the brain. Many patients with vascular dementia are not hospice-eligible. Whether a patient with vascular dementia has a life expectancy of six months or less depends on other medical indicators, such as severe nutritional impairment, or significant disability that severely limits the individual's ability to move and take care of himself or herself. *See, e.g.*, Palmetto GBA's Local Coverage Determinations for Hospice Stroke and Coma (L316) and Neurological Conditions (L30708).

62.     Clinical guidelines are also available to assist in identifying patients who have a life expectancy of six months or less due to debility. The hospice diagnosis of debility is characterized by progression of disease as documented by worsening clinical status, symptoms,

14

**EXHIBIT A**

signs, and laboratory results, which in combination cause an irreversible decline in the patient's health such that the patient is not expected to live more than six months. The diagnosis of debility has been used as a terminal diagnosis when a patient experiences such decline related to multiple medical conditions, none of which are deemed terminal by themselves. Whether a patient with debility has a life expectancy of six months or less depends on various medical indicators, such as recurrent or intractable infections, irreversible weakness from lack of nourishment, and deteriorating ability to move and perform activities of daily living (eating, bathing, dressing, and toileting) without assistance. *See, e.g.*, Decline in Clinical Status Guidelines in Cahaba GBA's Local Coverage Determination for Hospice Determining Terminal Status (L13653). Such indicators would routinely be noted in the patient's medical record. In 2013, CMS issued guidance that debility and adult failure to thrive should no longer be used as principal hospice diagnoses because these diagnoses "are incongruous to the comprehensive nature of the hospice assessment, the specific, individualized hospice plan of care, and the hospice services provided." 78 Fed. Reg. 27823, 27832 (May 10, 2013).

63.     CMS also has instructed hospice providers that an individual should be considered for discharge from the Medicare hospice benefit if he or she improves or stabilizes sufficiently over time while on hospice, such that he or she no longer has a life expectancy of six months or less. *See* 75 Fed. Reg. 70372, 70448 (Nov. 17, 2010).

64.     The LCDs advise that if a patient improves or stabilizes over time while in a hospice such that he/she no longer has a prognosis of six months or less from the most recent recertification evaluation or definitive interim evaluation, that the patient should be considered for discharge from the Medicare hospice benefit.

**EXHIBIT A**

65.     On November 22, 2005, CMS released a Final Rule, effective January 23, 2006, revising 42 C.F.R. § 418, to require hospices to put in place a "discharge planning process that takes into account the prospect that a patient's condition might stabilize or otherwise change such that the patient cannot continue to be certified as terminally ill." 42 C.F.R. § 418.26(d).

**D.     How Hospice Providers Obtain Payments from Medicare.**

66.     The United States, through CMS, reimburses Medicare providers with payments from the Medicare Trust Fund, which is supported by American taxpayers. CMS, in turn, contracts with Medicare claims processors to review, approve, and pay Medicare bills, called "claims," received from health care providers like Evercare. In this capacity, the Medicare claims processors act on behalf of CMS.

67.     Payments typically are made by Medicare directly to the health care provider rather than to the Medicare participant, who usually assigns his or her right to Medicare payment to the provider.

68.     Since January 1, 2006, multiple Medicare claims processors have processed Medicare hospice claims submitted by Evercare.

69.     Hospice providers like Evercare are reimbursed based upon their submission of an electronic or hard-copy claim form called a "CMS-1450 form."

70.     When a hospice provider submits a Medicare hospice claim, it represents that it is entitled to payment for the claim.

71.     On the CMS-1450 form, the hospice provider must state, among other things, the patient's name, the diagnosis supporting the patient's admission to hospice, and the beginning

**EXHIBIT A**

and ending dates of the period covered by the bill. *See* Medicare Claims Processing Manual, Chap. 11, Processing Hospice Claims.

72.     On the claim form, the provider certifies that the billing information on the claim is "true, accurate, and complete"; that "[p]hysician's certifications and re-certifications, if required by contract or Federal regulations, are on file"; and that "[r]ecords adequately describing services will be maintained and necessary information will be furnished to such governmental agencies as required by applicable law."

73.     Because it is not feasible for the Medicare program, or its contractors, to review every patient's medical records for the millions of claims for payments it receives from hospice providers, the Medicare program relies upon the hospice providers to comply with the Medicare requirements, and trusts the providers to submit truthful and accurate claims.

74.     Once the provider submits its CMS-1450 form to the Medicare claims processor, in most cases, the claim is paid directly to the provider without any review of the patient's medical record.

75.     The physician certifications and clinical information in the medical record are submitted to the Medicare claims processor only if the claim is selected for medical review, which does not happen routinely. *See generally* Medicare Claims Processing Manual, Chap. 11, Processing Hospice Claims, and Medicare Program Integrity Manual, Chap. 3, Verifying Potential Errors and Taking Corrective Actions.

76.     If a hospice claim is selected for medical review, the hospice provider (such as Evercare) is required to submit to Medicare the physician certifications and clinical information in the medical record supporting the claim.

**EXHIBIT A**

77.     The Medicare claims processor may not pay the claim if the clinical information that the hospice submits for medical review does not support that the patient is actually terminally ill and in need of hospice care.

78.     At all times relevant herein, the Defendants knowingly submitted, or caused to be submitted, false claims to Medicare through the respective carriers for the regions in which Evercare provided hospice services which they "knew," as defined by the FCA,  had been provided to ineligible hospice patients.

## VI.     THE IMPROPER CONDUCT OF THE DEFENDANTS

79.     From 2006 to the present and ongoing, the Defendants defrauded the United States through the submission, or causing the submission, of false or fraudulent claims to Medicare for ineligible hospice patients.

80.     As a result of the Defendants' submission of, or causing the submission of, claims that were knowingly false, or were submitted with reckless disregard or deliberate ignorance of their falsity, the United States was damaged by reimbursing Defendants for providing hospice care to patients that were not eligible for hospice benefits.

81.     In addition to billing Medicare for patients with knowledge of their ineligibility, Defendants knew or recklessly disregarded the fact that their business practices would cause the enrollment and provision of hospice services to ineligible patients, and thus the submission of false claims for the provision of hospice services to ineligible patients.

