IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 11-cv-00642-PAB-NYW
    (Consolidated with Civil Action No. 14-cv-01647-PAB)

---

Civil Action No. 11-cv-00642-PAB-NYW

UNITED STATES OF AMERICA *ex rel.* TERRY LEE FOWLER and LYSSA TOWL,

    Plaintiff,

v.

EVERCARE HOSPICE, INC., n/k/a Optum Palliative and Hospice Care, a Delaware corporation,
OVATIONS, INC., a Delaware corporation, and
OPTUMHEALTH HOLDINGS, LLC, a Delaware limited liability corporation,

    Defendants.

---

Civil Action No. 14-cv-01647-PAB

UNITED STATES OF AMERICA *ex rel.* SHARLENE RICE,

    Plaintiff,

v.

EVERCARE HOSPICE, INC.,

    Defendant.

---

## ORDER

---

This matter is before the Court on the Motion to Dismiss the Government's

Complaint in Intervention [Docket No. 67] filed by defendant Evercare Hospice, Inc.

("Evercare"), and the Motion to Dismiss Relators' Second Amended Qui Tam Complaint

[Docket No. 101] filed by defendants Evercare, Ovations, Inc. ("Ovations"), and

OptumHealth Holdings, LLC ("Optum").  The Court has jurisdiction pursuant to 28 U.S.C. § 1331.

## I.  BACKGROUND[1]

This action arises under the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.* Relators initiated a *qui tam* action on March 15, 2011, alleging that defendants knowingly submitted, or caused to be submitted, claims for Medicare hospice benefits for patients who were ineligible for such benefits.  *See* Docket No. 1.  On August 25, 2014, the United States (the "government") partially intervened in this action.  *See* Docket No. 34.

### A.  The Medicare Hospice Benefit

The Department of Health and Human Services reimburses hospice providers for services provided to eligible beneficiaries on a *per diem* basis.  *See* 79 Fed. Reg. 26538, 26543 (May 8, 2014).  The Centers for Medicare and Medicaid Services ("CMS") are the agencies within the Department of Health and Human Services charged with the administration of Medicare.  *See Sw. Pharm. Solutions, Inc. v. Ctrs. for Medicare and Medicaid Servs.*, 718 F.3d 436, 439 (5th Cir. 2013).  The Medicare program is divided into four major components – Parts A, B, C, and D.  Part A, the relevant part for this action, provides for hospital insurance services, including inpatient

---

[1]The following facts are drawn from the United States' complaint in intervention, Docket No. 46, and relators' second amended *qui tam* complaint, Docket No. 86, and are assumed to be true for the purposes of the present motion.  *See Alvarado v. KOB-TV, LLC*, 493 F.3d 1210, 1215 (10th Cir. 2007) ("We must accept all the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the plaintiff.").

hospital services, post-hospital extended care services, home health services, and hospice care.  42 U.S.C. § 1395d(a).

The Medicare statute provides that "no payment may be made . . . for any expenses incurred for items or services– . . . in the case of hospice care, which are not reasonable and necessary for the palliation or management of terminal illness[.]"  42 U.S.C. § 1395y(a)(1)(C).  To be eligible for the hospice care benefit (the "hospice benefit"), an individual's attending physician and the hospice program's medical director must certify that the patient is terminally ill "based on the physician's or medical director's clinical judgment regarding the normal course of the individual's illness."  42 U.S.C. § 1395f(a)(7).  The statute defines "terminally ill" as "a medical prognosis that the individual's life expectancy is 6 months or less."  42 U.S.C. § 1395x(dd)(3)(A).  By electing to receive hospice benefits under Medicare, a patient waives all rights to Medicare payments for curative treatment of the underlying terminal illness.  42 U.S.C. § 1395d(d)(2)(A)(ii)(I).  After the initial certification for a patient, Medicare provides up to two 90-day benefit periods, followed by an unlimited number of 60-day benefit period extensions.  42 U.S.C. § 1395d(a)(4).  At the end of each benefit period, the medical director or physician must recertify that, based on his or her clinical judgment, the patient remains terminally ill.  42 U.S.C. §§ 1395f(a)(7)(A)(i)-(ii).

While the Medicare statute requires only that a physician "certify in writing" a patient's terminally ill prognosis, accompanying regulations impose additional requirements.  The regulations provide, in relevant part, that

3

[t]he certification must conform to the following requirements:

(1) The certification must specify that the individual's prognosis is for a life expectancy of 6 months or less if the terminal illness runs its normal course.

(2) Clinical information and other documentation that support the medical prognosis must accompany the certification and must be filed in the medical record with the written certification as set forth in paragraph (d)(2) of this section.  Initially, the clinical information may be provided verbally, and must be documented in the medical record and included as part of the hospice's eligibility assessment.

42 C.F.R. § 418.22(b).

## B.  Alleged False Claims

### 1.  The Government's Claims against Evercare

Evercare provides hospice care to Medicare participants.  Docket No. 46 at 6, ¶ 10.  At times relevant to this action, Evercare operated for-profit hospice programs in 13 states: Alabama, Arizona, California, Colorado, Georgia, Illinois, Ohio, Maryland, Massachusetts, Missouri, Pennsylvania, Texas, and Virginia.  *Id.* at 5, ¶ 8.  From at least January 1, 2007, Evercare has received hundreds of millions of dollars from Medicare for hospice benefits, including $91.5 million for hospice patients who received hospice care for longer than one year.  Docket No. 46 at 34, ¶ 162.

The government alleges that Evercare violated the FCA by presenting or causing to be presented claims for hospice care for individuals for whom Evercare knew that its medical records did not support a prognosis of terminal illness.  Docket No. 46 at 17-18, ¶ 67.  According to the government, Evercare pressured its employees, including its physician Medical Directors, to meet patient "census" targets without regard to whether patients were eligible for hospice benefits.  *Id.* at 20, ¶ 73.  These census targets were

4

handed down by Evercare's corporate office, *id.* ¶ 74, and Evercare's director of finance and one Regional Director acknowledged that the census targets were unrealistic. *Id.* at 20-21, ¶ 78. Despite the acknowledged unrealistic census targets, Evercare's leadership pressured site leaders to meet them in a "hostile, aggressive, and intimidating" manner. *Id.* at 21, ¶ 79.

In addition to pressuring employees to meet census goals, Evercare incentivized employees to admit patients into hospice care. Docket No. 46 at 21, ¶ 80. Evercare employees were paid bonuses for each patient admitted into hospice care, *id.* ¶ 81, and clinical staff were paid additional compensation if their sites met Evercare's census targets. *Id.* ¶ 82. Evercare's policy of pressuring and incentivizing employees to admit patients resulted in multiple complaints that management was pressuring employees to admit and retain inappropriate patients. *Id.* at 22, ¶ 86. At one point, Beth Imlay, a Regional Director, stated that Evercare hospice should operate like a funnel: "easy to access end-of-life care (wide at the top) and hard to get out of (narrow end of funnel at the bottom)." *Id.* ¶ 87.

