**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 11-cv-00642-PAB-NYW

UNITED STATES OF AMERICA, *ex rel.* TERRY LEE FOWLER, and LYSSA TOWL,

Plaintiff,

v.

EVERCARE HOSPICE, INC., n/k/a Optum Palliative and Hospice Care, a Delaware corporation,
OVATIONS, INC., a Delaware corporation,
OPTUMHEALTH HOLDINGS, LLC, a Delaware limited liability corporation, and
UNITED HEALTHCARE SERVICES, INC., a Minnesota corporation,

Defendants.

---

**THE UNITED STATES' OPPOSITION TO RELATORS' MOTION TO DETERMINE RELATORS' SHARE OF SETTLEMENT PROCEEDS**

---

Plaintiff the United States of America, through undersigned counsel, opposes relators' request for $4,140,000, or 23 percent, of the $18 million settlement and requests the Court award relators $3,240,000, or 18 percent, of the settlement amount. A relators' share of 18 percent should be awarded because it is proportional to the relators' contribution to the prosecution of the case. Relators' request for 23 percent should be denied as unjustified because their contribution was not exceptional, their assistance was not unique, and their sacrifice was not uncommon.

## BACKGROUND

This case arises under the False Claims Act, 31 U.S.C. §§ 3729-3733. Relators Terry Fowler and Lyssa Towl filed a *qui tam* action in this district on March

15, 2011, alleging that Evercare knowingly submitted, or caused to be submitted, claims for Medicare hospice benefits for patients who were ineligible for such benefits. Docket No. 1. They filed their complaint about one month before Mr. Fowler resigned and two months after Ms. Towl was terminated from Evercare. Docket No. 176 at para. 23; Docket No. 176-4 at para. 31. Neither sought relief under the False Claims Act for retaliatory action by Evercare, *see* 31 U.S.C. § 3730(h), but Ms. Towl pursued a separate employment action involving her termination, *see* Docket No. 175 at 10; Docket No. 175-3 at para. 6.

On June 5, 2013, over two years after Mr. Fowler and Ms. Towl filed their *qui tam* action, Sharlene Rice, another former employee of Evercare, filed a *qui tam* action with overlapping allegations in the United States District Court for the Northern District of Illinois. *See* Docket No. 154-2. Ms. Rice's case was transferred to this district on June 5, 2014, and the cases were consolidated on June 24, 2014. The United States partially intervened in the consolidated action on August 25, 2014, and filed the United States' Consolidated Complaint in Intervention on November 10, 2014. Docket No. 46. Discovery proceeded in the consolidated action, and on September 21, 2015, the Court denied Evercare's motions to dismiss the complaints of the United States and relators Fowler and Towl. Docket No. 120.

On April 6, 2016, shortly before the deadline to disclose expert reports, the Court granted a joint request by the United States and Evercare to extend the discovery deadlines to facilitate settlement. Docket No. 153. On July 13, 2016, Evercare agreed to pay $18 million to resolve the claims in the consolidated action, which has since been dismissed, except for the relators' claims to a share of the

settlement proceeds. *See* Docket No. 183. As part of the settlement, Evercare also agreed to pay attorney's fees to Mr. Fowler and Ms. Towl as well as Ms. Rice.

Before the settlement was finalized, relators Fowler and Towl filed motions to dismiss Ms. Rice's complaint as second-in-time or disqualify her from receiving a relator's share. *See* Docket Nos. 154 and 166. Before the Court ruled on the issue of whether Ms. Rice's complaint was barred under the first-to-file bar, on September 12, 2016, Mr. Fowler and Ms. Towl filed another motion demanding the Court order the United States to pay them $4,140,000, or 23 percent, of the $18 million settlement. *See* Docket No. 175.

On September 15, 2016, the Court granted Mr. Fowler and Ms. Towl's motion to dismiss Ms. Rice's complaint, establishing that relators Fowler and Towl are the only relators entitled to a share of the settlement proceeds. *See* Docket No. 178. Undersigned counsel then obtained authority from Department of Justice officials to pay relators a share that is fair and reasonable in this case—$3,240,000, or 18 percent of the $18 million settlement.