18

**EXHIBIT A**

**A.      Ovations and Optum directly caused Evercare to file false claims to Medicare for the provision of hospice care to ineligible patients:**

82.      The fraud complained of herein was perpetuated by corporate policies and goals that incentivized fraud and punished compliance and consequently caused Evercare to file false claims to Medicare for the provision of hospice care to ineligible patients.

83.      These policies and goals were developed and enforced by the employees and agents of the parent corporations of Evercare: Ovations and Optum.

84.      At all times material hereto, Ovations and Optum dominated and controlled Evercare.

85.      For example, Ovations and then later Optum directly employed Jeff Maloney ("Maloney") who was the President and effective CEO of Evercare.  As the President of Evercare, Maloney was the individual who actively drove the policies and goals described below that led to Evercare's submission of knowingly false claims to Medicare for the provision of hospice services to ineligible patients.

86.      Maloney was transferred from Ovations to Optum as of January 1, 2011 and other former Ovations officers, employees and agents who supervised, directed, governed and controlled Evercare's actions were also transferred to Optum and continued to supervise, direct, govern and control Evercare's actions as employees of Optum.

87.      The transfer of ownership and control of Evercare from Ovations to Optum represents a substantial continuity of Ovations' business operation with respect to Evercare, including the domination and control of Evercare as well as the participation and direction of the activities of Evercare with respect to the acts and omissions that form the basis of this action.

**EXHIBIT A**

88.     Examples of Maloney's direct participation in developing and enforcing the policies and goals that led to these false claims include his frequent participation in the quarterly conferences with the Evercare Executive Directors ("EDs"), like Relator Towl, during which hospice census performance and goals were discussed and stressed.

89.     During one or more of these quarterly meetings with Maloney, Towl emphasized that the Defendants had a serious live discharge problem that prevented Towl from meeting what she considered to be unrealistic census goals – Towl described the situation as a "House of Cards."

90.     On one or more occasions, Maloney responded to Towl's notice that the Defendants were providing hospice treatment to a large number of ineligible hospice patients by commanding Towl to meet the census goals that she had been provided.

91.     At no time did Maloney take affirmative action to ensure these ineligible hospice patients were removed from the Defendants' census or to ensure that Medicare was not billed for the Defendants' provision of hospice services to these ineligible patients.

92.     Furthermore, when Fowler was reprimanded and retaliated against for his efforts to discharge ineligible patients, it was Maloney who directly communicated with him about his claims, which included Fowler's claim that Senior Management encouraged the enrollment of individuals not eligible for hospice.

93.     Maloney represented to Fowler in February of 2011, while Evercare's fraud scheme was in full swing, that he had fully investigated the claim that Senior Management encouraged the enrollment of individuals not eligible for hospice and there was no evidence to support Fowler's allegation.

**EXHIBIT A**

94.     Ovations and then Optum also employed Patricia Ford ("Ford") who on one or more occasions prior to the December 31, 2010 transition from Ovations to Optum identified herself as a Vice President of Ovations/Evercare Hospice and was a member of the so-called Senior Management referenced in ¶ 93, above.

95.     Ford, Randy Drager ("Drager"), Beth Imlay ("Imlay") and another Ovations and then Optum employee Rick McNatt ("McNatt") were other members of this Senior Management who created an environment that was hostile towards any employee facilitating the live discharge of ineligible hospice patients.

96.     For example, once a month each of the Evercare offices' EDs were required to participate in a conference call with Senior Management, which typically included Ford, Drager, Imlay and McNatt, during which census goals were presented by these superiors to a given ED, and the ED was typically berated about his or her failure to meet past census goals.

97.     Frequently during these monthly calls, the ED would contest the census goals for his or her office on the basis that many of the office's hospice patients were ineligible and needed to be live discharged. These superiors, including Ford and McNatt, would, nevertheless, press the ED to increase census and would discourage the discharge of ineligible patients.

98.     On one or more occasions, Ford told Towl that live discharges were inappropriate. As is discussed below, Zelenak, with Ford's approval and endorsement developed and implemented a live discharge policy that was designed to block or delay the live discharge of ineligible patients.

99.     Most of the superiors who participated in the monthly calls with the EDs and the scheme to block or delay live discharges were direct reports to Maloney.

**EXHIBIT A**

100.     In addition, Ovations and then Optum controlled and directed the marketing policies and goals of Evercare. For example, during these monthly calls with the EDs, it was common for McNatt, who was an Ovations and then Optum marketing specialist, to spearhead marketing discussions with the ED.  Typically it was McNatt, in conjunction with Ford and Imlay, who set the aggressive census goals for a given Evercare office, who berated the ED to meet these census goals, who ignored the ED's notice that large numbers of the Defendants' hospice patients were ineligible and who directed a given ED to employ aggressive sales tactics such as the practice of the Evercare sales force to troll a nursing home for new hospice patients, as is discussed below.

101.     Other Ovations and then Optum marketing specialists participated in the development and control of Evercare's marketing activities including the development of marketing campaigns and brochures which included the placement of billboards throughout the Denver market.

102.     In addition to providing the President and CEO of Evercare and controlling and directing Evercare's aggressive marketing policies and goals, Ovations and then Optum inserted its officers and employees into other key aspects of Evercare's operation including requiring Evercare to utilize its legal department, its Clinical Risk Management team and its Clinical Training team.

103.     And, it was Ovations who sent down one of its employees, Bev Duffy, to control Evercare's compliance with Medicare.

104.     At all times material hereto, Evercare, Ovations and Optum have portrayed themselves as a single, unified organization.

**EXHIBIT A**

105.     At all times material hereto, Evercare, Ovations and Optum have been the alter egos of their parent corporations, such that it would be unfair, unjust, fraudulent and/or inequitable to uphold the corporate form.  As such, in addition to being directly liable under the False Claims Act, these parent corporations are vicariously liable for the actions and/or inactions of Evercare and thus fully responsible for the conduct of their subsidiary, as well as all injuries and damages caused by their subsidiary, and all penalties, awards and judgments entered against the subsidiary.

106.     In addition, the parent corporations of Evercare, Ovations and then Optum, have been unjustly enriched by the acts and omissions of their subsidiary and have maintained possession, custody or control of certain property or money which was unjustly obtained from the United States Government and should have been reimbursed to the United States Government.