Evercare's general patient admission policy was as follows: when a patient was referred to an Evercare hospice, a nurse evaluated the patient to determine whether or not to admit him or her. Docket No. 46 at 22, ¶¶ 88(a)-(b). The nurse then orally communicated his or her findings to the Medical Director on duty, who issued a verbal order to admit the patient. *Id.* ¶ 88(c). Shortly after the order to admit the patient, a medical director (sometimes, but not always the same director who admitted the patient) signed the required certification of terminal illness. *Id.* at 23, ¶ 88(d). Thus,

both the medical director who issued the order to admit a patient and (if different) the medical director who signed the certification of terminal illness often did so without seeing the patient and without evaluating medical records. *Id.* at 25-26, ¶¶ 108-111.

Evercare's nurses, often the only clinical staff to meet with patients, were crucial to Evercare's process of admitting patients into hospice care and certifying patients' terminally ill prognoses. Docket No. 46 at 23, ¶ 90. Yet many of these nurses were hired with little or no prior hospice experience. *Id.* ¶ 91. Notably, Evercare's proportion of patients with Alzheimer's, dementia, and debility was higher than the national average for hospices due to Evercare's heavy reliance on referrals from nursing homes. *See id.* at 19, ¶¶ 71-72. But Evercare did not provide its staff with comprehensive training on identification of hospice-eligible patients with conditions such as Alzheimer's disease, dementia, and debility, and the clinical progression of those illnesses. *Id.* at 23, ¶ 92. What training Evercare did provide focused on the process of entering information into patients' electronic medical records rather than identifying terminally ill patients. *Id.* at 24, ¶ 96. As a result, Evercare's physicians observed that nurses were not adequately trained to assess hospice eligibility. *Id.* ¶ 99. One medical director in Massachusetts stated that, when she joined Evercare, the "majority" of patients seen by the nurse who was responsible for training other new nurses were not eligible for hospice care. *Id.* ¶ 100.

Evercare also allegedly implemented an asymmetric process for reviewing the admission decisions of clinical staff. While decisions to admit a patient were "seldom, if ever, questioned," decisions that a patient was not terminally ill were "subject to intense

6

scrutiny." Docket No. 46 at 25, ¶ 102.  Most Evercare locations had a policy that employees could not deny admission without the approval of the site manager. *Id.* ¶ 103.  Thus, when a nurse made a decision that a patient was not terminally ill, Evercare often sent a second nurse to admit the patient before a physician was called for an opinion about the patient's eligibility. *Id.* ¶¶ 104-05.  This practice occurred more frequently when patient census was low. *Id.* ¶ 106.

Evercare's recertification decisions (that is, decisions to certify that a patient was eligible for additional benefit periods) were made at interdisciplinary group meetings. Docket No. 46 at 26, ¶ 113.  At those meetings, each patient was discussed and a medical director would thereafter sign a certification of terminal illness. *Id.*  The medical director who signed the recertification often did not personally examine the patient and instead relied on oral reports of nurses during the interdisciplinary group meeting as well as patients' medical records. *Id.* at 26-27, ¶ 115.  These records were often inaccurate and lacking in information necessary to support a hospice determination. *Id.* at 27, ¶ 116.  Moreover, former Evercare employees noted a pattern in which nurses, in response to pressure to meet census goals, began emphasizing information that supported hospice eligibility from admissions assessments and in patients' medical records, and downplaying or omitting information that would tend to indicate a life expectancy of greater than six months. *Id.* at 28, ¶ 125.  A nurse who worked for Evercare in Phoenix stated that, in response to pressure to meet admissions or census goals, nurses began to document only what patients could not do, and omitted any information about what patients were able to do. *Id.* ¶ 126.

According to the government, Evercare's policy for discharging patients also tended to discourage discharging patients who were ineligible for hospice.  Evercare's policy required all medical directors' decisions to discharge patients to be reviewed by Ms. Imlay and Director of Quality Terry Zelenak.  Docket No. 46 at 29, ¶ 134.  Evercare had no similar policy for decisions to recertify patients for additional hospice periods. *Id.* ¶ 135.  Thus, clinical staff had to ask for permission to discharge patients, and one employee described the process as presenting "final findings to corporate for final approval" of discharge.  *Id.* at 30, ¶ 136.  In some cases, Evercare's management succeeded in persuading medical directors to recertify patients for whom the medical directors had requested discharge.  *Id.* ¶ 137.  At least one medical director who did not follow Evercare's discharge review policy was penalized.  *Id.* ¶ 139.  Additionally, Evercare managerial employees challenged or disregarded the opinions of physicians that patients were not terminally ill and should be discharged.  *Id.* at 31, ¶¶ 144-146.  When one medical director refused to change her mind when pressured to do so by an executive director, Hugh Henderson, a regional director, instructed the executive director to tell her that "she is not in line with our company philosophy and we may have to part ways."  *Id.* ¶ 147.

Additionally, Evercare conducted internal audits that, according to Ms. Zelenak, "'always' revealed a pattern of the clinical documentation in the medical record not supporting a terminal prognosis."  Docket No. 46 at 32, ¶ 150.  Evercare's internal audits of various sites conducted between 2009 and 2012 revealed that the majority of records audited did not support the terminal prognosis and initial certification.  *See id.* at

32-33, ¶¶ 151-152 (showing that documentation did not support terminal prognosis in 33 of 61 total charts reviewed).  Evercare never considered refunding Medicare for payments that it received for the patients whose records did not support a terminal prognosis.  *Id.* at 33, ¶ 154.  In addition, when Medicare claims processors denied payment for claims that had been selected for review on the grounds that the patient's medical record did not support a terminally ill prognosis, Evercare decided not to appeal the denial of payment about 20% of the time.  *Id.* at 33-34, ¶¶ 158-160.

The government brings claims for violation of the FCA and common law claims for payment by mistake and unjust enrichment.  By way of examples of patients for whom Evercare caused false claims to be submitted, the government identifies six patients, each of whom spent considerable time in hospice care, and each of whose records allegedly did not support a terminally ill prognosis.  *See* Docket No. 46 at 35-52.

### 2. *Relators' Additional Allegations*

Relators bring a single claim for violation of the FCA against Evercare, Optum, and Ovations.  Ovations was the sole shareholder of Evercare at all times relevant to this action up to December 31, 2010.  Docket No. 86 at 5, ¶ 22.  Optum has been Evercare's sole shareholder from January 1, 2011 to the present.  *Id.* at 6, ¶ 23.