## **LEGAL STANDARDS**

The False Claims Act is the government's primary tool for recovering money lost from the United States Treasury due to fraud. *See* 132 Cong. Rec. H9382-03 (Oct. 7, 1986) (Statement of Rep. Glickman); S. Rep. No. 99-345, at 1 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 5266. The Act allows a private citizen, known as a relator, to file a lawsuit, known as a *qui tam* action, on behalf of the United States to recover the government's damages. 31 U.S.C. § 3730. In order to be a relator, at a minimum, a person must (1) file a complaint under seal setting forth his or her

allegations; and (2) provide the government with a written disclosure of "substantially all material evidence and information the person possesses" related to those allegations. *Id.* at 3730(b)(2); *see also United States ex rel. Stone v. Rockwell Int'l Corp*., 282 F.3d 787, 794 (10th Cir. 2002).

After investigating the relator's allegations, the government may elect to intervene in and proceed with the action, in which case, the "action shall be conducted by the [g]overnment." 31 U.S.C. § 3730(b)(4). When the government intervenes and settles a *qui tam* case, as the United States did here, a relator is entitled to a share of between 15 and 25 percent of the settlement proceeds. *Id.* at § 3730(d)(1). The Act states that the amount awarded to the relator—which is taken out of the recovery that is returned to the government—is based on the "extent to which the person substantially contributed to the prosecution of the action." *Id.* at § 3730(d)(1).

The legislative history further clarifies that Congress intended greater assistance to result in greater reward, thereby incentivizing relators to not only disclose fraud but also play an active and constructive role in bringing the case to a successful conclusion. The legislative history describes the minimum award, 15 percent, as a "finder's fee," and explains that awards substantially above 15 percent are justified in cases where the relator "carefully develops all the facts and supporting documentation necessary to make the case and presents it in a thorough and detailed fashion to the Justice Department as required by law, and where that person continues to play an active and constructive role in the litigation that leads ultimately to a successful recovery to the United States Treasury." *See* 132 Cong. Rec. H9382-03 (Oct. 7, 1986) (Statement of Rep. Berman). Three factors relevant to valuing the

relator's role also are identified in the legislative history: (1) the "significance of the information" provided by the relator; (2) the "contribution of the [relator] to the result obtained"; and (3) "whether the information which formed the basis of the suit was known to the [g]overnment." S. Rep. No. 99-345, at 28 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 5266, 5293.

In addition, the Department of Justice has developed guidelines that it uses to assist in calculating a relator's share that is proportional to the relator's contribution and consistent with the position the Department has taken in other cases. Under the DOJ guidelines, the minimum, 15 percent, share is viewed as the starting point of the analysis from which various factors bearing on the helpfulness of the relator's conduct, as well as the impact of whistleblowing on the relator's personal and professional life, may warrant an increase or decrease in the percentage. The factors to consider for a possible increase in the percentage are: (1) the relator reported the fraud promptly; (2) when he learned of the fraud, the relator tried to stop the fraud or reported it to a supervisor or the government; (3) the *qui tam* filing, or the ensuing investigation, caused the offender to halt the fraudulent practices; (4) the complaint warned the government of a significant safety issue; (5) the complaint exposed a nationwide practice; (6) the relator provided extensive, first-hand details of the fraud to the government; (7) the government had no knowledge of the fraud; (8) the relator provided substantial assistance during the investigation and/or pre-trial phases of the case; (9) at his deposition and/or trial, the relator was an excellent, credible witness; (10) the relator's counsel provided substantial assistance to the government; (11) the relator and his counsel supported and cooperated with the government during the

entire proceeding; (12) the case went to trial; (13) the recovery was relatively small; and (14) the filing of the complaint had a substantial adverse impact on the relator.