**B.     Overview of Defendants' policies and goals that led to the filing of these false claims:**

107.     Defendants created an incentive for staff to admit and retain ineligible patients by providing monetary bonuses and other non-monetary incentives based upon meeting census targets set by the Defendants.  These included bonuses for staff members with responsibility for obtaining, admitting, certifying, recertifying and discharging patients.

108.     Defendants threatened staff with reductions in hours or terminations if census fell below targets and/or demoted or fired staff who discharged ineligible patients.

109.     Defendants employed inexperienced staff and failed to provide adequate hospice eligibility training to its staff to ensure that only hospice eligible patients were admitted and retained.

**EXHIBIT A**

110.     Defendants developed mandatory live discharge procedures that prevented, chilled, made difficult and/or delayed the live discharge of ineligible patients.

111.     Defendants engaged in intentional disregard, reckless disregard or deliberate ignorance of the statements of staff and outside consultants as well as their own records regarding the presence within Evercare's hospice census of ineligible patients.

112.     Defendants pressured or caused salaried and contracted physicians to improperly certify and recertify ineligible patients and/or to fail to live discharge ineligible patients.

113.     Defendants targeted for admission ineligible elderly patients with conditions like debility, dementia, Alzheimer's and cardiac or pulmonary irregularities that while serious were not likely to lead to the death of the patient within six months, thus allowing the Defendants to keep these types of patients on their hospice census for more than six months, if not several years.

114.     Defendants failed to immediately discharge patients as to whom the Defendants had decided not to appeal a carrier's denial of hospice benefits for a given month because the patient was ineligible, then billed the patient's hospice care in subsequent months even though the patient's eligibility had not materially changed.

115.     Defendants resisted live discharging ineligible patients.

116.     Defendants intentionally sequenced the submission of hospice claims to the carriers to attempt to hide or avoid audit and denial with respect to ineligible patients.

117.     These practices, independently and in conjunction with one another, resulted in the "knowing" admission and retention of patients who were ineligible for Medicare benefits, the submission of false claims to Medicare with respect to patients who were ineligible for the

24

**EXHIBIT A**

hospice benefit and the failure to reimburse the government with respect to these ineligible hospice patients.

118.    As a result, Medicare paid the Defendants millions of dollars that should not have been paid.

**C.    Defendants provided financial incentives to staff based on census:**

119.    The Defendants set aggressive census targets for each of the Evercare offices to achieve.

120.    The Defendants provided staff members with monetary bonuses if the individual Evercare office met its census goal.

121.    The Defendants employed a monthly "Scorecard" for each Evercare office that was heavily weighted towards a given office meeting its census goal.  For example, a given Evercare office would receive positive "points" if its Average Daily Census ("ADC") met the census goal.  Sub-categories within the ADC section of the scorecard included whether that month's admissions were greater than 30% of the ADC, whether the office had converted at least 85% of its referrals into admissions and whether the office had received at least 10% of its referrals from palliative care.

122.    On the negative side, the Scorecard would penalize a given office if its live discharges of ineligible patients exceeded 10% of the ADC.

123.    The Evercare staff was eligible for bonuses approaching 20% of their annual salaries if their office received a good score on the Scorecard.

124.    In addition, the Defendants employed a sales force called the Community Outreach Representatives ("COR"), whose duty was to troll nursing homes, hospitals and other

**EXHIBIT A**

care facilities to obtain new Evercare hospice patients.  The COR sales people were paid on a salary and monthly commission basis, and thus these sales people received financial bonuses on the basis of the number of new admissions achieved through their sales efforts.

125.    Periodically Evercare ran special promotions that gave COR sales people additional incentives to cause the admission of new hospice patients.

126.    Furthermore, the Interdisciplinary Team ("IDT"), which was responsible for making decisions regarding the admission, certification, re-certification, retention and provision of care to hospice patients, was largely composed of individuals who had a financial incentive to admit and retain hospice patients.

127.    The provision of bonuses and other financial incentives to staff based on admissions and census created an incentive to admit and retain patients that were ineligible for the Medicare hospice benefit.

**D.    Defendants pressured, threatened and retaliated against staff to meet census goals:**

128.     At the same time, the Defendants pressured, threatened and retaliated against staff to meet census goals and threatened adverse consequences and acted upon those threats if census fell below those targets.

129.    Staff received regular communications from superiors informing them of each office's census goals, current census and the need to increase census.

130.    Staff was periodically advised that the failure to increase census would result in the need to cut hours or personnel.

131.    On a national basis, the Executive Directors ("ED") for each Evercare office would receive a monthly berating from his or her superiors if the census goals were not met.

**EXHIBIT A**

132.     By way of example, in January, February and March of 2010, Towl, Ursula Peterson ("Peterson"), the Clinical Services Director, and staff physician Dr. Rooney ("Rooney") live discharged approximately fifteen (15) patients from the Denver office who were deemed to have been hospice ineligible.  These were patients that typically had been on Evercare hospice service for more than a year, with a few having been on service for several years.  These patients did not meet the eligibility criteria for hospice care as they were not "terminally ill."

133.     Shortly after the live discharges of these ineligible patients, in approximately March of 2010, Towl, Peterson and Rooney were called on the carpet by the Vice-President Ford, and the Executive Regional Director, Imlay, for discharging these ineligible patients.

134.     Rooney was subsequently never promoted.  Ursula Peterson was demoted and later quit.  Towl remained on the job, but was repeatedly advised by Ford and Imlay that Towl needed to be more responsible for the growth of her office's hospice census and that live discharges negatively impacted that growth.

135.     On January 5, 2011, following the live discharges of additional, ineligible patients, Towl was fired by the Defendants.  Towl was specifically advised that the reason for her termination was the failure to maintain and improve census.

136.     Similarly, Fowler recommended that the Boston office discharge many ineligible patients.  In the time period of August through December of 2010, Boston live discharged 31 ineligible patients.

137.     Like the Denver patients described above, most of these Boston patients had been on hospice service for greater than 180 days and did not meet the LCD eligibility criteria.  One patient had been on service for over 900 days. Shortly after the Boston office live discharged a

**EXHIBIT A**

number of these ineligible patients, Fowler was placed on a corrective action plan by his superiors.