Relators' Second Amended Complaint ("SAC") contains numerous factual allegations that are similar to those in the government's complaint in intervention.  *See generally* Docket No. 86.[2]  Relators allege that Evercare's fraud was perpetuated by the

---

[2] In the interest of brevity, the Court only recites those allegations that are specific to Relators' claims against Optum and Ovations or that do not appear in the government's complaint in intervention.

policies handed down by employees of Ovations and later Optum, each of which dominated and controlled Evercare as its sole shareholder. Docket No. 86 at 19, ¶¶ 82-4. Specifically, Ovations and Optum employed Jeff Maloney, an Ovations (and later Optum) employee who served as the "President and effective CEO of Evercare." Docket No. 86 at 19, ¶ 85. Mr. Maloney participated in quarterly conferences with executive directors at which hospice census goals were "discussed and stressed," and was directly involved in at least one instance where clinical staff (relator Fowler) was reprimanded for discharging patients. *Id.* at 20, ¶¶ 88, 92. Two other employees of Ovations/Optum, Patricia Ford and Rick McNatt, were part of a four-person senior management team that handed census goals to executive directors, discouraged discharge of eligible patients, and developed a discharge review policy that erected hurdles to discharge of ineligible patients. *See id.* at 21, ¶¶ 96-98. These individuals directly reported to Mr. Maloney. *Id.* ¶ 99.

According to relators, defendants targeted patients with conditions like debility, dementia, and Alzheimer's disease because defendants knew that "once certified as 'terminally ill' [d]efendants would be able to keep these types of patients on census for lengthy periods of time." Docket No. 86 at 34, ¶¶ 172-3. Many of these types of patients were live discharged after having received hospice care for more than 300 days. *Id.* ¶ 175.

Eventually, Medicare claims carriers responsible for reviewing certain of defendants' locations began to target defendants' patients for review and to deny hospice benefits for ineligible patients. Docket No. 86 at 34, ¶ 176. Defendants received numerous denials of payment for patients on the grounds that the patients

10

were not terminally ill.  *Id.* at 35, ¶ 178.  On many occasions, defendants elected not to appeal their carriers' denial of payment after reviewing the patient's chart.  *Id.* ¶¶ 179, 181.  As of December 28, 2010, defendants had elected not to appeal 19% of the denials received at its Boston location, 4% for Cincinnati, 25% for Phoenix, 3% for Tucson, 67% for Denver, and 38% for Colorado Springs.  *Id.* ¶ 182.  On many occasions, however, defendants neither immediately discharged a patient whose claim for payment had been denied nor examined the patient to justify continuing to provide that patient with hospice care.  *Id.* at 36, ¶ 184.  Instead, defendants kept many "no appeal" patients in hospice and continued to bill the government for those patients.  *Id.* ¶ 186.  Defendants' billing office labeled these patients "bill the next claim – no appeal – continue to bill."  *Id.* ¶ 187.  The manager of the billing office, Ed Glancey, stated that it would be a waste of time to perform an internal audit to discharge and/or bill ineligible patients at $0 because the billing office would continue to bill for those patients.  *Id.* ¶ 188.  Mr. Glancey also stated that the billing office attempted to determine the order in which Evercare's carriers pulled claims for audit review and would sequence suspect claims in order to avoid detection.  *Id.* at 37, ¶ 189.  For example, if Evercare's billing office determined that the carrier was selecting every fifth claim, the billing office would slot "clearly valid claims" such as cancer patients in every fifth slot and place suspect claims in different slots.  *Id.*

## II.  STANDARD OF REVIEW

The Court's function on a Rule 12(b)(6) motion for failure to state a claim upon which relief can be granted is not to weigh potential evidence that the parties might

present at trial, but to assess whether the plaintiff's complaint alone is sufficient to

plausibly state a claim. Fed. R. Civ. P. 12(b)(6); *Dubbs v. Head Start, Inc.*, 336 F.3d

1194, 1201 (10th Cir. 2003) (citations omitted). A district court may take into account

"documents referred to in the complaint if the documents are central to the plaintiff's

claim and the parties do not dispute the documents' authenticity." *Alvarado*, 493 F.3d

at 1215 (citation and quotation marks omitted).

The "plausibility" standard requires that relief must plausibly follow from the facts

alleged, not that the facts themselves are plausible. *Bryson v. Gonzales*, 534 F.3d

1282, 1286 (10th Cir. 2008). However, "where the well-pleaded facts do not permit the

court to infer more than the mere possibility of misconduct, the complaint has

alleged–but it has not shown–that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556

U.S. 662, 679 (2009) (internal quotation marks and alteration marks omitted).

## III.  ANALYSIS

The FCA, in relevant part, imposes liability on any person who "knowingly

presents, or causes to be presented, a false or fraudulent claim for payment or

approval." 31 U.S.C. § 3729(a)(1). As defined by the FCA, the term "knowingly" means

either that the person "(i) has actual knowledge of the information; (ii) acts in deliberate

ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of

the truth or falsity of the information." 31 U.S.C. § 3729 (b)(1). The term "claim," in

relevant part, means "any request or demand . . . for money or property . . . that [] is

presented to an officer, employee, or agent of the United States." *Id.* § 3729

(b)(2)(A)(i). Thus, to state a claim for false presentment under the FCA, a plaintiff must

allege (1) a false or fraudulent claim, (2) is presented to the United States for payment or approval, (3) with knowledge that the claim is false or fraudulent.  *See United States ex rel. Troxler v. Warren Clinic, Inc.*, 2014 WL 5704884, at *2 (N.D. Okla. Nov. 5, 2014). Additionally, the FCA authorizes private individuals to bring *qui tam* actions in the name of the government based on violations of Section 3729 of Title 31 of the United States Code.  31 U.S.C. § 3731(b)(1).

"The FCA recognizes two types of actionable claims–factually false claims and legally false claims."  *United States ex rel. Conner v. Salina Reg'l Health Ctr., Inc.*, 543 F.3d 1211, 1217 (10th Cir. 2008).  A factually false claim requires proof that the government payee has submitted "an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided."  *Id.* (citation and quotation omitted).  A legally false claim, in contrast, requires a plaintiff to demonstrate that the defendant has "'certified compliance with a statute or regulation *as a condition* to government payment,' yet knowingly failed to comply with such statute or regulation."  *Id.* (quoting *Mikes v. Straus*, 274 F.3d 687, 695-96 (2d Cir. 2001)) (emphasis in original).  In the Tenth Circuit, a legally false claim can rest on either a theory of "express false certification" or "implied false certification."  *Id.*  An express false certification theory occurs when a payee "falsely certifies compliance with a particular statute, regulation or contractual term, where compliance is a prerequisite to payment."  *Id.*  An implied false certification theory, in contrast, "focuses on the underlying contracts, statutes, or regulations themselves to ascertain whether they make compliance a prerequisite to the government's payment."  *Id.* at 1218 (citing

13

*United States ex rel. Siewick v. Jamieson Sci. & Eng'g, Inc.*, 214 F.3d 1372, 1376 (D.C. Cir. 2000).  "If a contractor knowingly violates such a condition while attempting to collect remuneration from the government, he may have submitted an impliedly false claim."  *Id.*  In other words, for purposes of analyzing an implied false certification claim, the pertinent inquiry is not "whether a payee made an affirmative or express false statement, but whether, through the act of submitting a claim, a payee knowingly and falsely implied that it was entitled to payment."  *United States ex rel. Lemmon v. Envirocare of Utah, Inc.*, 614 F.3d 1163, 1169 (10th Cir. 2010) (citation and quotation omitted).