Under the DOJ guidelines, the following factors are to be considered for a possible decrease in the percentage: (1) the relator participated in the fraud; (2) the relator substantially delayed in reporting the fraud or filing the complaint; (3) the relator, or relator's counsel, violated FCA procedures; (4) the relator had little knowledge of the fraud or only suspicions; (5) the relator's knowledge was based primarily on public information; (6) the relator learned of the fraud in the course of his government employment; (7) the government already knew of the fraud; (8) the relator, or relator's counsel, did not provide any help after filing the complaint, hampered the government's efforts in developing the case, or unreasonably opposed the government's position in litigation; (9) the case required a substantial effort by the government to develop the facts to win the lawsuit; (10) the case settled shortly after the complaint was filed or with little need for discovery; and (11) the recovery was relatively large. [1]

"The relators bear the burden of proving that their contribution to the case warrants more than a fifteen percent share of the recovery." *United States ex rel. Johnson v. Universal Health Servs., Inc.*, 889 F. Supp. 2d 791, 794 (W.D. Va. 2012).

---

[1] From January 2009 to the end of fiscal year 2015, the government recovered $19.4 billion in settlements and judgments related to *qui tam* suits and paid relator's share awards totaling $3 billion, approximately 15.5 percent, during the same period. *See* Press Release, U.S. Department of Justice, Justice Department Recovers Over $3.5 Billion From False Claims Act Cases in Fiscal Year 2015 (Dec. 3, 2015), available at https://www.justice.gov/opa/pr/justice-department-recovers-over-35-billion-false-claims-act-cases-fiscal-year-2015

Considering congressional intent and the factors specified in the legislative history and DOJ guidelines, courts have found the most generous awards are reserved for exceptional cases where the relator's "conduct in disclosing the fraud is virtually flawless," *United States v. General Electric*, 808 F. Supp. 580, 584 (S.D. Ohio 1992), the "relator actively and uniquely aids the government in the prosecution of the case," *United States ex rel. Burr v. Blue Cross and Blue Shield of Florida, Inc*., 882 F. Supp. 166, 168 (M.D. Fla. 1995), or the relator's contribution can fairly described as "uncommon, unusual, and exemplary," *United States ex rel. Alderson v. Quorum Health Grp., Inc*., 171 F. Supp. 2d 1323, 1338 (M.D. Fla. 2001).

## ARGUMENT

The Court should deny Mr. Fowler and Ms. Towl's request for 23 percent, nearly the maximum possible recovery, and award them 18 percent, three percent and $540,000 more than the minimum reward, because they met, but did not exceed, the expectations of all relators to promptly disclose reliable, credible information, respond to requests for assistance in the government's investigation, and cooperate with the government in its litigation and resolution of the case.

The United States acknowledges that Mr. Fowler and Ms. Towl initiated their *qui tam* action reasonably soon after Evercare disciplined or terminated them following their involvement in the discharge of patients who they believed were ineligible for hospice care. *See* Docket No. 176 at paras. 21-23; Docket No. 176-4 at paras. 27-28. They complied with their statutory obligations to file their complaint under seal, and disclose to the government substantially all material evidence and information they possessed about Evercare's alleged fraud, providing details from their personal

experiences at the company, notifying the United States of a nationwide scheme. *See* Docket No. 1. They responded to the government's requests for assistance and did not interfere with the government's pursuit of the case, which may deter future misuse of the Medicare hospice benefit, which relators correctly characterize as a significant issue impacting the health and well-being of a particularly vulnerable patient population. Their conduct therefore warrants, and undersigned counsel have obtained authority for and offered, an additional $540,000 above the minimum reward.

Relators' contributions and personal sacrifices do not, however, justify the nearly $1 million they seek on top of the amount the United States has agreed to pay them. They did not develop all the facts and supporting documentation necessary to make the case. Extensive fact-gathering by the government alone was required to support intervening, filing suit, and settling the case, before depositions were taken, but not before "the government engaged in substantial written discovery to obtain key documents, including representative patient charts, and employed an expert witness to review these patient charts," without involvement by relators, as they acknowledge in their motion. *See* Docket No. 175 at 11. Relators do not claim to, and did not, play an active role in the resolution of the case. While relators were fired or forced out of Evercare after resisting the status quo, both found other employment, and neither claim to have suffered personal hardship that rises to a level supporting the "handsome reward" they seek. *See* Docket No. 175 at 18-19. In short, relators' demand for 23 percent is based on an overstatement of the quality of their information, the value of their assistance and cooperation, and the impact of their whistleblowing on their personal and professional lives, as explained further below.