**E.      Defendants employed inexperienced staff and failed to provide adequate hospice eligibility training:**

138.     Defendants did not require hospice eligibility experience as a pre-requisite for the hiring of its staff, including its doctors and nurses, and failed to provide adequate training to staff to ensure that only hospice eligible patients were admitted and retained.

139.     Staff requests for training were often ignored and the staff was advised at times that Evercare was a "self-help" organization.

140.     The COR sales force was largely comprised of individuals who did not possess hospice training and could not discern an eligible patient from an ineligible one.

141.     As one example of employing inexperienced staff, in approximately November or December of 2009 Evercare in Denver changed Dr. Rob Howe's ("Howe") status from working as a contract physician to an Evercare salaried employee.  Howe was hired to act as an associate medical director.  This change in Howe's status was made over Towl's objection.

142.     Howe was by training and experience an emergency room doctor with little or no end of life care experience, and little or no experience or training with the hospice eligibility regulations or LCDs.  However, at the point in time when Howe was hired as a salaried employee he had displayed a liberal knack for admitting and certifying hospice patients.

143.     Similarly, when in the spring of 2010 Evercare decided to establish a compliance program, it hired from another United HealthCare company Bev Duffy, R.N. who also had no hospice experience and no expertise with interpreting hospice regulations, auditing hospice charts, or training hospice staff.

**EXHIBIT A**

144.    In particular, at all times material hereto, Evercare did not establish a concrete policy or procedure, and train its staff with respect to said policy and procedure, to ensure that only eligible patients were admitted or retained.

145.    Defendants also provided no compliance training regarding hospice eligibility, no quality training and as a general statement most of the staff did not know what the LCDs or regulations mandated regarding hospice eligibility.

146.    Defendants actively discouraged staff attempts to better understand the LCDs or regulations.

147.    In fact, Evercare staff was advised by Ford and Zelenak that the carriers' LCDs regarding eligibility were not mandatory but were simply guidelines that need not be followed.

**F.    Defendants developed mandatory live discharge procedures that prevented, chilled, made difficult or delayed the live discharge of ineligible patients:**

148.    In approximately late 2008, early 2009, Evercare imposed a mandatory policy that any requests by physicians, nurses or other staff to live discharge an Evercare hospice patient had to be reviewed and approved by either Zelenak, who is an R.N., or Imlay, who is an L.P.N.

149.    By way of background, an L.P.N. does not possess the education, training or experience to make judgment calls regarding the hospice eligibility of a given patient.

150.    Defendants' process to live discharge a patient required multiple layers of review to maximize the opportunities to object to discharge and to delay the process.

151.    The discharge decision was not left solely to the discretion of the medical director, the associate medical director, the executive director or the Interdisciplinary Team.

152.    The end result was that recommendations by R.N.s and physicians to discharge ineligible patients or bill such patients at zero were challenged or ignored, thus, at a minimum,

**EXHIBIT A**

causing a significant delay in the live discharge of these ineligible patients and the knowing

submission by Defendants of Medicare claims for payment for care provided to ineligible

patients.

153.    This live discharge policy, in addition to the negative ramifications associated

with reducing census discussed above, caused a chilling effect on R.N.s or physicians ordering

the discharge of ineligible patients.

**G.    Defendants engaged in intentional disregard, reckless disregard or deliberate ignorance of the statements of staff, outside consultants and their own records regarding the presence of ineligible patients:**

154.    On one or more occasion, Defendants were advised by physicians or staff that

ineligible patients were on Evercare's hospice census, yet Defendants intentionally, with reckless

disregard or deliberate ignorance, failed to take adequate and appropriate measures to discharge

these ineligible patients.

155.    For example, during the above-described meeting in approximately March of

2010 between Towl, Peterson, Rooney, Ford and Imlay, Rooney stated to Ford and Imlay that at

least half of Denver's hospice patients were ineligible.  The Defendants chose to take no action

to fully explore Rooney's statement and instead took the opposite approach, retaliating against

Rooney, Towl and Peterson and pressuring them not to live discharge patients.

156.    Similarly, on a periodic basis Fowler conducted chart audits and reported his

findings to the Defendants' governing bodies. Significant red flags were identified in these

periodic chart audits; it was not unusual for these audits to indicate that 10-45% of the audited

patients were not hospice eligible.  The Defendants took no affirmative action after receipt of

**EXHIBIT A**

these periodic chart audits to clean their hospice census of the ineligible patients or to ensure Medicare was not billed for the hospice services that were provided to these ineligible patients.

157.    Defendants also periodically received a census summary titled "Hospice Exec Summary" which detailed the ADC on a quarterly basis for each of the Evercare offices and these offices as a whole, the average length of service ("ALOS") for discharged patients and the percentage of patients whose length of service ("LOS") was greater than 180 days.  The statistics from these summaries would have alarmed an organization that was intent on abiding by the regulations.  For example, between the first quarter of 2008 and November of 2010, the national ALOS increased from 75.8 to 125.6 days.  And, on a national basis the percentage of patients whose LOS was greater than 180 days rose from 28% to 44% meaning that potentially 44% of Evercare's hospice patients were ineligible.

158.    Perhaps more alarming was the available statistics regarding the number and percentage of patients who had been on service for greater than 300 days, many of whom were ultimately discharged in good or fair condition.

159.    For example, the Defendants maintained a record known as an Admission Discharge Report which at any given time detailed the information regarding the patients being provided hospice services from a given Evercare office.   These Evercare records evidence that at times the percentage of patients from offices like Cincinnati, Colorado Springs, Phoenix, Denver and Boston, who were on service for more than 300 days, was approximately 10% or more of the patient population.

160.    Most of these 300+ day patients were diagnosed with conditions like debility, dementia and Alzheimer's that normally do not cause immediate death.

**EXHIBIT A**

161.     In addition, the Defendants employed an outside consultant, on information and belief to be the Corridor Group ("Corridor"), to analyze the Defendants' hospice operation, including their quality control and the eligibility of the hospice patients.

162.     Corridor issued a report that was deemed to be negative to the operation and was subsequently locked away by the Defendants' legal department. Even Zelenak, the Director of Quality, was not allowed to see the Corridor report.