### A.  The Government's Complaint

The government's FCA claim is based on the interplay between the Medicare statute and the regulations implementing that statute.  The government argues that Evercare is liable under the FCA because it "claimed reimbursement for Medicare hospice benefits while knowing the clinical facts in the patients' medical records did not support that the patients were terminally ill and needed hospice care."  Docket No. 92 at 3.  The government's claim, therefore, is based on a theory of implied false certification. "To state viable implied-false-certification claims, [the government's complaint] need[s] to contain sufficient factual allegations to show that [Evercare] knowingly submitted legally false requests for payment to the government, that the government paid the requests and that, had the government known of the falsity, it may not have paid." *Lemmon*, 614 F.3d at 1169.  The Court, therefore, must decide whether compliance with the regulations' requirement that medical records support the certifying physicians'

clinical judgment is a prerequisite to payment and, if so, whether the government has alleged that Evercare failed to comply with the requirement.

### 1. Condition of Payment vs. Condition of Participation

Evercare argues that the government fails to state a claim that Evercare violated the documentation requirement contained in § 418.22(b) of Title 42 of the Code of Federal Regulations because the requirement is a "condition of participation" in the Medicare program, not a "condition of payment" under the Medicare hospice benefit, and cannot therefore support an FCA claim.  Docket No. 67 at 14-19.

"The success of a false certification claim depends on whether it is based on 'conditions of participation' in the Medicare program (which do not support an FCA claim) or on 'conditions of payment' from Medicare funds (which do support FCA claims)."  *United States ex rel. Hobbs v. MedQuest Assocs., Inc.*, 711 F.3d 707, 714 (6th Cir. 2013) (citations omitted).  "Conditions of participation, as well as a provider's certification that it has complied with those conditions, are enforced through administrative mechanisms, and the ultimate sanction for violation of such conditions is removal from the government program."  *Conner*, 543 F.3d at 1220.  "Conditions of payment are those which, if the government knew they were not being followed, might cause it to actually refuse payment."  *Id.*

Evercare first argues that the documentation requirement is not a condition of payment because  "[n]othing in § 418.22(b)(2) or elsewhere in the applicable statute or regulations expressly conditions payment to a hospice on compliance with the requirement" that clinical information and other documentation that supports the terminally ill prognosis accompany the certification.  Docket No. 67 at 17 (defendant's

15

emphasis removed).  The Court disagrees.  Evercare acknowledges that the governing statute conditions payment for hospice care on a written certification.  *See id.* (noting that 42 U.S.C. § 1395f is titled "Conditions of and limitations on payment for services," and that it requires a physician's written certification that a patient is terminally ill).  The regulations go further than the statute and detail the requirements for the certification.  *See generally* 42 C.F.R. § 418.22.  Specifically, the regulation provides that, with certain narrow exceptions, "the hospice must obtain the written certification before it submits a claim for payment[,]" *id.* § 418.22(a)(2), and, importantly, outlines the required contents of the certification.  *Id.* § 418.22(b).  The contents of the certification listed in the regulations are not mere suggestions.  Rather, by the plain terms of the regulation, they are requirements to which a physician's certification "*must conform.*"  *Id.* (emphasis added).  This language unmistakably conditions payment on execution of a physician's certification that complies with the regulation's content requirements.

Evercare next argues that Medicare's "regulatory structure" reinforces that the requirements in 42 C.F.R. § 418.22(b) are mere conditions of participation.  *See* Docket No. 67 at 17-18.  In support, Evercare points to another provision in the Code of Federal Regulations, 42 C.F.R. § 418.104, titled "Condition of participation: Clinical records."  That provision requires hospice providers to maintain "[a] clinical record containing past and current findings" for each hospice patient, and that the record "must contain correct clinical information that is available to the patient's attending physician and hospice staff."  *Id.*[3]  One of the records that must be maintained as a condition of

---

[3] Section 418.104 also requires entries in the clinical record to be "legible, clear, complete, and appropriately authenticated and dated," *id.* § (b), requires the hospice

participation under this section is the "[p]hysician certification and recertification of terminal illness as required in § 418.22. . ." *Id.* § (a)(5).  Evercare argues that, because this provision is titled a "Condition of participation" and refers to the certification requirement in Section 418.22(b), then Section 418.22(b) must also be a condition of participation.  *See* Docket No. 67 at 18.  The Court finds Evercare's argument unpersuasive.  Section 418.104 requires hospice providers to take adequate steps to maintain and safeguard the entirety of patients' medical records, including the physician's certification of a terminally ill prognosis.  There is no contradiction between conditioning payment to a hospice provider on obtaining a detailed written certification that a patient is terminally ill and conditioning continued participation on maintaining that certification as part of a patient's medical record.  As such, § 418.104 does not alter the Court's conclusion that the content requirements of § 418.22(b) are a condition of payment.

Third, Evercare argues that § 418.22(b) cannot be a condition of payment because, if it were, then any violation of its requirements would be actionable under the FCA.  Docket No. 67 at 18.  Evercare points specifically to § 418.22(b)(3)(i), which requires that a physician "include a brief narrative explanation of the clinical findings that supports a life expectancy of 6 months or less as part of the certification and recertification forms" and that "[i]f the narrative is part of the certification or

_____

provider to safeguard the information against loss or unauthorized use, *id.* § (c), requires the provider to maintain the records for six years after the death or discharge of the patient, *id.* § (d), provides for transfer of records upon discharge or transfer of care, *id.* § (e), and requires records to be made "readily available on request by an appropriate authority."  *Id.* § (f).

recertification form, then the narrative must be located immediately prior to the physician's signature."  Evercare posits that, were a physician accustomed to signing the certification before the narrative rather than after, the certification would be actionable under the FCA and therefore § 418.22(b) cannot possibly be a condition of payment.  Docket No. 67 at 18.  The Court does not agree with Evercare's *reductio ad absurdum* argument.  The Tenth Circuit has recognized that implied false certification claims "includ[e] a materiality requirement" that "necessitates showing that the false certification was 'material to the government's decision to pay out moneys to the claimant.'"  *Lemmon*, 614 F.3d at 1169 (quoting *Conner*, 543 F.3d at 1219).  At the pleadings stage, a complaint need only allege facts that make it plausible that "the government *may* not have paid" had it known of the false certification.  *Id.* at 1170 (emphasis in original).  Thus, under Tenth Circuit case law, courts may distinguish between material and merely technical noncompliance with a condition of payment. The Court finds that the government's allegations satisfy the materiality requirement, as it is plausible that the government may have withheld payments to Evercare if it knew that hospice patients' records lacked supporting documentation of a terminal illness. The Court takes no position on whether Evercare's hypothetical concerning signature placement would satisfy the materiality requirement.