**A. Quality of Relators' Information**

Relators vastly overstate the quality of the information they provided by contending that it enabled the settlement of the case "without the government taking one deposition post-intervention." Docket No. 175 at 11. In fact, extensive pre-litigation factual development by the government alone helped position the United States to resolve the case at a relatively early stage of discovery. The depth and scope of this additional fact-gathering is plain from a simple comparison of the falsity and scienter allegations in the complaints filed by the relators and the United States.

First, with respect to falsity, the critical difference in the United States' complaint is its specific identification of clinical information in patients' medical records that shows the claims Evercare submitted for those patients were false because the records did not support that the patients had a prognosis of six months or less. *See, e.g.*, Docket No. 46 at para. 176 ("On August 17, 2009, Evercare's nurse recorded that LH 'uses a walker for stability' and can 'do [her] own cares with occasional assist'"); para. 186 ("on February 4, 2010, Evercare's nurse recorded that RS 'is on a regular diet eating 100% of meals at this time,' and 'up walking around in facility common area'"); para. 237 ("In a physician visit prior to her discharge in August 2010, the physician recorded that ZF was able to 'ambulate on her own,' that her 'weight has remained stable,' that she was a FAST 7A, with 'no significant infections or fever,' and that she had 'no [symptoms] that are difficult to manage.'"). During the time periods in which the medical records did not support a terminal prognosis, the United States' complaint identifies—by claim numbers, dates, and amounts paid—the specific false claims that Evercare submitted. Docket No. 46 at paras. 178, 194, 205, 214, 227,

239. The specificity of the United States' allegations of false claims reflects the intensive medical record review of a statistically valid random sample that it performed, without involvement by relators, before it elected to pursue the case.

Indeed, in denying Evercare's motion to dismiss, the Court found the United States' complaint contained "detailed information about each patient's condition and the clinical findings in their records that tend to show their terminal prognosis was not supported." Docket No. 120 at 25-26. In contrast, the relators' complaint does not reference specific clinical information or other documentation in the patients' medical records bearing on the patients' prognoses. *See* Docket No. 1 at paras. 132-152. As a result, the Court concluded that relators' allegations were insufficient with respect to certain patients for whom relators alleged no other facts supporting their ineligibility. Docket No. 120 at 29-30 (holding that relators satisfied Rule 9(b) only with respect to patients for whom a claim had been denied by Medicare and not appealed by Evercare).

The government's additional, extensive fact-gathering is further evident in the breath and specificity of its pleading of scienter. The United States' complaint contains, for example, detailed allegations, quoting from company documents and referencing experiences of former employees nationwide, concerning Evercare's pressure on staff to admit and keep patients and failure to ensure staff communicated to physicians accurate and complete information about the patients' conditions. *See, e.g.*, Docket No. 46 at para. 87 ("Ms. Imlay explained in a July 2009 email, Evercare hospice should be a 'funnel': 'easy to access end-of-life care (wide at the top) and hard to get out of (narrow end of funnel at the bottom)'."); para. 126 ("a nurse who

worked for Evercare in Phoenix from 2008 to 2010 stated that due to pressure to meet admissions or census goals, nurses learned how to show hospice eligibility by documenting *only* what a patient was not able to do, not what a patient was able to do."). Based on these details, among others, the Court concluded that "the government's complaint contains extensive allegations that suggest that the information on which the physicians relied (which consisted of oral reports from nurses who evaluated the patients) was not reliable and therefore precluded those physicians' legitimate exercise of clinical judgment." Docket No. 120 at 20.

The relators' complaint simply does not contain comparable allegations rebutting Evercare's principal defense that it could not have knowingly submitted false claims because it reasonably relied on the clinical judgment of certifying physicians. Although alleging that Evercare failed to adequately train its staff and pressured them to meet aggressive patient census targets, relators' complaint does not contend, for example, that pressure caused staff to censor their reports about patients' conditions. In general, far fewer references to supporting documents and knowledgeable witnesses appear on the face of the relators' complaint compared to the United States' complaint. The numerous additional details in the United States' complaint, gathered from its own investigation, were necessary to support its pursuit of the case. *See* Docket No. 46 at paras. 95, 100-101, 106, 117, 119-121, 126-132, 136, 138, 142-43, 145-148, 150-154.