163.     The Defendants did not implement a compliance program until the Spring of 2010 and then the compliance program was placed in the hands of an Ovations and then Optum employee, Bev Duffy, who had no hospice experience.  As a result, at all times material hereto, the Defendants did not adequately review potential and existing patients for hospice eligibility and failed to control the conduct of branch offices that were known to admit and retain large percentages of ineligible patients.

**H.     Defendants pressured or caused salaried and contracted physicians to improperly certify and recertify ineligible patients and/or fail to live discharge ineligible patients:**

164.     Defendants utilized physicians who were either salaried employees of Defendants or on a long term contract with Defendants to certify and recertify hospice patients.

165.     The salaried physicians were subject to criticism, withholding of bonuses, demotion or termination if the hospice census and financial goals were not met.

166.     Defendants thus pressured or caused these salaried physicians to certify and recertify patients that were ineligible for hospice benefits and/or pressured or caused these salaried physicians not to immediately live discharge ineligible patients.

167.     Similarly, Defendants entered into long term contracts with other physicians to assist with the certification and recertification of Defendants' hospice patients. The nature of

**EXHIBIT A**

these contracts both provided incentives to the contract physicians to certify and recertify ineligible patients and subjected these contract physicians to the same type of criticism, pressure and threat of contract termination if they failed to assist in maintaining and building hospice census.

168.    Defendants challenged these salaried and contract physicians' recommendations for live discharges to ensure, among other things, that these physicians understood that reducing census was not favored.

169.    Defendants were aware of, and did not discourage, the practice of these physicians to certify and recertify patients these doctors had never examined or had not seen in many months, if not years. Large and inappropriate numbers of certifications and re-certifications were completed without the physician actually seeing the patient or having a working familiarity with the patient's condition or status.  For example, it was not uncommon for a physician to certify or recertify a patient based upon the representations of one of Defendants' employees or agents, versus a careful review of the patient's chart and a physical examination of the patient.

170.    The end result was that a large number of Defendants' hospice patients were improperly certified or recertified by these salaried and contract physicians.

**I.      Defendants targeted for admission ineligible patients with conditions like debility, dementia, Alzheimer's and cardiac or pulmonary irregularities that while serious were not likely to lead to the patient's death within six months:**

171.    Defendants appreciated that one hospice patient who remains on service for a year or even three years is a more valuable patient that one who dies within thirty to forty-five days.

**EXHIBIT A**

172.     At all times material hereto, approximately 15-25% of Defendants' hospice patients were individuals with conditions like debility, dementia, Alzheimer's and cardiac or pulmonary irregularities that while serious were probably not going to cause the patient's death within six months.  These patients were, or are, ineligible for one or more months for which Defendants billed Medicare for the provision of hospice services.

173.     Defendants, including their sales force, targeted these types of patients knowing that once certified as "terminally ill" Defendants would be able to keep these types of patients on census for lengthy periods of time.

174.     For example, as of November, 2011, offices like Cincinnati, Colorado Springs, Denver, Boston and Phoenix had approximately 10% or more of their patients on service for greater than 300 days with some patients being on service for greater than 900 days.  In addition, at that time 44% of Defendants' hospice patients had been on service for greater than 180 days.

175.     Many of these types of patients were ultimately live discharged, albeit too late, in good or fair condition after having been on service for more than 300 days.

**J.      Defendants failed to immediately discharge patients as to whom Defendants had decided not to appeal a carrier's denial of hospice benefits for a given month because the patient was ineligible, then billed the patient's hospice care in subsequent months even though the patient's eligibility had not materially changed:**

176.     The carriers responsible for policing offices like Boston, Denver and Phoenix, began over time to target Defendants' patients and to deny hospice benefits for many of these patients.

177.     When a carrier denies a patient's claim, the first step is notification by the carrier of the denial and an invitation to Defendants to submit additional documentation, which is

**EXHIBIT A**

commonly known as an "additional development request" or ADR. At this point, Defendants have significant appellate rights, including taking the matter to federal district court.

178.    Defendants received many denials and ADRs with respect to their Boston, Colorado Springs, Denver and Phoenix offices on the basis that the patient was not eligible for hospice benefits because the patient was not "terminally ill."

179.    On many occasions, Defendants elected not to appeal the carrier's determination that the patient was not eligible.

180.    When the decision was made not to appeal the carrier's denial, the requested hospice benefit was forfeited, or in the circumstance where the carrier had already authorized payment and payment had been made, the Defendants were required to effectively reimburse that payment, which they did by either a reimbursement payment or an accounting transaction in which an overpayment was designated by the carrier and recouped with respect to later claims.

181.    The decision not to appeal was only made after a concerted review of the patient's chart and conference involving more than one of the Defendants' employees or agents.

182.    For example, as of December 28, 2010, 19% of the ADRs the Boston office had received were written off as "no appeal."  The percentages of "no appeals" for other offices were: Cincinnati – 4%, Phoenix- 25%, Tucson- 3%, Denver- 67% and Colorado Springs- 38%.

183.    This means that with respect to the carrier's draw of files to audit and review, using Denver as an example, 67% of those claims audited and reviewed were deemed to be invalid, and Defendants agreed by virtue of their decision not to appeal the carrier's denial that the claims had been false.

**EXHIBIT A**

184.    However, on many occasions with respect to these "no appeal" patients Defendants neither: immediately discharged the patient nor thoroughly examined the patient, obtained in-depth evaluations of the patient or otherwise obtained a legitimate justification for not discharging the patient and maintaining the patient on census.

185.    In fact, with respect to many of these "no appeal" patients who were maintained on census, a review of the patient's medical or nursing chart evidences the patient was not eligible in the time period before the carrier's denial of hospice benefits and remained ineligible in the subsequent months.

186.    Nevertheless, the Defendants kept these "no appeal" patients on hospice service, and, instead, continued to bill the Government and make best efforts to conceal these ineligible claims from being detected by the carrier.

187.    The Defendants' billing office, located near Phoenix, AZ, would label these types of patients "bill the next claim – no appeal- continue to bill."  Defendants' Phoenix billing office is headed by Defendants' CFO, Randy Drager, managed by Ed Glancey and most of the billing is performed by individuals who have been provided a region for which the individual is responsible.  For example at certain times material hereto, the individual billers have included Patti Reilly, Jennifer Jagars, Londi Johnson and Natalie Hilverda.