In sum, the Court finds that the requirement that physicians' certifications are accompanied by clinical information and other documentation that support a patient's prognosis is a condition of payment under applicable Medicare statutes and regulations.

18

### 2. Evercare's Reliance on Physicians' Clinical Judgment

Evercare argues that the government fails to plead any false representation because the certifications rely on the clinical judgments of Evercare's certifying physicians and those judgments cannot be objectively false.  Docket No. 67 at 10-11. Evercare cites *United States ex rel. Morton v. A Plus Benefits, Inc.*, for the proposition that "[e]xpressions of opinion, scientific judgments, or statements as to conclusions about which reasonable minds may differ cannot be false."  139 F. App'x 980, 982 (10th Cir. 2005) (unpublished) (citations omitted).  While *Morton* noted that liability under the FCA "must be predicated on an objectively verifiable fact," the Tenth Circuit expressly rejected the argument that the exercise of clinical judgment poses an absolute bar to FCA liability.  *See id.* at 983 ("we are not prepared to conclude that in all instances, merely because the verification of a fact relies upon clinical medical judgments . . . the fact cannot form the basis of an FCA claim").  For example, FCA liability has been found in false certification cases where a hospice provider's business practices created an environment in which "physicians could not legitimately exercise their medical judgment because defendants provided false information on which the physicians relied."  *United States ex rel. Landis v. Hospice Care of Kansas, LLC*, 2010 WL 5067614, at *4 (D. Kan. 2010).

Here, unlike *Morton*, the government's allegations are "susceptible to proof of truth or falsity," *Morton,* 139 F. App'x at 983, and are therefore sufficient to state a claim.  Specifically, the government alleges that the physicians who issued orders to admit patients into hospice care did not examine the patients and relied on oral reports

19

of the nurses who evaluated them.  See Docket No. 46 at 25 , ¶¶ 108-09.  The government further alleges that the physicians who signed the certifications (often different from the admitting physicians) frequently signed them without seeing patients, *see* Docket No. 46 at 26, ¶¶ 111, 115, and thus had to rely on medical records or oral reports from nurses.  *See id.* at 26-7, ¶ 115.

While the Medicare regulations do not require that a certifying physician conduct an in-person examination, the government's complaint contains extensive allegations that suggest that the information on which the physicians relied (which consisted of oral reports from nurses who evaluated the patients) was not reliable and therefore precluded those physicians' legitimate exercise of clinical judgment.  Specifically, the complaint alleges that Evercare's management placed intense pressure on employees to admit patients into hospice care, with one regional director stating in an email that Evercare's hospice service should be a "funnel" that provided "easy to access end-of-life care (wide at the top) and hard to get out of (narrow end of funnel at the bottom)." Docket No. 46 at 22, ¶ 87.  This pressure, according to the complaint, took many forms, including setting unrealistic "target census numbers" for hospice patients, Docket No. 46 at 20, ¶ 76, and pressuring site leaders to meet those targets in a "hostile, aggressive, and intimidating" manner.  *Id.* at 21, ¶ 79.  Evercare also incentivized employees to admit hospice patients by providing bonuses for each patient admitted into hospice, *id.* ¶ 81, and threatened layoffs and disciplined or terminated staff to pressure employees to meet census expectations.  *Id.* ¶ 83.  As a result of these

tactics, Evercare received "multiple complaints" that "management pressured and instructed employees to admit and retain inappropriate patients." *Id.* at 22, ¶ 86.

The government also alleges that the nurses' reports on which Evercare's certifying physicians relied were "inaccurate" and lacked "information and detail necessary to support a hospice determination," *id.* at 27, ¶ 116, both because Evercare's nurses were poorly trained and because Evercare's policy of pressuring clinical staff to admit patients caused nurses to censor their reports. Specifically, the government alleges that Evercare hired nurses with "little or no prior hospice experience" and did not provide them with "comprehensive training on the identification of hospice-eligible patients with Alzheimer's disease, dementia, and debility, and the clinical progression of these illnesses," Docket No. 46 at 23, ¶¶ 91-92, which constituted a large percentage of Evercare's hospice patients. *Id.* at 19, ¶ 71. The government alleges that nurses' decisions not to admit patients were subject to intense scrutiny, but decisions to admit a patient were "seldom, if ever, questioned[.]" *Id.* at 25, ¶ 102. As a result of this pressure, the government alleges, "nurses learned how to show hospice eligibility by documenting *only* what a patient was not able to do, not what a patient was able to do." *Id.* at 28, ¶ 126 (emphasis in original).

The complaint further alleges that Evercare's management exerted direct pressure on physicians to recertify ineligible patients. The complaint alleges that "[a]t least one Medical Director who did not follow the discharge review policy was penalized" and was accused of "ruining the budget" for discharging ineligible patients. *Id.* at 30, ¶ 139. The complaint details a separate incident in Ohio in which an

21

executive director unsuccessfully attempted to convince a physician to change her mind and recertify patients who she believed were ineligible for hospice care, and the executive director was subsequently instructed to tell the physician that "she is not in line with our company philosophy and we may have to part ways." *Id.* at 31, ¶¶ 146-47.

The Court finds that the government's allegations are sufficient to render its claims plausible that Evercare's "intentional, reckless business practices lead physicians to inaccurately certify patients as terminally ill, and that [Evercare] submitted claims even though [it] knew, or had reckless disregard for the fact, that the patients were not terminally ill." *Landis*, 2010 WL 5067614, at *5 (holding that allegations that a hospice provider "pressured employees to certify, recertify, or not discharge patients regardless of whether they were eligible for hospice benefits" were sufficient to allege that the provider claimed reimbursement with reckless disregard for whether the patients were terminally ill).

***3. The FCA's Knowledge Requirement***

Evercare argues that the government does not plausibly allege facts that satisfy the FCA's knowledge requirement for two reasons. First, Evercare argues that the complaint does not allege that any physicians certified patients who they knew were not terminally ill or that Evercare provided hospice services knowing that patients were not eligible for the hospice benefit. This argument, however, is irrelevant to the government's theory of liability. The government argues that Evercare, not its physicians, made fraudulent claims for reimbursement for hospice because it knew (or acted with reckless disregard of the possibility) that its hospice patients' medical records did not support that patients were terminally ill. *See* Docket No. 92 at 3. FCA

liability "may be predicated on knowingly causing [a false] record or statement to be made or used." *United States ex rel. Baker v. Cmty. Health Syss., Inc.*, 709 F. Supp. 2d 1084, 1118 (D.N.M. 2010).  The Court finds that the government's allegations concerning Evercare's policy of pressuring employees to admit patients, failing to train nurses to recognize when patients with various conditions are terminally ill, and threatening and disciplining physicians who exercise their clinical judgment and decline to admit patients, satisfy the FCA's knowledge requirement.  As the government argues, *see* Docket No. 92 at 13, these allegations make it plausible that Evercare failed to ensure that its physicians received adequate information to exercise proper clinical judgment and that Evercare sought to influence its physicians' clinical judgment. This is sufficient to allege that Evercare acted, at a minimum, "in reckless disregard of the truth or falsity" of whether its physicians' terminally ill prognoses were supported by adequate documentation.  31 U.S.C. § 3729(b)(1)(A)(iii).