Moreover, after intervening, the government conducted the action, engaging in "substantial written discovery" and a comprehensive expert medical review of a statistically valid random sample of Evercare patients, which review was essential to

evaluating the extent to which Evercare violated the False Claims Act as alleged in the United States' complaint. *See* Docket No. 175 at 11; *see also* Docket No. 134 at 3. Relators are thus wrong to take credit for settlement of the case "without the government taking one deposition post-intervention." Docket No. 175 at 11. The quality of the relators' information—which pales in comparison to the information provided in the cases cited by relators—does not earn them a share above 18 percent.

For example, in *United States ex rel. Johnson-Pochardt v. Rapid City Reg'l Hosp.*, cited by relators at pages 10-11 of their motion, the court awarded 24 percent based, in part, on facts that the relator in that case, an administrator of the defendant-hospital, maintained her position at the hospital "throughout the action," spending "hours reading and copying documents after working a full day at the hospital," disclosing to the government a "steady flow of information," which the court described as a "mass production of documents and other information akin to discovery" that "essentially established the claims brought against the defendants." 252 F. Supp. 2d 892, 897-98, 904 (D.S.D. 2003).

Similarly, in *United States v. General Electric,* the relator, an employee of General Electric, working in Israel, began accumulating documents indicating the company's misuse of government funds, "which he ultimately 'smuggled' out of Israel to Switzerland." 808 F. Supp. 580, 582 (S.D. Ohio 1992). The court there awarded the relator 22.5 percent, finding "no dispute" that it "would have been difficult, if not impossible, to sustain a case against General Electric" without the documents that the relator smuggled from Israel. *Id.* at 583; *see also United States ex rel. Rille v. Hewlett-*

*Packard Co*., 784 F. Supp. 2d 1097, 1101 (E.D. Ark. 2011) (awarding 21 percent based, in part, on relators' disclosure of "700,000 pages of incriminating documents"). In contrast, the information the relators provided in this case fell short of establishing the claims the United States brought against Evercare, and the relators here do not assert that procurement of that information required heroic efforts like those of the relators in the cases they cite.

**B. Value of Relators' Assistance and Cooperation**

In support of their request for 23 percent, relators again overstate the value of their assistance and cooperation, which was not unique and does not justify a share above 18 percent. Relators argue that their assistance—by meeting with the government on a few occasions, producing lists of potential witnesses and document search terms and "outlines of potential deposition testimony," and reviewing "patient audit files"—and their cooperation were so valuable they "bear directly on the successful outcome of the case." Docket No. 175 at 12-14. In fact, their lists of potential witnesses and search terms, while helpful, are the type of assistance commonly provided by relators. *See* Donald H. Caldwell, Jr., *Qui Tam Actions: Best Practices for Relator's Counsel*, 38 J. Health L. 367, 377-78 (2005). The "outlines of potential deposition testimony" that relators tout were no more than a three-page collection of "observations" about individuals whom the government was preparing to depose pursuant to civil investigative demands. *See* Docket No. 176-9 at 80-83 (describing, for example, one deponent as "a reincarnated 'hippie chic'" and acknowledging an inability to provide much information about another "except second hand"). The "patient audit files" that relators reviewed were internal audit documents,

not patient medical files, and the product of their review was merely another three-page collection of observations with little substance. *See* Docket No. 176-9 at 85-87 (acknowledging lack of familiarity with many of the documents).

Relators' assistance and cooperation are therefore readily distinguishable from the unique contributions by relators and their counsel that courts have found justify a share substantially above the minimum. In *United States ex rel. Shea v. Verizon Commc'ns, Inc*., for example, the court awarded 20 percent based, in part, on facts that the relator and his counsel "worked very closely" with the government "throughout its investigation," drafting legal memoranda and proposed subpoena requests, and the relator himself "spent hundreds of hours on the case, both pre-filing and post-filing," meeting with government counsel, investigators, and auditors "more than 10 times." 844 F. Supp. 2d 78, 86 (D.D.C. 2012).