188.    Members of the Defendants' billing office intentionally billed patients that should have been billed at zero because often times these invalid claims were paid.  Ed Glancey stated on at least one occasion that efforts to internally audit the patient files to discharge and/or bill at zero ineligible patients was a waste of time because the billing office would still bill the claims.

**EXHIBIT A**

189.     In addition, Mr. Glancey stated that the billing office would make its best effort to determine the order in which the carriers were pulling claims for audit and review and would intentionally sequence the suspect claims in a fashion to avoid detection.  For example, if the carrier was pulling every fifth claim, the billing department would slot clearly valid claims, like a cancer patient who had died within 45 days, into the fifth slot and place the suspect claims in different slots.

**K.     Examples of ineligible patients who were admitted and retained on Defendants' hospice census:**

190.     The foregoing practices contributed to the improper admission and retention of ineligible patients.

191.     The following patients are examples of the Defendants knowingly admitting, retaining, billing and failing to reimburse with respect to patients that were ineligible for hospice.

192.     Patient 1was admitted to Evercare hospice care through the Denver office in October of 2008 and was live discharged to self-care on approximately November 21, 2010 in good or fair condition.  Patient 1 had been admitted with a dementia diagnosis.  At the time of Patient 1's live discharge, it was determined that for the approximate 780 days that Patient 1 had been on hospice service that Patient 1 had probably not been eligible.  Defendants continuously billed Medicare for the ineligible hospice care of Patient 1 from admission to discharge.

193.     Patient 2 was admitted to Evercare hospice care through the Phoenix office on July 8, 2009 with a diagnosis of Parkinson's disease.  The carrier flagged and denied the initial claim from July 8, 2009 on the basis that Patient 2 was not hospice eligible.  Defendants made a decision not to appeal the carrier's denial of this claim, yet kept Patient 2 on service until December 17, 2009 at which time Patient 2 was live discharged in fair condition.  Defendants

**EXHIBIT A**

continuously billed Medicare for the ineligible hospice care of Patient 2 from admission to discharge.

194.     Patient 3 was admitted to Evercare hospice care through the Boston office on November 20, 2008 with a diagnosis of a malignant neoplasm.  The carrier flagged and denied the claims from March 1, 2009, January 1, 2010, February 1, 2010 and April 1, 2010 on the basis that Patient 3 was not hospice eligible.  Defendants made a decision not to appeal the carrier's denial of these claims, yet kept Patient 3 on service.  Defendants continuously billed Medicare for the ineligible hospice care of Patient 3 from admission to October 6, 2010.

195.     Patient 4 was admitted to Evercare hospice care through the Phoenix office on July 10, 2006.  Patient 4 had been on service from 2006 until at least 2011, with a few brief interludes, with a diagnosis of dementia and depression.  The carrier flagged and denied the claims from November 1, 2009 and December 1, 2009 on the basis that Patient 4 was not hospice eligible.  Defendants made a decision not to appeal both the carrier's denials, yet kept Patient 4 on service and Patient 4 remained on service as of March 15, 2011.  Defendants continuously billed Medicare for the ineligible hospice care of Patient 4 from admission to at least March 15, 2011, and possible continuing thereafter.

196.     Patient 5 was admitted to Evercare hospice care through the Denver office on July 9, 2010 and remained on service as of March 15, 2011.  Patient 5 was admitted with a diagnosis of debility.  As of January 5, 2010 it was known that Patient 5 probably was not and never had been hospice eligible.  Defendants took no action to live discharge Patient 5.  Defendants continuously billed Medicare for the ineligible hospice care of Patient 5 from admission to at least March 15, 2011, and possible continuing thereafter.

**EXHIBIT A**

197.     Patient 6 was admitted to Evercare hospice care through the Phoenix office in February of 2007 with a diagnosis of heart failure.  Patient 6 was on hospice service from 2007 until 2011, with a few short breaks.  The carrier flagged and denied the claims for Patient 6 from October 1, 2007, December 1, 2007, October 10, 2008, February 1, 2009, July 1, 2009 and September 1, 2009 on the basis that Patient 6 was not hospice eligible.  Defendants made a decision not to appeal the carrier's denial of these claims, yet kept Patient 6 on service until October 6, 2010, with one brief interlude in treatment between April 6, 2010 and May 25, 2010, when Patient 6 was discharged to self-care in good condition.  Defendants continuously billed Medicare for the ineligible hospice care of Patient 6 from admission to October 6, 2010.

198.     Patient 7 was admitted to Evercare hospice care through the Boston office on July 16, 2008 with a dementia diagnosis.  The carrier flagged and denied the initial claim from July 16, 2008 on the basis that Patient 7 was not hospice eligible.  Defendants made a decision not to appeal the carrier's denial of this claim, yet kept Patient 7 on service until April 23, 2009 at which time Patient 7 was live discharged in fair condition.  Defendants continuously billed Medicare for the ineligible hospice care of Patient 7 from admission to discharge.

199.     Patient 8 was admitted to Evercare hospice care through the Phoenix office on November 15, 2006 with a dementia diagnosis.  Patient 8 remained on Evercare hospice service until live discharged on July 16, 2010 in fair condition, with one break of six months after December of 2008.  Patient 8 was readmitted to Evercare hospice care on September 23, 2010 with a dementia diagnosis and was on service as of March 15, 2011.   The carrier flagged and denied the claims from December 1, 2007, January 1, 2008, February 1, 2008, March 1, 2008, April 1, 2008 and May 1, 2008 on the basis that Patient 8 was not hospice eligible.  Defendants

39

**EXHIBIT A**

made a decision not to appeal the carrier's denial of these claims, yet kept Patient 8 on service as described above.  Defendants continuously billed Medicare for the ineligible hospice care of Patient 8 while Patient 8 was on service.

200.     Patient 9 was admitted to Evercare hospice care through the Denver office on July 30, 2004 with a diagnosis of multiple sclerosis.  Patient 9 remained on Evercare hospice service until she died on July 30, 2010, with one break in Evercare hospice service between July and October of 2008.  The carrier flagged and denied the claims from January 1, 2008, February 1, 2008, March 1, 2008, April 1, 2008 and May 1, 2008 on the basis that Patient 9 was not hospice eligible.  Defendants made a decision not to appeal the carrier's denial of these claims, yet kept Patient 9 on service as described above.  Defendants continuously billed Medicare for the ineligible hospice care of Patient 9 while Patient 9 was on service.