Second, Evercare argues that it could not "knowingly" fail to comply with the documentation requirement because the term "support" is ambiguous.  Docket No. 67 at 21.  Evercare argues that the word "support" in § 418.22(b)(2) means only that "the record must lend some assistance to the physician's terminal-illness prognosis," while the government's theory requires a patient's medical records to "prove the patient's terminal illness to any clinician who happens to review it subsequently." *Id.* at 22.  The Court need not decide on the proper interpretation of § 418.22(b), as the complaint alleges facts sufficient to conclude that Evercare failed to satisfy even its lenient interpretation of the word "support."  Specifically, the government alleges that Evercare's Director of Quality acknowledged that its internal reviews of medical records

23

"'always' revealed a pattern of the clinical documentation in the medical record not supporting a terminal prognosis." Docket No. 46 at 32, ¶ 150. The government also alleges that Evercare's internal audits of various sites conducted between 2009 and 2012 revealed that the majority of records audited did not support the terminal prognosis and initial certification. *See id.* at 32-33, ¶¶ 151-152 (showing that documentation did not support terminal prognosis in 33 of 61 total charts reviewed). Despite this substantial finding of non-compliance with the regulation that requires supporting documentation, Evercare did not consider refunding Medicare payments that it received for individuals for whom its audits revealed that payments were inappropriate. *Id.* at 33, ¶ 154. Thus, Evercare's own audits showed that more than 50% of the charts reviewed did not satisfy the "support" requirement, however Evercare claims to have interpreted that requirement. The Court finds that the government sufficiently alleges that Evercare acted with at least reckless disregard for the possibility that its physician certifications were unsupported.

### 4. Rule 9(b)

Defendants argue that the government fails to satisfy Rule 9(b)'s heightened pleading requirements.[4] Docket No. 67 at 26. "Rule 9(b) joins with [Rule] 8(a) to form the general pleading requirements for claims under the FCA." *Lemmon*, 614 F.3d at 1171. Rule 9(b) requires that, in a pleading alleging fraud, the circumstances

---

[4]Evercare also argues that the complaint fails to satisfy Rule 8(a) because the government does not plead facts that render the falsity or knowledge elements of its FCA claim plausible. Docket No. 67. The Court has already held that the government's complaint satisfies the plausibility standard with respect to both falsity and scienter. *See* Parts III(A)(2)-(3) *supra*.

constituting fraud or mistake must be stated with particularity. *Barrett v. Tallon*, 30 F.3d 1296, 1300 (10th Cir. 1994); *Tal v. Hogan*, 453 F.3d 1244, 1263 (10th Cir. 2006). A complaint alleging fraud must "set forth the time, place and contents of the false representation, the identity of the party making the false statements and the consequences thereof. *Koch v. Koch Indus., Inc.*, 203 F.3d 1202, 1236 (10th Cir. 2000) (citing *Lawrence v. Nat'l Bank v. Edmonds (In re Edmonds)*, 924 F.2d 176, 180 (10th Cir. 1991)). To satisfy Rule 9(b)'s requirements in the FCA context, a pleading must "show the specifics of a fraudulent scheme and provide an adequate basis for a reasonable inference that false claims were submitted as part of that scheme." *Lemmon*, 614 F.3d at 1172 (citations omitted).

Evercare argues that the complaint fails to satisfy Rule 9(b)'s requirements because it does not allege a nexus between Evercare's business practices and a specific false or fraudulent claim. Docket No. 67 at 26. Evercare cites *United States ex rel. Sikkenga*, 474 F.3d 702 (10th Cir. 2006), for the proposition that an FCA plaintiff cannot rely on general allegations about a fraudulent scheme to satisfy Rule 9(b)'s heightened pleading requirement. *Id.* The Court finds that, to the extent the government is required to "tie a[] specific claim" to its allegations of a fraudulent scheme, *Sikkenga*, 474 F.3d at 728, n.34, it has satisfied this burden. The government identifies six patients, who it refers to as LH, RS, DH, VB, LG, and ZF, each of whom spent considerable time in hospice care and each of whose records allegedly did not support a terminally ill prognosis. *See* Docket No. 46 at 35-52. The complaint contains detailed information about each patient's condition and the clinical findings in their

records that tend to show that their terminal prognosis was not supported. *See id.* Evercare does not defend these patients' specific certifications. Instead, Evercare argues that the government's allegations in each case merely reflect a "different medical judgment than the certifying physician." Docket No. 67 at 27. The Court has already rejected this argument. Evercare rightly points out that, if the complaint was based entirely on disagreements with Evercare's certifying physicians in specific cases, the government's references to these six patients would be insufficient to state a claim. The government's allegations are not so limited, however. As the Court has already found, the government has plausibly alleged that Evercare adopted a policy that resulted in widespread over-certification of patients as hospice-eligible. The Court finds that the medical records of the six patients highlighted in the complaint "provide an adequate basis for a reasonable inference that false claims were submitted as part of that scheme." *Lemmon*, 614 F.3d at 1172 (citations omitted).

### 5. *Payment by Mistake and Unjust Enrichment*

Evercare argues in cursory fashion that the government's second and third claims – respectively, payment by mistake and unjust enrichment – should be dismissed because the government "does not allege that hospice services were not rendered." Docket No. 67 at 29. The Court disagrees. The common law doctrine of payment by mistake "is available to the United States and is independent of statute." *United States v. Mead*, 426 F.2d 118, 124 (9th Cir. 1970). It requires a showing that the government made "payments under an erroneous belief which was material to the decision to pay[.]" *Id.* Evercare's argument that the government does not allege

payment for any hospice care that Evercare did not provide misses the point.  It appears to be undisputed that Evercare provided hospice care for all patients for which it made claims for payment.  The government, however, alleges that it made payments for patients who were ineligible for hospice care.  The Court finds that the government's theory is sufficient to state a claim for payment by mistake.