Similarly, in *United States ex rel. Alderson v. Quorum Health Grp., Inc*., the court awarded 24 percent based, in part, on facts that the relator's counsel retained an auditor, who prepared a report that became an exhibit to the United States' complaint; during the litigation, relator's counsel took the lead in serving subpoenas on over 200 hospitals throughout the country and opposing defense motions to limit discovery; and during mediation, relator and his team of attorneys and accountants developed a financial analysis and other evidence offered to advance the resolution of the case. 171 F. Supp. 2d 1323, 1329-30 (M.D. Fla. 2001). The relator, the court concluded, "participated fully in virtually every aspect of the case from beginning to conclusion" with his counsel assuming "a responsibility essentially equivalent to DOJ attorneys." *Id.* at 1331-36; *see also Johnson-Pochardt*, 252 F. Supp. 2d at 905 (relator's

"attorneys were nearly as prominent as the government's throughout the action," playing an "instrumental role in settling the case"). Relators here do not claim to, and in fact did not, provide the type of extraordinary assistance that relators have provided in other cases where a substantial share was warranted.

C. **Impact of Relators' Whistleblowing**

Finally, the impact of relators' whistleblowing on their personal and professional lives, while not insignificant, was not substantial enough to support a share above 18 percent. As noted, both Mr. Fowler and Ms. Towl found other employment after Evercare fired or forced them out. Docket No. 176 at para. 25; Docket Not. 176-4 at para. 32. Although the salary of Mr. Fowler's new job was not equal to his salary at Evercare, and Ms. Towl became self-employed, building a consulting business that took two years to become a success, such personal sacrifices are not uncommon for relators. The hardships they suffered simply do not rise to the level that supports a substantial award. *Cf. Johnson-Pochardt*, 252 F. Supp. 2d at 902-03 (awarding relator 24 percent based, in part, on facts that the *qui tam* action "wreaked havoc" on relator's life by contributing to physical ailments, marital difficulties, and financial instability); *Alderson*, 171 F. Supp. 2d at 1338 (awarding relator 24 percent based, in part, on the "disruptive and divisive effect of the litigation on [relator] and his family").

**CONCLUSION**

For the reasons stated, the United States respectfully requests that the Court deny relators' motion for $4,140,000, or 23 percent, of the $18 million settlement and award relators $3,240,000, or 18 percent, of the settlement amount.

Dated: October 17, 2016

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General

ROBERT C. TROYER
Acting United States Attorney

s/ Holly H. Snow
Michael D. Granston
Renée Brooker
Holly H. Snow
Olga Yevtukhova
Kelly E. Phipps
Attorneys, Civil Division
United States Department of Justice
601 D Street, NW
Washington, DC 20004
Telephone: (202) 616-2879
E-mail: holly.h.snow@usdoj.gov

Shana T. Mintz
Attorney, Civil Division
United States Department of Justice
700 Stewart Street, Suite 5220
Seattle, WA 98101
Telephone: (206) 553-2264
E-mail: shana.t.mintz@usdoj.gov

Marcy E. Cook
Edwin G. Winstead
Assistant United States Attorneys
1225 Seventeenth Street, Suite 700
Denver, Colorado 80202
Telephone: (303) 454-0171/0102
Fax: (303) 454-0404
E-mail: marcy.cook@usdoj.gov
edwin.winstead@usdoj.gov

ATTORNEYS FOR THE UNITED STATES

**CERTIFICATE OF SERVICE**

I hereby certify that on October 17, 2016, I electronically filed the foregoing using the CM/ECF system, which will cause a copy of the foregoing to be e-mailed to the following:

Michael S. Porter
porterlaw@comcast.net

Richard C. LaFond
richardlafondpc@gmail.com

Paul Stephen Enockson
paul@enocksonlaw.com

Counsel for Relators

Michael C. Theis
michael.theis@hoganlovells.com

Emily Mary Lyons
emily.lyons@hoganlovells.com

Lacy Gallier Brown
lacy.brown@hoganlovells.com

Counsel for Defendants

s/ Holly H. Snow
Holly H. Snow