201.     Patient 10 was admitted to Evercare hospice care through the Phoenix office on November 1, 2006 with a diagnosis of dementia.  Patient 10 remained on Evercare hospice service until she was discharged to self-care in fair condition on February 10, 2010.  The carrier flagged and denied the claims from December 1, 2007, January 1, 2008, February 1, 2008 and March 1, 2008 on the basis that Patient 10 was not hospice eligible.  Defendants made a decision not to appeal the carrier's denial of these claims, yet kept Patient 10 on service as described above.  Defendants continuously billed Medicare for the ineligible hospice care of Patient 10 while Patient 10 was on service.

202.     Patient 11 was admitted to Evercare hospice care through the Boston office on December 12, 2007 with a diagnosis of adult failure to thrive.  Patient 11 remained on Evercare hospice service for 540 days until she was discharged to self-care in fair condition on June 3,

**EXHIBIT A**

2009.  The carrier flagged and denied the claim from July 1, 2008 on the basis that Patient 11 was not hospice eligible.  Defendants made a decision not to appeal the carrier's denial of these claims, yet kept Patient 11 on service as described above.  Defendants continuously billed Medicare for the ineligible hospice care of Patient 11 while Patient 11 was on service.

203.    Patient 12 was admitted to Evercare hospice care through the Denver office on September 25, 2008 and remained on service as of March 15, 2011.  Patient 12 was admitted with a diagnosis of late effects of a CVA.  As of January 5, 2010 it was known that Patient 12 probably was not and never had been hospice eligible.  Defendants took no action to live discharge Patient 12.  Defendants continuously billed Medicare for the ineligible hospice care of Patient 12 from admission to at least March 15, 2011, and possible continuing thereafter, which amounts to at least 890 days of billing for ineligible service.

204.    Patient 13 was admitted to Evercare hospice care through the Boston office on March 28, 2007 with a dementia diagnosis.  Patient 13 remained on Evercare hospice service for 659 days until she was discharged to self-care in fair condition on January 14, 2009.  The carrier flagged and denied the claim from June 1, 2008 on the basis that Patient 13 was not hospice eligible.  Defendants made a decision not to appeal the carrier's denial of these claims, yet kept Patient 13 on service as described above.  Defendants continuously billed Medicare for the ineligible hospice care of Patient 13 while Patient 13 was on service.

205.    Patient 14 was admitted to Evercare hospice care through the Denver office in August of 2008 and remained on service as of at least March 15, 2011.  Patient 14 was admitted with a diagnosis of dementia.  As of January 5, 2010 it was known that Patient 14 probably was not and never had been hospice eligible.  Defendants took no action to live discharge Patient 14.

**EXHIBIT A**

Defendants continuously billed Medicare for the ineligible hospice care of Patient 14 from admission to at least March 15, 2011, and possibly continuing thereafter, a period of at least 920 days.

206.     Patient 15 was admitted to Evercare hospice care through the Boston office on May 1, 2008 with a dementia diagnosis.  Patient 15 remained on Evercare hospice service for 540 days until she was discharged to self-care in fair condition on October 22, 2009.  The carrier flagged and denied the claim from July 1, 2009 on the basis that Patient 15 was not hospice eligible.  Defendants made a decision not to appeal the carrier's denial of these claims, yet kept Patient 15 on service until October 22, 2009.  Defendants continuously billed Medicare for the ineligible hospice care of Patient 15 while Patient 15 was on service.

207.     Patient 16 was admitted to Evercare hospice care through the Denver office in June of 2008 and remained on service as of March 15, 2011.  Patient 16 was admitted with a diagnosis of Alzheimer's.  As of January 5, 2010 it was known that Patient 16 probably was not and never had been hospice eligible.  Defendants took no action to live discharge Patient 16. Defendants continuously billed Medicare for the ineligible hospice care of Patient 16 from admission to at least March 15, 2001 and possibly continuing thereafter, a period of at least approximately 980 days.

208.     Patient 17 was admitted to Evercare hospice care through the Boston office on September 12, 2008 with a dementia diagnosis.  The carrier flagged and denied the claim from October 1, 2009 on the basis that Patient 17 was not hospice eligible.  Defendants made a decision not to appeal the carrier's denial of this claim, yet kept Patient 17 on service until February 10, 2010 at which time Patient 17 was live discharged in fair condition.  Defendants

42

**EXHIBIT A**

continuously billed Medicare for the ineligible hospice care of Patient 17 from admission to discharge.

209.    Patient 18 was admitted to Evercare hospice care through the Denver office on February 15, 2007 and was live discharged to self-care on approximately November 25, 2010 in good or fair condition.  Patient 18 had been admitted with a diagnosis of Alzheimer's.  At the time of Patient 18's live discharge, it was determined that for the approximate 1,380 days Patient 18 had been on hospice service that Patient 18 probably had not been eligible.  Defendants continuously billed Medicare for the ineligible hospice care of Patient 18 from admission to discharge.

210.    Patient 19 was admitted to Evercare hospice care through the Colorado Springs office on August 15, 2006 with a diagnosis of congestive heart failure.  Patient 19 was initially on Evercare hospice service from August 15, 2006 to November 17, 2008, or 824 days, then readmitted on August 10, 2009 and remained on service as of March 15, 2011, for an additional 582 days. The carrier flagged and denied Patient 19's claims from February 1, 2008, March 1, 2008 and April 1, 2008 on the basis that Patient 19 was not hospice eligible.  Defendants made a decision not to appeal the carrier's denial of these claims, yet kept Patient 19 on service as described above.  Patient 19's chart evidences that Patient 19 was never eligible for hospice care.  Defendants continuously billed Medicare for the ineligible hospice care of Patient 19 while Patient 19 was on service.