Evercare's argument regarding unjust enrichment is deficient for the same reason.  Unjust enrichment requires a showing that "(1) at plaintiff's expense (2) defendant received a benefit (3) under circumstances that would make it unjust for defendant to retain the benefit without paying." *Robinson v. Colo. State Lottery Division*, 179 P.3d 998, 1007 (Colo. 2008).[5]  To sustain this theory, the government is not required to allege that it paid for services that were not rendered.  The Court finds that the complaint satisfies all three elements of this claim.

### B.  Relators' Complaint

Defendants Ovation and Optum (collectively, "defendants") move to dismiss the SAC on three grounds, two of which mirror the arguments that Evercare made in seeking dismissal of the government's complaint in intervention.  The Court addresses each of defendants' arguments in turn.

---

[5]The government does not take issue with Evercare's citation of Colorado law to describe the elements of unjust enrichment.  At least for purposes of this motion, the Court will operate under the same premise.  *Cf. Grynberg v. Total S.A.*, 538 F.3d 1336, 1346 (10th Cir. 2008) ("Because the parties' arguments assume that Colorado law applies, we will proceed under the same assumption").

### 1.  Objectively False Claim

Defendants argue that relators do not allege an objectively false or fraudulent claim.  *See* Docket No. 101 at 3-4.  The Court rejects this argument for the reasons detailed in this Order with respect to the government's complaint.  The relators' complaint, like the government's complaint in intervention, alleges that defendants gave priority to their census numbers over the clinical judgment of their medical staff. Relators allege that defendants discouraged discharge of patients who medical staff believed were ineligible for hospice, *see* Docket No. 86 at 21, ¶ 97, pressured physicians to certify and recertify ineligible patients, *id.* at 24, ¶ 112, instituted a discharge policy that allowed unqualified administrators to second-guess the discharge recommendations of treaters, *id.* at 29, ¶¶ 148-49, disciplined nurses and physicians for discharging ineligible patients, *id.* at 27, ¶ 134, 27-28, ¶ 137, actively discouraged staff from learning more about LCDs[6] and regulations regarding hospice eligibility, *id.* at 29 ¶¶ 145-46, and attempted to reverse-engineer their carrier's audit procedure in order to avoid detection of bills submitted for patients who had previously been deemed ineligible.  *Id.* at 37, ¶ 189. Upon reviewing the SAC, the Court finds that relators, like the government, have sufficiently alleged the particulars of an intentional business practice that led to the submission of claims with at least reckless disregard for whether patients were terminally ill.  *Landis*, 2010 WL  5067614, at *5.

---

[6]"LCDs" refers to Hospice Local Coverage Determinations, which are created by carriers and "set forth certain general and disease specific clinical variables" for determining terminal status.  *See* Docket No. 86 at 12, ¶¶ 54-55.

## 2.  Rule 9(b)

Relators provide examples of 21 patients (referred to as Patients 1-21) for whom defendants allegedly submitted claims for reimbursement despite knowing that they were ineligible for hospice.  *See* Docket No. 86 at 37-44, ¶¶ 192-212.  Many of relators' allegations are based on defendants' continued submission of bills for patients even though defendants' carrier determined, through a review process, that those patients were ineligible for hospice care and defendants elected not to appeal the denial of payment.  *See generally id.*

Defendants argue that relators' examples are insufficient because the claims of ineligibility are made in a conclusory fashion.  The Court agrees with respect to certain patients.  Specifically, a number of the 21 specifically-identified patients in the SAC never had claims denied on the basis that they were ineligible for hospice care.  *See generally* Docket No. 86 at 37-44.[7]  With respect to those patients, relators' allegations are inadequate.  With respect to Patient 1, for instance, relators allege only that at the time of his or her discharge, "it was determined that for the approximate 780 days that Patient 1 had been on hospice service that Patient 1 had probably not been eligible." Docket No. 86 at 37, ¶ 192.  Relators' allegations do not include sufficient facts that show who determined Patient 1's past ineligibility and how defendants' certification of Patient 1 for hospice care fits into relators' general allegations of a fraudulent scheme.  *Sikkenga*, 474 F.3d at 728, n.34 (noting that an FCA relator's claims did not "tie any specific claim . . . to th[e] series of events" that comprised the alleged fraudulent

---

[7]These are Patients 1, 5, 12, 14, 16, 18, and 21.

scheme).  The Court finds similar pleading defects with respect to Patients 5, 12, 14, 16, 18, and 21.

The Court, however, finds that relators have satisfied Rule 9(b) with respect to the remaining patients, each of whom had a claim denied, which denial defendants did not appeal.  Defendants argue that there is no evidence that "a rejection of a claim for an earlier certification period – for unspecified reasons – renders a physician's subsequent certification of a terminal prognosis false."  Docket No. 101 at 8. Defendants ignore the Tenth Circuit's holding that an FCA plaintiff need only "show the specifics of a fraudulent scheme and provide an adequate basis for a reasonable inference that false claims were submitted as part of that scheme" to satisfy the requirements of Rule 9(b).  *Lemmon*, 614 F.3d at 1172 (citations omitted).  Relators alleged that, when defendants elected not to appeal a denial of payment for a patient that the carrier deemed ineligible, they neither immediately discharged the patient nor examined the patient to obtain a legitimate justification for keeping him or her in hospice care.  *See* Docket No. 86 at 36, ¶ 184.  In fact, rather than re-evaluate patients whose claims were denied, relators allege that defendants' billing office would label those patients "bill the next claim - no appeal - continue to bill," *id.* ¶ 187, and that the billing office would "make its best effort to determine the order in which the carriers were pulling claims for audit and review and would intentionally sequence the suspect claims in a fashion to avoid detection."  *Id.* at 37, ¶ 189.  The Court finds that relators' allegations concerning the remaining example patients are sufficiently tied to their allegations that defendants fraudulently continued billing for patients deemed ineligible for care to satisfy Rule 9(b)'s requirements as stated in *Lemmon*.

30

Defendants also argue that, in certain cases, relators' allegations show that some patients whose claims were denied were discharged for a time and then re-admitted.  *See* Docket No. 101 at 8 (noting that Patient 6 was discharged between April 6, 2010 and May 25, 2010 and that Patient 8 had one six-month break from hospice care).  The Court has identified five patients – Patients 4, 6, 8, 9, and 19 – who did not receive continuous hospice care.  Having found relators' allegations sufficient with respect to the majority of Patients 1-21, the Court need not address this argument. Nevertheless, the Court notes that, with the exception of Patient 4,[8] each patient's temporary discharge from hospice care came several months after defendants' claims for those patients were denied, and relators allege that defendants continued to bill Medicare for those patients until their discharge.  *See* Docket No. 86 at 39-40, ¶¶ 197, 199, 200, 43, ¶ 210.

### 3.  *Relators' Authority to Pursue their Claims*

#### a.  Duplication of the Government's Claims

Defendants argue that relators' complaint should be dismissed because it merely duplicates the government's FCA claim against Evercare and differs from the government's complaint only in that Relators name Evercare's corporate parents, Ovations and Optum, as additional defendants.  *See* Docket No. 101 at 11-13. Relators respond that FCA violators are jointly and severally liable for their actions, so they are entitled to bring separate claims against Ovations and Optum.  *See* Docket No.