211.    Patient 20 was admitted to Evercare hospice care through the Denver office in February of 2008 and was live discharged to self-care in October of 2010 in good or fair condition.  Patient 20 had been admitted with a debility diagnosis.  At the time of Patient 20's

43

**EXHIBIT A**

live discharge, it was determined that for the approximate 975 days Patient 20 had been on

hospice service that Patient 20 probably had not been eligible.  The carrier in the second quarter

of 2010 denied a claim for Patient 20 on the basis she was not hospice eligible.  At that time she

received her first physician visit from Evercare.  The Defendants made a decision not to contest

or appeal this denial of benefits, but kept Patient 20 on hospice service for at least an additional

120 days. Defendants continuously billed Medicare for the ineligible hospice care of Patient 20

from admission to discharge.

212.    Patient 21 was admitted to Evercare hospice care through the Cincinnati office on

December 20, 2007 with a diagnosis of failure to thrive and was live discharged to self-care on

December 8, 2010 after the determination was made that Patient 21 was not eligible for hospice

care.  Patient 21's chart evidenced that Patient 21 had never been eligible for hospice care.

Defendants continuously billed Medicare for the ineligible hospice care of Patient 21 from

admission to discharge, a total of 1,082 days.

213.    Additional examples of Defendants false Medicare claims for hospice services

provided to ineligible patients will be demonstrated through discovery and at trial.

## VII.    FIRST CLAIM FOR RELIEF – FCA LIABILITY
**(Violation of 31 U.S.C. § 3729(a)(1), as amended 31 U.S.C. § 3729(a)(1)(A)**
**against Ovations and Optum)**

214.    The Relators incorporate by reference the prior allegations of this Second

Amended Complaint, as though more fully set forth herein.

215.    On or about January 1, 2006 and continuing into the future, Defendants

"knowingly" presented or "knowingly" caused to be presented to an officer or employee of the

United States Government false or fraudulent claims for payment or approval, in violation of 31

**EXHIBIT A**

U.S.C. § 3729(a)(1), as amended October 27, 1986, and 31 U.S.C. § 3729(a)(1)(A), as amended

May 20, 2009, with respect to bills submitted to Medicare for hospice services rendered at

Defendants' sites nationwide.

216.     The Defendants' acts and omissions were material.

217.     At all times material hereto, Defendants acted by and through their officers,

directors, employees and/or agents and are, therefore, vicariously responsible for the actions of

said officers, directors, employees and/or agents.

218.     As a direct and proximate result of the Defendants' actions, the United States

Government paid, approved or allowed false or fraudulent claims.

219.     Accordingly, the United States is entitled to judgment against the Defendants for

the full amount of the damages it has sustained because of the acts and omissions of the

Defendants, plus treble damages and penalties.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, the Relators, Terry Fowler and Lyssa Towl, on behalf of the United

States, request (a) that the United States Government recover from the Defendants Evercare

Hospice, Inc. n/k/a/ Optum Palliative and Hospice Care, Ovations, Inc. and OptumHealth

Holdings, LLC, jointly and severally, all sums which it improvidently paid to, or for the benefit

of, the Defendants, including interest thereon;  (b) that the damages described in (a) be trebled as

provided in 31 U.S.C. § 3729(a); (c) that a civil penalty of no less than $5,500 and no more than

$11,000 be assessed against Defendants, jointly and severally, for each false claim, record or

statement submitted directly or indirectly to the Government; (d) that the Court award the

Relators all amounts as are permitted under 31 U.S.C. § 3730(d), including an appropriate share

**EXHIBIT A**

of any sums recovered and benefits obtained in this action, now or in the future, along with the

Relators' reasonable expenses, attorney fees, and costs incurred herein; and (e) that the Court

grant any additional appropriate relief with respect to this *qui tam* claim.

**THE RELATORS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE**

Respectfully submitted this Thursday, February 19, 2015.

THE LAW FIRM OF MICHAEL S. PORTER

By:      /s/ Michael S. Porter_____
         Michael S. Porter, Esq.
         4465 Kipling Street
         Wheat Ridge, CO  80033
         Telephone:  (303) 940-8370
         Fax:     (303) 421-4309
         E-mail: porterlaw@comcast.net

         Richard C. LaFond, Esq.
         Richard C. LaFond, P.C.
         P.O. Box 20764
         Boulder, CO  80308
         Telephone:  (303) 388-4551
         Fax:  (303) 388-8324
         E-mail:  richardlafondpc@gmail.com

         Paul S. Enockson
         Enockson Law LLC
         4465 Kipling Street
         Wheat Ridge, CO 80033
         Telephone: (303) 999-0134
         Fax: (303) 421-4309
         E-mail: paul@enocksonlaw.com
**ATTORNEYS FOR THE PLAINTIFFS/RELATORS**
**TERRY FOWLER AND LYSSA TOWL**

Relator Terry Fowler's address:
2615 S. Columbine Street
Denver, CO 80201

Relator Lyssa Towl's address:
56 S. Russell Court
Golden, CO 80401

46

**EXHIBIT A**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 19, 2015, I electronically filed the foregoing using the

CM/ECF system that will send email notifications of such filing to the following email

addresses:

Paul S. Enockson, Esq.
paul@enocksonlaw.com
Counsel for Relators in 11-cv-00642

Richard C. LaFond, Esq.
richardlafondpc@gmail.com
Counsel for Relators in 11-cv-00642

James F. Barger, Jr., Esq.
jim@frohsinbarger.com
Counsel for Relator in 14-cv-1647

Michael C. Theis, Esq.
Michael.theis@hoganlovells.com
Counsel for Defendants

Emily Mary Lyons, Esq.
Emily.lyons@hoganlovells.com
Counsel for Defendants

Holly H. Snow, Esq.
Holly.H.Snow@usdoj.gov
Counsel for United States of America

Marcy E. Cook, Esq.
marcy.cook@usdoj.gov
Counsel for United States of America

Brain E. Bowcut, Esq.
Brian.bowcut@usdoj.gov
Counsel for United States of America

Katherine M. Gaumond, Esq.
kgaumond@crosslawfirm.com
Counsel for Relator in 14-cv-1647

David A. DeMarco, Esq.
David.demarco@hoganlovells.com
Counsel for Defendants

Corey William Roush, Esq.
Corey.roush@hoganlovells.com
Counsel for Defendants

\_\_\_/s/ Michael S. Porter_____
Michael S. Porter

47

**EXHIBIT A**