---

[8]Relators' allegations concerning Patient 4 state only that he or she had "a few brief interludes" in hospice care, and the Court cannot therefore determine whether those interludes followed the carrier's denial of defendants' claims for that patient in November and December 2009.  *See* Docket No. 86 at 38, ¶ 195.

105 at 5.  The Court agrees with relators.  The FCA provides that, "[i]f the Government

proceeds with the action, it shall have the primary responsibility for prosecuting the

action, and shall not be bound by an act of the person bringing the action.  Such person

shall have the right to continue as a party to the action. . . ."  31 U.S.C. § 3730(c)(1).

Although courts often dismiss superseded claims, dismissal is not required where

defendants make "no showing that the Relators' participation during the course of the

litigation will cause them undue burden or expense that would justify limiting their

participation."  *United States ex rel. Sansbury v. LB & B Assocs., Inc.*, 58 F. Supp. 3d

37, 47 (D. D.C. 2014) (citing cases).  The Court finds that relators' continued

participation in this action is appropriate, particularly given relators' claims against

Ovations and Optum, in which the government did not intervene.  As relators note,

multiple defendants acting in concert in violation of the FCA are jointly and severally

liable, *see United States v. Williams*, 2003 WL 21384640, at *6 (N.D. Ill. June 12, 2003)

(citing *United States v. Hughes*, 585 F.2d 284, 286 n.2 (7th Cir. 1978)), so relators'

claim, which names Evercare, Ovations, and Optum as defendants, is not merely

duplicative of the government's FCA claim against Evercare.

### b.  Relators' Direct and Alter Ego Allegations against Ovation and Optum

Defendants argue that relators fail to state a direct liability claim against Ovations

and Optum because they merely "lump Ovations, Optum, and Evercare all together as

'Defendants,' thereby disguising allegations solely regarding Evercare's actions as the

acts of Ovations and Optum."  Docket No. 106 at 8.  First, defendants improperly raise

this issue for the first time on reply.  Second, relators allege that Ovations and Optum,

32

as Evercare's sole shareholder, employed a number of people who participated in the allegedly fraudulent scheme, including Jeff Maloney, an Ovations (and later Optum) employee who served as the "President and effective CEO of Evercare."  Docket No. 86 at 19, ¶ 85.  Mr. Maloney, according to relators, participated in quarterly conferences with executive directors at which hospice census goals were "discussed and stressed" and was directly involved with reprimanding relator Fowler for discharging patients.  *Id.* at 20, ¶¶ 88, 92.  Relators also allege that two other employees of Ovations/Optum, Patricia Ford and Rick McNatt, were part of a four-person senior management team that perpetuated the alleged fraudulent scheme.  *See id.* at 21, ¶¶ 94-5.  The SAC alleged that this senior management team handed census goals to executive directors, discouraged discharge of eligible patients, and developed a discharge review policy that erected hurdles to discharging ineligible patients.  *See id.* ¶¶ 96-98.  Ms. Ford and Mr. McNatt reported directly to Mr. Maloney.  *Id.* ¶ 99.  In sum, the Court finds that relators have sufficiently alleged participation of Ovations and Optum in the scheme to collect payments for ineligible patients.

Defendants challenge relators' allegation that Ovations and Optum are vicariously liable for Evercare's actions on the grounds that Evercare was the alter ego of its parent corporations.  *See* Docket No. 101 at 14.  A request to pierce the corporate veil is governed by the law of the defendant company's state of incorporation. Restatement (Second) of Conflicts § 307 (1971); *see also* Charles Alan Wright et al., 7 Fed. Prac. & Proc. Civ. § 1826 (3d ed.) ("Under prevailing conflicts principles, state law typically will direct that a plaintiff's status be tested by the law of the corporation's state

of incorporation."). Evercare, Ovations, and Optum are (or were) all Delaware corporations. Docket No. 86 at 3, ¶ 9, 5, ¶ 22, 6, ¶ 23. "Delaware law permits a court to pierce the corporate veil of a company where there is fraud or where it is in fact a mere instrumentality or alter ego of its owner." *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1457 (2d Cir. 1995) (internal citation and alterations omitted). To prevail on an alter ego claim, "a plaintiff must show (1) that the parent and the subsidiary operated as a single economic entity and (2) that an overall element of injustice or unfairness is present." *Id.* (internal citations and alterations omitted).

The first prong of the alter ego test requires showing "exclusive domination and control . . . to the point that [the child company] no longer has legal or independent significance of its own." *Wallace ex rel. Cencom Cable Income Partners II, L.P. v. Wood*, 752 A.2d 1175, 1183-84 (Del. Ch. 1999) (internal citation and alterations omitted). The second prong requires a showing of fraud or injustice inherent "in the defendants' use of the corporate form." *In re Foxmeyer Corp.*, 290 B.R. 229, 236 (Bankr. D. Del. 2003). "The underlying cause of action, at least by itself, does not supply the necessary fraud or injustice." *Id.* Any tort, statutory violation, or breach of contract is "in some sense, an injustice. Obviously this type of 'injustice' is not what is contemplated by the common law rule that piercing the corporate veil is appropriate only upon a showing of fraud or something like fraud." *Mobil Oil Corp. v. Linear Films, Inc.*, 718 F. Supp. 260, 268 (D. Del. 1989).

The Court assumes, but does not decide, that relators satisfy the first prong of Delaware's alter ego test. The Court finds, however, that relators have not alleged facts

sufficient to satisfy the second prong.  Relators argue that the SAC satisfies the second

prong because "Ovation and Optum used Evercare to perpetrate the fraudulent

scheme."  Docket No. 105 at 23.  This is insufficient, as relators' argument is

inseparable from its underlying claim.  *Mobil Oil*, 718 F. Supp. at 268.  Because relators

have not pled facts that support a finding that respecting Evercare's corporate form will

result in an injustice, the Court finds that relators have failed to state an alter ego claim

against Optum and Ovations.

## IV.  CONCLUSION

For the foregoing reasons, it is

**ORDERED** that the Motion to Dismiss the Government's Complaint in

Intervention filed by defendant Evercare Hospice, Inc. [Docket No. 67] is **DENIED**.  It is

further

**ORDERED** that the Motion to Dismiss Relators' Second Amended *Qui Tam*

Complaint filed by defendants Evercare Hospice, Inc., Ovations, Inc., and OptumHealth

Holdings, LLC [Docket No. 101] is **GRANTED** in part and **DENIED** in part.  It is granted

with respect to relators' alter ego theory of liability against defendants Ovations, Inc.

and OptumHealth Holdings, LLC.  It is denied in all other respects.


DATED September 21, 2015.

BY THE COURT:


 s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge